## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| FOGGY BOTTOM ASSOCIATION,<br>2560 Virginia Avenue, NW, Suite 195<br>Washington, DC 20037 | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| vs. | )<br>) |
| DISTRICT OF COLUMBIA OFFICE OF<br>PLANNING,<br>801 North Capitol Street, NE, Suite 4000<br>Washington, DC 20002; | )<br>)<br>)<br>)<br>) |
| and, | )<br>) |
| DISTRICT OF COLUMBIA ZONING<br>COMMISSION,<br>441 4th Street, NW, Suite 210 South<br>Washington, DC 20001; | )<br>)<br>)<br>)<br>) |
| and, | )   Court No. 06 Civ. _____ (  )<br>) |
| DISTRICT OF COLUMBIA DEPARTMENT<br>OF HEALTH,<br>825 North Capitol Street, NE<br>Washington, DC 20002; | )<br>)<br>)<br>)<br>) |
| and, | )<br>) |
| DISTRICT OF COLUMBIA DEPARTMENT OF<br>CONSUMER AND REGULATORY AFFAIRS,<br>949 North Capitol Street, NE<br>Washington, DC 20002; | )<br>)<br>)<br>)<br>) |
| and, | )<br>) |
| DISTRICT OF COLUMBIA HISTORIC<br>PRESERVATION REVIEW BOARD,<br>801 North Capitol Street, NE, Suite 3000<br>Washington, DC 20002; | )<br>)<br>)<br>)<br>) |
| and, | )<br>) |

DISTRICT OF COLUMBIA PUBLIC SCHOOLS,  )
825 North Capitol Street, N.E., Suite 9076        )
Washington, DC, 20002,                                  )
                                                                    )
         Defendants.                                          )
_____)

## COMPLAINT

Plaintiff, Foggy Bottom Association ("FBA"), for its complaint, alleges as follows:

## NATURE OF THE ACTION

1.        This is an action for injunctive and declaratory relief against the District of Columbia Office of Planning ("Office of Planning"), the Zoning Commission for the District of Columbia ("Zoning Commission"), the District of Columbia Department of Health ("Department of Health"), the District of Columbia Department of Consumer and Regulatory Affairs ("Department of Regulatory Affairs"), the District of Columbia Historic Preservation Review Board ("Historic Preservation Board"), and the District of Columbia Public Schools ("Public Schools"), arising from the George Washington University's ("GW") violations of the Corrected Final Order on Remand dated January 23, 2002 ("Final Order") of the District of Columbia Board of Zoning Adjustment ("BZA") and GW's February 16, 2006 submission of "an application to the District of Columbia Zoning Commission for first stage review and approval of a planned unit development and zoning map amendment for the Foggy Bottom Campus" ("application") and "the Foggy Bottom Campus Plan:  2006-2025."  ("new campus plan").

2.        Plaintiff seeks a permanent injunction (1) prohibiting the Office of Planning from supporting and the Zoning Commission from approving GW's application and new campus plan, (2) directing the Historic Preservation Review Board to designate the

School Without Walls (the Ulysses S. Grant School established in 1897) a national historic site, and (3) prohibiting the Public Schools from transferring to GW any parcels or development rights on the School Without Walls.

3.    Plaintiff further seeks a declaratory judgment that (1) GW's application and new campus plan constitute "major actions" likely to have substantial negative impact on the environment, which require the issuance of an environmental impact statement ("EIS") prior to their consideration by the Office of Planning and the Zoning Commission, and (2) approval of GW's application and new campus plan without the issuance of an EIS and consideration of comments from affected residents would violate the District of Columbia Environmental Policy Act, D.C. ST. § 8-109.03.

4.    Plaintiff's request for a permanent injunction and declaratory relief is based upon the following: (1) the Office of Planning's action and the Zoning Commission's approval of GW's application and new campus plan would result in diminution of value of the residential property owned by plaintiff's members in Foggy Bottom, amounting to an unlawful taking of property without just compensation in violation of the Fifth Amendment; (2) GW's application and new campus plan violate the National Historic Preservation Act in that they seek to substantially alter the historic character of Foggy Bottom, including the Foggy Bottom Historic District, a section of the neighborhood listed in the National Registry of Historic Places since 1987, (3) GW's application and new campus plan violate DC ST. § 6-641.09 because they seek a special exception and zoning amendment while GW is currently in violation of Conditions 8 and 9(a)-(b) of the BZA's Final Order pertaining to the existing campus plan, (4) GW's application and new campus plan violate Title 11, § 210.2 of the District of Columbia Municipal Regulations

("DCMR") because they seek university use "objectionable to neighboring property because of noise, traffic, number of students, or other objectionable conditions," and (5) GW's application and new campus plan fail to present "a plan for developing the campus as a whole" in contravention of 11 DCMR §§ 210.4 & 507.3 and thus cannot be recommended by the Office of Planning or approved by the Zoning Commission. Further, GW's existing campus plan has nearly four years to run and should not be superseded by a new campus plan.

## JURISDICTION AND VENUE

5.      This action arises under the Takings Clause of the Fifth Amendment, U.S. Const. Amend. 5, the National Historic Preservation Act, 16 U.S.C. § 470, the District of Columbia Environmental Policy Act of 1989, D.C. Code § 8-109 *et seq.* ("DCEPA"), the District of Columbia Zoning Regulations, DC ST. § 6-641.09, and Title 11, §§ 210.2, 210.4, and 507.3 of the District of Columbia Municipal Regulations.

6.      The Court possesses jurisdiction to entertain plaintiff's claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction, as the pendent claims are so related to the federal claims that they form part of the same case or controversy).

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because all defendants reside in the District of Columbia and all of the events and omissions giving rise to plaintiff's claims occurred in the District of Columbia.

8.      The Foggy Bottom Association possesses organizational standing to maintain this action on behalf of its members because they have suffered concrete injury within the zone of interests protected by plaintiff's claims.  The Foggy Bottom Association further

4

possesses standing because its members would otherwise have standing to maintain this action on their own, the interests it seeks to protect are germane to the organization's purpose, and neither the claims asserted nor the relief requested requires participation of individual members in the lawsuit.

## THE PARTIES

9.      The Foggy Bottom Association is a homeowner's and tenant's association comprised of owners and renters of residential property in the Washington, D.C. neighborhoods known as "Foggy Bottom" and "The West End."

10.      The District of Columbia Office of Planning is an agency of the District of Columbia, deriving its authority from Title 10, § 2305 of the DCMR.

11.      The District of Columbia Zoning Commission is an independent agency of the District of Columbia, deriving its authority from DC ST. § 6-641.01.

12.      The District of Columbia Department of Health is an independent agency of the District of Columbia, deriving its authority to review the environmental impact of major actions pursuant to Mayor's Order 98-86 and 20 DCMR § 7205.

13.      The District of Columbia Department of Consumer and Regulatory Affairs is an independent agency of the District of Columbia, deriving its authority to review the environmental impact of major actions pursuant to DCMR § 7203.2.

14.      The District of Columbia Historic Preservation Review Board is composed of members appointed by the Mayor operating within the District of Columbia Historic Preservation Office.  It is an independent Board established to carry out historic preservation guidelines and is assisted by the staff of the District of Columbia Office of Planning's Historic Preservation Office.

15.    The District of Columbia Public Schools is an independent agency of the District
of Columbia.

## FACTUAL ALLEGATIONS

### A.    GW's Aggressive Expansion In Foggy Bottom

16.    The George Washington University is an institution of higher education
established pursuant to a federal charter.

17.    According to GW's Office of Institutional Research, the GW office responsible
for compiling statistics, GW's "unduplicated enrollment" in all campuses in Fall 2005
was 24,099, of whom 9,660 were full-time undergraduate students.  According to the
same office, GW's "on-campus enrollment" in Fall 2005 was 20,318, of which 9,590
were full-time undergraduate students.  In Fall 2005, GW employed 1,549 full-time
faculty, 2,929 part-time faculty, and 5,792 staff.

18.    Foggy Bottom is south of the District's Washington Circle, bounded by 19th
Street, E Street, Rock Creek Park, and Pennsylvania Avenue, N.W.  Foggy Bottom is
largely subject to R-3, R-5-D, and R-5-E zoning applicable to low/medium density
residential areas.

19.    GW does not have a discreet campus area in Foggy Bottom.  Its campus area is
conjoined with the Foggy Bottom neighborhood and is defined by an imaginary boundary
that also includes non-GW property.  It is adjoined on the north by the West End
neighborhood, on the east by the Central Employment Area, on the south by additional
residential areas and the Federal enclave, and on the west by the Foggy Bottom Historic
District.

20.    Over the past two decades, GW has expanded its presence in Foggy Bottom in an unprecedented scale.  GW's aggressive expansion in Foggy Bottom threatens to transform this neighborhood from a predominantly residential area to an extensively commercially zoned university campus.

21.    In a report dated April 21, 2000, the Office of Planning found that "if the University continues to purchase land outside the campus plan boundaries and the number of students living in the small, constrained Foggy Bottom community continues to increase, the residential community will reach a 'tipping point' where the Foggy Bottom community simply transforms into a 'University area.' "  The Office of Planning thus concluded that decisive action was required to stem the tide of excessive GW expansion.

22.    Similarly, in its Final Order dated January 23, 2002, the BZA found that "the University's aggressive expansion into Foggy Bottom and the West End area has brought those neighborhoods to the 'tipping point,' if not beyond.  Large swathes of Foggy Bottom / West End have effectively been transformed into an expanded campus at the expense of the prior variety of uses."  The BZA further found that "the University's use of its residentially-zoned property within the campus boundaries for non-residential uses has become objectionable to the surrounding neighborhoods."

23.    At the time the BZA issued its order (Fall 2001), GW had 8,044 full-time undergraduate students and 7,000 graduate students enrolled for the 2000-2001 academic year.  Final Order, ¶ 3.  However, GW had only 4,108 beds on campus for its undergraduate students at that time.  *Id.* ¶ 8.

24.    The BZA credited the testimony of Foggy Bottom residents that undergraduate students residing in Foggy Bottom conducted themselves in a boisterous manner and disturbed the residential character of the neighborhood.

25.    Specifically, the BZA found that the influx of GW students to certain Foggy Bottom residential buildings had made them "much noisier, seriously disturbing long-term residents, many of whom are elderly," and that "the quality of life in [these buildings] has diminished as the student population has grown."  Final Order, ¶¶ 14, 16.

26.    The BZA further found that the presence of a large number of undergraduate students in off-campus dormitories in Foggy Bottom and excessive university expansion had subjected Foggy Bottom to population pressure, student malfeasance, and resident displacement, which collectively had a deleterious impact on this neighborhood.

27.    In fact, in hearings pertaining to GW's 2000-2010 campus plan, the Office of Planning and the Advisory Neighborhood Council both concluded that, "if the University failed to provide more on-campus housing for its undergraduates, *the [Foggy Bottom-West End] neighborhood would irreparably suffer*."  831 A.2d 933.  (emphasis added).

28.    The Ward 2 section of the Comprehensive Plan, a detailed planning document proposed by the Mayor and enacted by the Council of the District of Columbia, identified Foggy Bottom as an area suffering from diminishing housing stock as a result of the expanded presence of GW and its students in Foggy Bottom.  10 DCMR § 1327.1(b). The Comprehensive Plan noted the "negative effect" of student pressure on Foggy Bottom, associating the deterioration of this neighborhood with acceleration of GW's activities in the area, increased university generated traffic, and the recent influx of students residing in off-campus housing acquired by GW.  10 DCMR § 1358.1.

29.     In *George Washington University v. District of Columbia Board of Zoning Adjustment*, 831 A.2d 921, 933 (2003), the District of Columbia Court of Appeals held that the Office of Planning's and the BZA's findings described in paragraphs 20 to 28 above were supported by substantial evidence.

30.     In *George Washington University v. District of Columbia*, 318 F.3d 203 (D.C. Cir. 2003), the Court of Appeals for the District of Columbia Circuit found "no constitutional infirmities" in the BZA's imposition of limitations on GW's 2000-2010 campus plan as a result of the Office of Planning's and the BZA's findings described in paragraphs 20 to 28 above, stating that a "city might reasonably consider the youngest students to be the ones most likely to disturb residents in the surrounding communities, as well as most likely to need whatever shreds of parietal rules may subsist on campus." *Id.* at 206, 211.

**B.     The District's Zoning Scheme For Universities**

31.     The District's zoning scheme for universities is promulgated by the Zoning Commission pursuant to D.C. ST. § 6-641 and 11 DCMR §§ 210, 302.2 and 507.

32.     Pursuant to the District's zoning scheme, universities may locate in areas zoned for high-density commercial use.  However, for land zoned residential or special purpose, university use requires a special exception.  The application process for this consists of two stages.  In the first stage, the university submits a "campus plan" that describes its intentions for new land use over several years.  Upon approval by the Zoning Commission, the campus plan establishes the limitations within which all future construction must occur.  In the second stage, the Zoning Commission reviews the individual projects that the university proposes to undertake, evaluating them both for

consistency with the campus plan, the zoning regulations, and the Comprehensive plan for the National Capitol.

33.     In evaluating a university's application for a special exception, the Zoning Commission must ensure that the proposed university use is "not likely to become objectionable to neighboring property because of noise, traffic, number of students or other objectionable conditions."  11 DCMR § 210.2.  The Zoning Commission must further ensure that the proposed university use is consistent with the Comprehensive Plan.  10 DCMR § 112.6(b).  The Zoning Commission must guard against "unreasonable campus expansion into improved low-density areas."  11 DCMR § 210.3.

### C.    The Limitations Placed On GW's 2000-2010 Campus Plan

34.     The BZA's January 23, 2002 Final Order placed several limitations on GW's 2000-2010 campus plan designed to curtail GW's encroachment into Foggy Bottom. These limitations were based upon the BZA's findings that GW's acquisition of buildings in Foggy Bottom and their subsequent conversion to student-occupied dormitories, and GW's informal off-campus housing of undergraduate students in Foggy Bottom, threatened the "livability and residential character" of Foggy Bottom.

35.     The BZA further found that increases in undergraduate enrollment at GW were not accompanied by commensurate increases in on-campus housing.  In 2001, all of GW's off-campus dormitories and housing was located in Foggy Bottom/West End. Final Order, ¶ 13.

36.     The BZA thus conditioned its approval of GW's 2000-2010 campus plan upon the "University's promptly tak[ing] decisive steps to provide housing for the bulk of its undergraduate students on campus."  Final Order, at 5.

37.    Noting the "adverse consequences of [GW's] failure to supply sufficient housing for its full-time undergraduate students on campus," the BZA imposed Condition 9 upon GW.  Among the limitations placed on GW's existing campus plan in Condition 9 was the requirement that the university provide housing on-campus or outside of Foggy Bottom for 70% (5,600) of the first 8,000 undergraduate students, plus one on-campus or non-Foggy Bottom bed for every full-time undergraduate student over 8,000.  After August 31, 2006, the 5,600 beds were to be entirely located on campus.  Final Order, Conditions 9(a)-(c).

38.    The Final Order prohibited the issuance of new special exceptions and permits to GW if it were not in compliance with Condition 9.  Specifically, Condition 9(e) provided: "No special exception shall be granted and no permit to construct or occupy buildings for nonresidential use on campus may be issued, and existing special exceptions and permits issued pursuant to the campus plan approved by this Order shall be subject to suspension and revocation, whenever a semiannual report reveals that the University is not in compliance with the provisions of this condition."

39.    GW's constitutional challenge to Condition 9(e) was rejected by the Court of Appeals for the District of Columbia Circuit.  318 F.3d 211.  The District of Columbia Court of Appeals also sustained Condition 9(e), stating that it "clearly serves two functions that advance the District's goals.  First, it strengthens the university's incentive to comply with the housing provisions.  Second, even though the new non-housing construction that Condition 9(e) holds hostage may not relate directly to new housing demands . . . , the condition as a general matter keeps housing and non-housing growth proceeding in parallel."  831 A.2d 935.

40.     The Final Order placed caps on student enrollment and the employment of faculty and staff at GW.  Pursuant to Condition 8, "[s]tudent enrollment (headcount) over the life of the plan shall not exceed 20,000 students and the student full-time equivalent shall not exceed 16,553.  The number of full-time equivalent faculty and staff shall not exceed 1,550 and 9,000 respectively, while the headcounts for faculty and staff shall not exceed 2,236 and 10,293 respectively."  BZA Order dated March 29, 2001, Condition 8.  This condition was sustained by the District of Columbia Court of Appeals.  831 A.2d 938.

41.     The Final Order also directed GW, starting in Fall 2001, to "require all full-time freshmen and sophomore students to reside in University housing located within the campus boundary established by the Board, to the extent that such housing is available."  BZA Order dated March 29, 2001, Condition 10.  This condition was sustained by both the District of Columbia Court of Appeals, 831 A.2d 921, and the Court of Appeals for the District of Columbia Circuit.  318 F.3d 211.

42.     The Final Order further directed GW to "provide at least 2,800 off-street parking spaces within the campus boundary."  BZA Order dated March 29, 2001, Condition 15(b).  Parking spaces obtained by GW outside the campus plan boundary, including those at the Kennedy Center, were not to be counted toward the 2,800 requirement.

43.     The Final Order provided that "University uses and structures . . . [shall] be located to avoid adverse impacts on non-University properties, especially those residential properties on the periphery of the campus."  BZA Order dated March 29, 2001, Condition 5.

44.     The Final Order prohibited the granting of new special exceptions to GW, "unless the University proves that it has consistently remained in substantial compliance" with

the order, and further threatened revocation of existing permits and certificates of

occupancy issued to GW as well as imposition of fines and penalties under the Civil

Enforcement Act in the event GW violated the order.  BZA Order dated March 29, 2001,

Condition 20.

45.     In hearings before the BZA pertaining to the 2000-2010 campus plan, GW's

general counsel, speaking on behalf of GW, suggested that the BZA should deny special

exceptions for new buildings if GW were not in compliance with its housing obligations:

"That's the stick that's hanging over one's head and it's driving our commitment. . . .

Can this Board reject a project because the University is not otherwise in compliance

with the campus plan? . . .  That's perfectly legitimate.  The Board has that authority."

**D.     GW's Violations Of The Final Order And 2000-2010 Campus Plan**

46.     GW's student headcount exceeds the 20,000 cap set forth in Condition 8 of the

Final Order.

47.     According to GW's Office of Institutional Research, the GW office responsible

for compiling statistics regarding student enrollment, GW's total student headcount for

the Fall 2004 semester was 20,355.  GW was thus in violation of Condition 8 during the

Fall 2004 semester because it enrolled at least 335 students over the cap set forth by the

Final Order.

48.     According to GW's Office of Institutional Research, GW's "unduplicated

enrollment" in all campuses in Fall 2005 was 24,099.  GW was thus in violation of

Condition 8 of the Final Order during the Fall 2005 semester because it enrolled 4,099

students over the cap set forth in the Final Order.  According to the same office, GW's

"on-campus enrollment" in Fall 2005 was 20,318.  Therefore, at a minimum, GW

enrolled 318 students over the cap set forth in the Final Order.

49.    Upon information and belief, GW's student headcount for Spring 2006 continues

to exceed 20,000.

50.    GW is currently in violation of Condition 8 of the Final Order because its total

student enrollment has continuously exceeded 20,000 since Fall 2004.

51.    According to GW's Office of Institutional Research, GW had 4,478 faculty in Fall

2005, 1,549 of whom were full-time and 2,929 part-time.  GW is thus in violation of

Condition 8 of the Final Order because it has 2,242 faculty over the 2,236 cap set forth in

the Final Order.

52.    GW has failed to provide housing on-campus or outside of Foggy Bottom for

5,600 of its first 8,000 undergraduate students, plus one on-campus or non-Foggy Bottom

bed for every full-time undergraduate student over 8,000, as set forth in Conditions 9(a)

and 9(b) of the Final Order.

53.    According to GW's Office of Institutional Research, GW enrolled 9,590 full-time

undergraduate students in the Fall 2005 semester.  GW was thus obligated to provide at

least 7,190 beds on campus or outside of Foggy Bottom for its full-time undergraduate

students.  However, GW has failed to do so.

54.    According to its February 28, 2006 bi-annual submission to the Zoning

Commission, GW currently provides only 5,580 on-campus beds and no university-

supplied beds outside of Foggy Bottom to its undergraduate students.

55.     GW's on-campus and university supplied beds outside of Foggy Bottom are 1,610 below the minimum required by Conditions 9(a)-(b) of the Final Order.  Therefore, GW is currently in violation of Conditions 9(a)-(b) of the Final Order.

56.     GW has similarly violated Conditions 9(a)-(b) of the Final Order from Fall 2002 through Fall 2004.

57.     According to GW's Office of Institutional Research, GW enrolled 8,883 full-time undergraduate students in the Fall 2002 semester.  GW was thus obligated to provide at least 6,483 beds on campus or outside of Foggy Bottom for its full-time undergraduate students.  GW failed to provide the requisite number of on-campus and university supplied beds outside of Foggy Bottom in Fall 2002.

58.     According to GW's Office of Institutional Research, GW enrolled 9,206 full-time undergraduate students in the Fall 2003 semester.  GW was thus obligated to provide at least 6,806 beds on campus or outside of Foggy Bottom for its full-time undergraduate students.  GW failed to provide the requisite number of on-campus and university supplied beds outside of Foggy Bottom in Fall 2003.

59.     According to GW's Office of Institutional Research, GW enrolled 9,687 full-time undergraduate students in the Fall 2004 semester.  GW was thus obligated to provide at least 7,287 beds on campus or outside of Foggy Bottom for its full-time undergraduate students.  GW failed to provide the requisite number of on-campus and university supplied beds outside of Foggy Bottom in Fall 2004.

60.     In its February 28, 2006 submission to the Zoning Commission, GW admittedly excluded certain categories of students from its full-time undergraduate student enrollment "headcount."  Specifically, GW excluded:  (1) "Foggy Bottom full-time

undergraduates who were away for the entire semester, e.g., on study abroad programs," (2) "Foggy Bottom full-time undergraduates who take no courses but are 'enrolled' for administrative purposes as a prerequisite to graduation," and (3) "Full-time undergraduates accounted for under the Mount Vernon Campus Plan Order."

61.    GW's exclusion of these categories of students from its full-time undergraduate student headcount is contrary to the express language of the Final Order, which does not exclude these classes of students from the full-time undergraduate student headcount.

62.    In its February 28, 2006 submission to the Zoning Commission, GW admittedly "included in the on-campus bed count those beds occupied by Foggy Bottom full-time undergraduates in facilities not owned by the University, but located within campus boundaries."

63.    GW's inclusion of beds occupied by undergraduate students in facilities not owned by the University in Foggy Bottom is contrary to the Final Order, which expressly directs GW to "provide beds . . . on campus or outside Foggy Bottom/West End" to its undergraduate students, rather than in buildings leased by GW in Foggy Bottom.

64.    In its February 28, 2006 submission to the Zoning Commission, GW admittedly conducted the headcount for its full-time undergraduate students by averaging the number of students enrolled in the Fall 2005 and Spring 2006 semesters.

65.    GW's determination of its full-time undergraduate student headcount by averaging the number of students enrolled in the Fall 2005 and Spring 2006 semesters is contrary to the Final Order, which requires GW to provide sufficient on-campus beds for its undergraduate student population at any one time, rather than the "average" number of students in two semesters.

66.    GW is currently in violation of Conditions 9(a)-(b) of the Final Order.

67.    Pursuant to Conditions 9(e) and 20 of the Final Order, GW's violations of Conditions 8, 9(a) and 9(b) of the Final Order prohibit the Zoning Commission from granting new special exceptions or issuing new permits to GW to construct or occupy buildings for nonresidential use.

68.    Pursuant to Conditions 9(e) and 20 of the Final Order, GW's violations of Conditions 8, 9(a) and 9(b) of the Final Order prohibit the Zoning Commission and the Office of Planning from considering GW's application and new campus plan.

**E.    GW's Rezoning Application And 2006-2025 Campus Plan**

69.    On February 16, 2006, GW submitted "an application to the District of Columbia Zoning Commission for first stage review and approval of a planned unit development and zoning map amendment for the Foggy Bottom Campus" in conjunction with "the Foggy Bottom Campus Plan: 2006-2025," seeking consolidated review and approval of significant zoning amendments and university use of 7,346,577 square feet of floor area -- compared to the 5,613,986 square feet approved in the existing Campus Plan-- in Foggy Bottom, an area primarily zoned residential. (The application excludes the Square 54 and Square 80 developments which would add an additional one million square feet of floor area.)

70.    Recognizing that its intended expansion in Foggy Bottom violates the existing campus plan, GW boldly states in its application that it "has worked closely with the Office of Planning to identify the appropriate zoning mechanism to achieve the University's proposed development plan," and that the "Office of Planning ultimately recommended that a new Campus Plan, coupled with the two-stage PUD process

(including commercial rezoning of certain sites concentrated in the campus core) and a text amendment to the Campus Plan Regulations to permit an increase in aggregate FAR in R-5-D and R-5-E zones from 3.5 to 4.5, would provide an effective means to accommodate GW's forecasted academic and student housing needs." Application, at 2.

71.    GW's application and new campus plan specifically exclude Squares 54 and 80, which are to be "the subject of separate consolidated PUD and rezoning applications." Application, at 3. Yet, Squares 54 and 80 are within the official campus boundaries.

72.    Despite its exclusion of Square 54 from the new campus plan, GW admittedly intends to convert Square 54 to high-density, commercial use as "a mixed use 'town center' to provide the campus and the community with a unique neighborhood gathering place as well as to generate revenue necessary to support the University's academic mission." Specifically, GW's application indicates that Square 54 (the site of the old GW hospital), is to be "redeveloped as a mixed use town center" containing 500,000 square feet of office space, 330,000 square feet of residential space, and 100,000 square feet of retail space. Application, at H-19.

73.    GW's exclusion of Squares 54 and 80 from its application and new campus plan violates 11 DCMR §§ 210.4 and 507.3, which require GW to submit, and the Zoning Commission to only consider, "a plan for developing the campus as a whole."

74.    GW's application and new campus plan seek to substantially alter the residential character of Foggy Bottom by: (1) converting to university use nearly 1.74 million square feet of land, (2) proposing eighteen development sites, including the creation of a new cancer center on Square 39 and redevelopment of the 1482-space parking garage on Square 54, (3) creating an "I Street retail corridor to serve the Foggy Bottom and West

End neighborhoods," (4) rezoning five blocks of residential property bordered by the District's 23rd, I, G, and 20th Streets into high-density commercial land, (5) rezoning from C-3-C to C-4 a block on Pennsylvania Avenue admittedly resulting in increased height up to 130 feet, (6) erecting a building on 2425 L Street containing 28,000 square feet of office space and 200 luxury condominiums, and (7) intending to convert Squares 54 and 80 under separate rezoning applications, all of which are to take place in Foggy Bottom and remain in effect for the next 20 years.

75.      GW's application and new campus plan and its proposed "*Grow Up, Not Out*" development strategy, if implemented, would substantially alter the residential character of Foggy Bottom.

76.      GW misleadingly states in its application that, "[a]s of the fall 2005 census, the Foggy Bottom Campus community included 18,802 undergraduate and graduate students on a headcount basis, and 6,054 faculty and staff (regular full- and part-time) on a headcount basis."  Application, at H-1.  The headcount conducted by GW's Office of Institutional Research (posted on GW's website), however, indicates that GW enrolled at least 20,318 students (and more likely 24,099 students) and employed 10,270 faculty and staff in Fall 2005.

77.      The "headcount" in GW's new campus plan is based on an enrollment methodology that excludes from the total student body three categories of students: study abroad, continuous enrollment, and Mount Vernon students.  New Campus Plan, at Q-2.  These excluded categories collectively amount to 1,516 students, reducing the total headcount at GW from 20,318 to 18,802.

78.    The enrollment methodology in GW's new campus plan is contrary to the Final Order.

### F.    The School Without Walls

79.    The School Without Walls is bounded on the north and west by the District's 22nd and G Streets, adjacent to a GW residence hall on Square 80 that "is to be addressed under [a] separate zoning process."  New Campus Plan, Exs. I & O.

80.    In 2003, the Foggy Bottom Conservancy filed a petition before the Historic Preservation Review Board requesting the School Without Walls to be designated a historic site and listed in the National Register of Historic Places.

81.    To this day, the Historic Preservation Review Board has failed to hold the requisite public hearing concerning the Foggy Bottom Conservancy's petition.

82.    The Historic Preservation Review Board's failure to act upon the Foggy Bottom Conservancy's petition is arbitrary and capricious and without substantial evidence.

83.    The School Without Walls qualifies as a historic site and should be subject to the protections of the National Historic Preservation Act.

84.    On March 23, 2006, the District of Columbia Public Schools and GW announced the "School Without Walls Partnership," an agreement whereby GW is to purchase from the Public Schools a parcel of land and additional development rights on the School Without Walls.  The agreement provides for erection of a new structure on the parcel purchased by GW as well as "modernization" and "expansion" of the remaining structures of the School Without Walls.

85.    The "School Without Walls Partnership" seeks to diminish the historical character of the School Without Walls in contravention of the National Historic Preservation Act.

86.    Implementation of the "School Without Walls Partnership" and the Public Schools' sale of the parcel of land on the School Without Walls to GW, undermine the authority of the Office of Planning and the Zoning Commission.

87.    GW's exclusion of Square 80 (the GW residence hall adjacent to the School Without Walls) from its application and new campus plan violates 11 DCMR §§ 210.4 and 507.3, which require GW to submit to the Zoning Commission "a plan for developing the campus as a whole."

88.    The Public Schools lacks the authority to sell the parcel on the School Without Walls and additional development rights to GW before the Historic Preservation Review Board holds a public hearing on the Foggy Bottom Conservancy's petition to designate the School Without Walls a national historic site.

89.    GW's application and new campus plan and their proposed "*Grow Up, Not Out*" development strategy, if implemented, would substantially alter the historic character of Foggy Bottom, a neighborhood listed in the National Register of Historic Places since 1987.

## COUNT ONE

### (takings)

90.    Plaintiff repeats and re-alleges all previous allegations as if set forth herein.

91.    The Takings Clause of the Fifth Amendment, applied to the states through the Fourteenth Amendment, prohibits the taking of private property "for public use, without just compensation."

92.    A *Penn Central* taking occurs when government regulation imposes a detrimental economic impact on private property or interferes with the owner's distinct investment-backed expectations.

93.    The Foggy Bottom Association's members possess legitimate property interests in their residential properties in Foggy Bottom.

94.    These property interests encompass plaintiff's members' desire to enjoy residential use of their property without unlawful interference by the District or by private parties acting upon the District's land-use authority.

95.    The Foggy Bottom Association's members further possess distinct investment-backed expectations in their residential property in Foggy Bottom.

96.    GW's repeated and continuous violations of the District's zoning laws and the Final Order have deprived plaintiff's members of legitimate interests to enjoy residential use of their property in Foggy Bottom by increasingly transforming this neighborhood to a commercially-zoned university campus.

97.    GW's application and new campus plan, if implemented, would deprive plaintiff's members of legitimate interests to enjoy residential use of their property in Foggy Bottom by increasingly transforming this neighborhood to a commercially-zoned university campus.

98.    The Zoning Commission's and the Office of Planning's failure to enforce their regulations and the Final Order, despite GW's repeated and continuous violations of the Final Order and the District's zoning laws, has imposed a severe burden on plaintiff's members, depriving them of legitimate interests in enjoying residential use of their

property, detrimentally impacting the economic value of their property, and interfering with their distinct investment-backed expectations.

99.     The Zoning Commission's and the Office of Planning's failure to enforce their regulations and the Final Order, despite GW's repeated and continuous violations of the Final Order and the District's zoning laws, amounts to a taking of plaintiff's members' Foggy Bottom property without just compensation.

100.    The Zoning Commission's and the Office of Planning's approval of GW's application and new campus plan would pose a severe burden on plaintiff's members, depriving them of legitimate interests in enjoying residential use of their property, detrimentally impacting the economic value of their property, and interfering with their distinct investment-backed expectations.

101.    The Zoning Commission's and the Office of Planning's approval of GW's application and new campus plan would amount to a taking of plaintiff's members' Foggy Bottom property without just compensation.

102.    The Zoning Commission and the Office of Planning should be prohibited from approving GW's application and new campus plan without paying just compensation (in an amount to be determined at trial) to the members of the Foggy Bottom Association for the regulatory taking of their property in Foggy Bottom.

## COUNT TWO

### (16 U.S.C. § 470)

103.    Plaintiff repeats and re-alleges all previous allegations as if set forth herein.

104.    The National Historic Preservation Act, 16 U.S.C. § 470, was enacted to preserve the Nation's historic resources.  The Act directs federal and state agencies to preserve

"the historical and cultural foundations of the Nation" and to guard against "ever-increasing extensions of urban centers, . . . commercial, and industrial developments" that lead to "historic properties significant to the Nation's heritage [] being lost or substantially altered."  16 U.S.C. § 470(b).

105.    The National Historic Preservation Act creates a private right of action for affected residents to block the sale, demolition, development, or modification of structures having national historic significance.

106.    The Foggy Bottom Association possesses organizational standing to pursue this cause of action on behalf of its members who have suffered concrete injury within the zone of interests protected by the National Historic Preservation Act.

107.    GW's application and new campus plan and their proposed "*Grow Up, Not Out*" development strategy, if implemented, would substantially alter the historic character of Foggy Bottom, a neighborhood listed in the National Register of Historic Places since 1987, and subject to the protections of the National Historic Preservation Act and its implementing regulations.

108.    GW's application and new campus plan, if implemented, would contravene the objectives of the National Historic Preservation Act by substantially altering the architectural and historic heritage of Foggy Bottom through increasing transformation of this neighborhood into a commercially-zoned university campus.

109.    GW's application and new campus plan, if implemented, would violate Executive Order 11593 (May 13, 1970), which requires "purchasers and transferees of a property listed on the National Register of Historic Places . . . to use such property in a manner compatible with preservation objectives."

110.    In 2003, the Foggy Bottom Conservancy filed a petition before the Historic

Preservation Review Board requesting the School Without Walls to be designated a

national historic site and listed in the National Register of Historic Places.

111.    The Historic Preservation Review Board has failed to hold the requisite public

hearing concerning the Foggy Bottom Conservancy's petition.

112.    The School Without Walls qualifies as a historic site and should be subject to the

protections of the National Historic Preservation Act.

113.    On March 23, 2006, the Public Schools and GW announced the "School Without

Walls Partnership," an agreement whereby GW is to purchase from the Public Schools a

parcel of land and additional development rights on the School Without Walls.  This

agreement provides for erection of a new structure on the parcel purchased by GW as

well as substantial modification of the remaining structures of the School Without Walls.

114.    The "School Without Walls Partnership" seeks to diminish the historic character

of the School Without Walls in contravention of the National Historic Preservation Act.

115.    The Public School's sale of the parcel on the School Without Walls and additional

development rights to GW violates the National Historic Preservation Act, its

implementing regulations, and Executive Order 11593.

## COUNT THREE

### (D.C. ST. § 8-109.03)

116.    Plaintiff repeats and re-alleges all previous allegations as if set forth herein.

117.    Section 8-109.03(a) requires the pertinent District of Columbia agency to

"prepare or cause to be prepared . . . a detailed EIS at least 60 days prior to

implementation of the proposed major action" whenever it "proposes or approves a major action that is likely to have substantial negative impact on the environment."  DC ST. § 8-109.03(a).  Subsection (b) requires the pertinent District of Columbia agency to "make available for review by the public" the EIS, to provide a reasonable period for comment thereon, and to hold a public hearing if "25 registered voters in an affected single member district request a public hearing."  DC ST. § 8-109.03(b).

118.    Section 8-109.02 defines "major action" as "any action that costs over $1,000,000 and that may have a significant impact on the environment."  DC ST. § 8-109.02(2). Section 8-109.02 further defines "environment" as "the physical conditions that will be affected by a proposed action, including but not limited to, the land, air, water, minerals, flora and fauna."  *Id.* § 8-109.02(3).

119.    GW's application and new campus plan cost in excess of $1 million.

120.    GW's application and new campus plan will have a significant negative impact on the environment of Foggy Bottom by increasing population density, noise, pollution, traffic, the height of buildings, and by materially changing the nature of use of this property.

121.    GW's application and new campus plan constitute "major actions" as that term is defined in DC ST. § 8-109.02(2).

122.    GW's application and new campus plan will have a substantial negative impact on the environment of Foggy Bottom by increasing beyond the tipping point population density, noise, pollution, and traffic in this area.

123.    GW's application and new campus plan can neither be considered nor approved by the Zoning Commission and the Office of Planning prior to issuance of an environmental impact statement.

124.    The Foggy Bottom Association demands a public hearing on the environmental impact of GW's application and new campus plan pursuant to DC ST. § 8-109.03(b). Plaintiff has secured the requisite signatures from "25 registered voters in an affected single member district" and has otherwise satisfied the requirements for demanding a public hearing pursuant to section 8-109.03(b).

## COUNT FOUR

### (D.C. ST. § 6-641.09)

125.    Plaintiff repeats and re-alleges all previous allegations as if set forth herein.

126.    Section 6-641.09 gives a private right of action to plaintiff to seek injunctive relief against GW for its violations of the zoning laws.  DC ST. § 6-641.09.  Specifically, section 6-641.09 provides that in the event of a zoning violation, "any neighboring property owner or occupant who would be specially damaged by any such violation may, in addition to all other remedies provided by law, institute injunction, mandamus, or other appropriate action or proceeding to prevent such unlawful erection, construction, reconstruction, alteration, conversion, maintenance, or use, or to correct or abate such violation or to prevent the occupancy of such building, structure, or land."

127.    GW has continuously and repeatedly violated the District's zoning laws and the Final Order by (1) exceeding the student enrollment and faculty caps set forth in Condition 8 of the Final Order, and (2) failing to provide the requisite number of on-campus beds for its full-time undergraduate students as set forth in Conditions 9(a)-(c) of

the Final Order, as more fully described in paragraphs 46 to 59 above. Plaintiffs have suffered special damages under the meaning of DC ST. § 6-641.09 arising from GW's violations of the zoning laws and the Final Order including, but not limited to, shortage of parking spaces, excessive population density, and increased pollution, noise, and traffic in Foggy Bottom.

128.    The Office of Planning and the Zoning Commission should neither consider nor approve GW's application and new campus plan in light of GW's continuous and repeated violations of the District's zoning laws and Conditions 8 and 9(a)-(c) of the Final Order, as described in paragraphs 46 to 59 above.

129.    The Office of Planning and the Zoning Commission should enforce the Final Order against GW pursuant to DC ST. § 6-641.09.

### COUNT FIVE

### (11 DCMR § 210.2)

130.    Plaintiff repeats and re-alleges all previous allegations as if set forth herein.

131.    Section 210.2 of Title 11 provides that "[u]se as a college or university shall be located so that it is not likely to become objectionable to neighboring property because of noise, traffic, number of students, or other objectionable conditions."

132.    GW's continuous and repeated violations of the District's zoning laws and the Final Order violate 11 DCMR § 210.2.

133.    GW's application and new campus plan violate section 210.2 because they seek university use "likely to become objectionable to neighboring property because of noise, traffic, number of students, or other objectionable conditions."

134.     The Office of Planning and the Zoning Commission should deny GW's
application and new campus plan because they violate section 210.2 and the elements of
the Comprehensive Plan.

## COUNT SIX

### (11 DCMR §§ 210.4, 507.3)

135.     Plaintiff repeats and re-alleges all previous allegations as if set forth herein.

136.     Section 210.4 of Title 11 provides:  "As a prerequisite to requesting a special
exception for each college or university use, the applicant shall have submitted to the
Commission for its approval *a plan for developing the campus as a whole*, showing the
location, height, and bulk . . . of all present and proposed improvements, including . . . :
(a) Buildings and parking and loading facilities. . . .  and (d) A description of all activities
conducted or to be conducted on the campus, and of the capacity of all present and
proposed campus development."  11 DCMR § 210.4 (emphasis added)

137.     Section 507.3 of Title 11 provides that a university seeking a special exception
"shall have submitted and the Commission shall have approved *a plan for developing the
campus as a whole*."  11 DCMR § 507.3 (emphasis added)

138.     GW's application and new campus plan specifically exclude significant
development that is to occur on Squares 54 and 80, including creation of a mixed-used
town center (at the site of GW hospital) containing 500,000 square feet of office space,
330,000 square feet of residential space, and 100,000 square feet of retail space, and the
erection of a structure on the School Without Walls.

139.    GW's exclusion of Squares 54 and 80 from its application and new campus plan

violates 11 DCMR §§ 210.4 and 507.3, which require GW to submit, and the Zoning

Commission to only consider, "a plan for developing the campus as a whole."

140.    The Office of Planning and the Zoning Commission should deny GW's

application and new campus plan because they fail to present "a plan for developing the

campus as a whole" in violation of 11 DCMR §§ 210.4 and 507.3.

### DEMAND FOR JURY TRIAL

141.    Plaintiff hereby demands trial before a jury.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief against defendants and each of them as follows:

(a) Judgment in favor of plaintiff and against all defendants for the counts enumerated above;

(b) A permanent injunction prohibiting the Office of Planning and the Zoning Commission from approving GW's application and new campus plan until the District of Columbia provides just compensation (in an amount to be determined at trial) to the members of the Foggy Bottom Association for the regulatory taking of their property in Foggy Bottom;

(c) A permanent injunction prohibiting the Office of Planning and the Zoning Commission from approving GW's application and new campus plan pursuant to DC ST. § 6-641.09 and 11 DCMR §§ 210.2, 210.4, and 507.3;

(d) A permanent injunction directing the Historic Preservation Review Board to designate the School Without Walls a national historic site and to recommend the same for inclusion in the National Register of Historic Places;

(e) A permanent injunction prohibiting the Public Schools from transferring to GW any parcels or development rights on the School Without Walls;

(f) A declaratory judgment that GW's application and new campus plan constitute "major actions" as that term is defined in DC ST. § 8-109.02(2), and that they are likely to have substantial negative impact on the environment of Foggy Bottom under DC ST. § 8-109.03;

(g) A declaratory judgment that approval of GW's application and new campus plan without the preparation of an environmental impact statement and consideration of comments from Foggy Bottom residents would violate the District of Columbia Environmental Policy Act, D.C. ST. § 8-109.03(a);

(h) Directing the Department of Health, the Office of Planning, the Zoning Commission and/or the Department of Regulatory Affairs to prepare or cause to be prepared an environmental impact statement concerning GW's application and new campus plan and to hold a public hearing thereupon pursuant to DC ST. § 8-109.03(b);

(i) Awarding plaintiff reasonable attorney fees and costs for this action; and

(j) Awarding plaintiff such other and further relief as the Court may deem just and proper.


Dated: April 24, 2006

_____
William H. Bode (Bar No. 113308)
Peter Grenier (Bar No. 418570)
Stefan Shaibani (Bar No. 490024)
BODE & GRENIER, LLP
1150 Connecticut Avenue, N.W.
Ninth Floor
Washington, DC 20036
Tel: (202) 862-4300
Fax: (202) 828-4130

*Attorneys for Foggy Bottom Ass'n*