**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

FOGGY BOTTOM ASSOCIATION,        )
                                 )
        Plaintiff,               )
                                 )
        vs.                      )
                                 )  Court No. 06 Civ. 0746 (RJL)
DISTRICT OF COLUMBIA OFFICE OF   )
PLANNING, *et al.*,              )
                                 )
        Defendants.              )
_____)

**<u>PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION</u>**


Dated: April 25, 2006                    /s/ William Bode
                                         William H. Bode (Bar No. 113308)
                                         Peter Grenier (Bar No. 418570)
                                         Stefan Shaibani (Bar No. 490024)
                                         BODE & GRENIER, LLP
                                         1150 Connecticut Ave, NW, 9th Fl.
                                         Washington, DC 20036
                                         Tel:  (202) 862-4300

                                         *Attorneys for Foggy Bottom Ass'n*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ........................................................................................ i

PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION ...................................1

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
 PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION ................................2

STATEMENT OF FACTS ...........................................................................................3

     I.     GW's Violations Of The BZA's Final Order .............................................3
         A.     GW's Violation Of Condition 8.........................................................4
             1.   GW's Violation Of The Student Enrollment Cap...............4
             2.   GW's Violation Of The Faculty Headcount Cap.................8
         B.     GW's Violation of Conditions 9(a) and 9(b) .............................8
         C.     The Clear Import Of Conditions 9(e) And 20..............................11

     II.    The Office Of Planning's Set Down Recommendation............................ 12

ARGUMENT .............................................................................................................14

     I.     Standard Governing The Issuance Of Preliminary Injunctions .................14

     II.    GW's Violations Of Conditions 8 And 9(a)-(b) Of The Final Order
         Preclude The District From Approving Its Application And New
         Campus Plan ..................................................................................16
         A.     Likelihood of Success On The Merits ............................................16
         B.     Irreparable Injury ............................................................................19
         C.     Substantial Harm To Others............................................................22
         D.     The Public Interest .........................................................................23

     III.   GW's Failure To Submit "A Plan For Developing The Campus As
         A Whole" Should Preclude Approval Of Its New Campus Plan..............24

     IV.   GW's Application And New Campus Plan Are "Major Actions"
         Requiring The Preparation Of An Environmental Impact Statement .......29
         A.     Likelihood Of Success On The Merits...........................................29
         B.     Irreparable Injury ...........................................................................34
         C.     Substantial Harm To Others...........................................................38
         D.     The Public Interest .........................................................................38

# TABLE OF AUTHORITIES

## CASES

*B & W Management, Inc. v. Tasea Investment Company*, 451 A.2d 879 (D.C. 1982)...................................16

*Citizens Ass'n of Georgetown, Inc. v. Zoning Com. of District of Columbia*, 477 F.2d 402 (D.C. Cir. 1973) ...........................................................................................................34,37,38

*Cobell v. Norton*, 391 F.3d 251 (D.C. Cir. 2004) .......................................................................14

*Concerned Citizens of Brentwood v. District of Columbia Board of Zoning Adjustment*, 634 A.2d 1234 (D.C. 1993) ...........................................................................................................30

*Cummings. v. Tripp, et al.*, 527 A.2d 230 (Conn. 1987) .............................................................20

*District of Columbia v. Totten*, 5 F.2d 374 (D.C. Cir. 1925).....................................................16

*Foggy Bottom Association v. District of Columbia Board of Zoning Adjustment*, 791 A.2d 64 (D.C. 2002) ...............................................................................................................31

*Friends of Tilden Park v. District of Columbia*, 806 A.2d 1201 (D.C. 2002) ..............................35

*Garcia v. Siffrin Residential Association*, 407 N.E.2d 1369 (Ohio 1980)....................................19

*George Washington University v. District of Columbia*, 318 F.3d 203 (D.C. Cir. 2003) ...........11,21,24

*George Washington University v. District of Columbia*, 391 F. Supp. 2d 109 (D.D.C. 2005) ..................21

*George Washington University v. District of Columbia Board of Zoning Adjustment*, 831 A.2d 921 (D.C. 2003) ......................................................................................................4,12,13, 22

*Gonzales v. O Centro Espirita Beneficente Uniao Do Vegetal*, 126 S. Ct. 1211 (2006)..............................14

*Jones v. District of Columbia Redevelopment Land Agency*, 499 F.2d 502 (D.C. Cir. 1973)....................36

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) .................................................................35

*Lund v. Watergate Investors Ltd. Partnership*, 728 A.2d 77 (D.C. 1999)...................................15,16, 20,23

*Marjorie Webster Junior College, Inc. v. District of Columbia Board of Zoning Adjustment*, 309 A.2d 314 (D.C. 1973) ...........................................................................................................27

*Maryland-National Capital Park and Planning Comm'n v. U.S. Postal Serv.*, 487 F.2d 1029 (D.C. Cir. 1973) ..........................................................................................................................36

*McNeil-PPC, Inc. v. Granutec, Inc.*, 919 F. Supp. 198 (E.D.N.C. 1995) ........................................15

*National Wildlife Federation v. Burford*, 835 F.2d 305 (D.C. Cir. 1987) ....................................14

*New York Pathological and X-Ray Lab. v. INS*, 523 F.2d 79 (2d Cir. 1975) ................................15

*President & Directors of Georgetown College for Georgetown University v. Diavatis*, 470 A.2d 1248 (D.C. 1983) .......................................................................................................................19

*Rafferty v. District of Columbia Zoning Commission*, 583 A.2d 169 (D.C. 1990) .......................23

*Retter v. Russo, et al.*, 2000 Conn. Super. LEXIS 2879 (Conn. 2000) .........................................20

*Spring Valley – Wesley Heights Citizens Association, et al. v. District of Columbia Zoning Commission*, 856 A.2d 1174 (D.C. 2004) ......................................................................................7

## STATUTES

10 DCMR § 112.6 ............................................................................................................................25

11 DCMR § 210.1 ............................................................................................................................24

11 DCMR § 210.2 ............................................................................................................................25

11 DCMR § 210.3 .......................................................................................................................25,26

11 DCMR § 210.4 ..................................................................................................................2,15,25, 28

11 DCMR § 507.3 ..................................................................................................................2,15,25, 28

11 DCMR § 2400.4 .....................................................................................................................22,28

20 DCMR § 7200 .....................................................................................................................15,29, 35,38

20 DCMR § 7201 .......................................................................................................................31,32, 33

20 DCMR § 7203 ............................................................................................................................32

20 DCMR § 7204................................................................................................................31

20 DCMR § 7205................................................................................................................32

20 DCMR § 7208................................................................................................................32

20 DCMR § 7209................................................................................................................32,36

20 DCMR § 7210................................................................................................................33

DC ST. § 6-641.09.............................................................................................................2,15,16, 19, 23

DC ST. § 8-109.................................................................................................................2,15,29, 30,31, 33,38

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

FOGGY BOTTOM ASSOCIATION,        )
                                       )
        Plaintiff,               )
                                       )
        vs.                  )
                                     )  Court No. 06 Civ. 0746 (RJL)
DISTRICT OF COLUMBIA OFFICE OF   )
PLANNING, *et al.*,                )
                                       )
        Defendants.            )
_____)

## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Pursuant to Rule 65 of the Federal Rules of Civil Procedure ("FRCP") and Local Civil Rule 65.1(c), the Foggy Bottom Association ("FBA"), through its counsel, Bode & Grenier, LLP, respectfully requests the Court to grant its motion for a preliminary injunction. In support of this motion, plaintiff relies upon the attached memorandum of points and authorities, the affidavits of Joy Howell and Scott Heiser, and the exhibits accompanying the affidavit of Stefan Shaibani.

ORAL ARGUMENT REQUESTED.

                                                     Respectfully submitted,

Dated: April 25, 2006                    /s/ William Bode
                                                       William H. Bode (Bar No. 113308)
                                                       Peter Grenier (Bar No. 418570)
                                                       Stefan Shaibani (Bar No. 490024)
                                                      BODE & GRENIER, LLP
                                                       1150 Connecticut Ave, NW, 9th Fl.
                                                       Washington, DC 20036
                                                       Tel: (202) 862-4300

                                                       *Attorneys for Foggy Bottom Ass'n*

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Plaintiff, the Foggy Bottom Association ("FBA"), respectfully requests the Court to grant its motion for a preliminary injunction prohibiting the District of Columbia Office of Planning ("Office of Planning") and the District of Columbia Zoning Commission ("Zoning Commission") from considering or approving the George Washington University's ("GW") February 16, 2006 rezoning application and new campus plan until the following have occurred:

1.      GW becomes compliant with Conditions 8 and 9(a)-(c) of the existing campus plan pursuant to the Board of Zoning Adjustment's ("BZA") Corrected Final Order On Remand dated January 23, 2002 ("Final Order") and DC ST. § 6-641.09 authorizing affected neighboring property owners to seek injunctive relief for a private party's violation of the zoning laws;

2.      GW submits "a plan for developing the campus as a whole" pursuant to 11 DCMR §§ 210.4 and 507.3; and

3.      The District of Columbia complies with DC ST. § 8-109.03 requiring the issuance of an environmental impact statement ("EIS") at least 60 days prior to implementation of a major action, by specifically doing the following: (a) the District determines that an EIS is necessary prior to approval of GW's application and new campus plan, (b) the District prepares or causes to be prepared an EIS concerning GW's application and new campus plan pursuant to § 8-109.03(a), (c) the District holds a public hearing on the aforementioned EIS pursuant to § 8-109.03(b), and (d) the District determines that GW's application and new campus plan will not pose a negative environmental impact on Foggy Bottom.

## STATEMENT OF FACTS

This action arises from GW's violations of the District of Columbia Board of Zoning Adjustment's Corrected Final Order on Remand dated January 23, 2002 and GW's February 16, 2006 submission of "an application to the District of Columbia Zoning Commission for first stage review and approval of a planned unit development and zoning map amendment for the Foggy Bottom Campus" and "the Foggy Bottom Campus Plan: 2006-2025." ("application and new campus plan"). On April 10, 2006, the Office of Planning recommended that the Zoning Commission approve and set down for public hearing GW's application and new campus plan. Despite objections from the Advisory Neighborhood Council, the Foggy Bottom Association, and other citizen groups, the Zoning Commission, on April 20, 2006, set down for public hearing GW's application. *See* Exs. N, O, & Y to Shaibani Affid.

### I.    GW's Violations Of The BZA's Final Order

The BZA's January 23, 2002 Final Order placed several limitations on GW's 2000-2010 campus plan designed to curtail the University's encroachment into Foggy Bottom. These limitations were based on the BZA's findings that increases in the number of GW students and faculty negatively impact Foggy Bottom through heightened noise, traffic, parking congestion, and pollution; that GW's acquisition of Foggy Bottom buildings and their subsequent conversion to student-occupied dormitories, and GW's informal off-campus housing of undergraduates in Foggy Bottom, threatened the "livability and residential character" of this neighborhood; and that increases in undergraduate enrollment at GW were not accompanied by commensurate increases in on-campus housing. BZA Order dated March 29, 2001, at 10 (Ex. A to Shaibani Affid.).

The BZA thus conditioned its approval of GW's existing campus plan on limitations of

GW student and faculty headcounts, as well as the "University's promptly tak[ing]

decisive steps to provide housing for the bulk of its undergraduate students on campus."

*Id.* at 5.

### A.    GW's Violation Of Condition 8

The Final Order placed caps on student enrollment and the employment of faculty

and staff at GW.  Pursuant to Condition 8:

> Student enrollment (headcount) over the life of the plan shall not exceed
> 20,000 students and the student full-time equivalent shall not exceed
> 16,553.  The number of full-time equivalent faculty and staff shall not
> exceed 1,550 and 9,000 respectively, while the headcounts for faculty and
> staff shall not exceed 2,236 and 10,293 respectively.

BZA Order dated March 29, 2001, at 14 (Ex. A to Shaibani Affid).  This condition was

sustained by the District of Columbia Court of Appeals.  *George Washington University*

*v. District of Columbia Board of Zoning Adjustment*, 831 A.2d 921, 938 (D.C. 2003).

GW has undeniably violated, and continues to violate, the student enrollment and faculty

employment caps imposed by Condition 8.

### 1.    GW's Violation Of The Student Enrollment Cap

In upholding the legality of Condition 8 in the face of an attack by GW, the

District of Columbia Court of Appeals described the terms of Condition 8 regarding

student enrollment:

> As a condition of approval of the campus plan, Condition 8 imposes
> limitations on student enrollment ... During the ten-year life of the plan,
> total student enrollment, including undergraduate and graduate students,
> both full and part-time, may not exceed 20,000 at any one time.

*George Washington University*, 831 A.2d at 937.  The simplicity of this definition – a

student headcount – was intended to eliminate confusion or dissent.  There can be no

doubt that Condition 8's requirements and implications were appreciated by GW from the outset.  Indeed, as the District of Columbia Court of Appeals stated, GW never challenged Condition 8 before the BZA, but rather represented that it should be continued in each successive campus plan.  *Id.*

It is indisputable that the student "headcount" reported by GW exceeds the 20,000 cap set forth in Condition 8.  According to GW's Office of Institutional Research, the GW office responsible for compiling statistics, GW's "Enrollment and Persistence" statistics indicate that GW enrolls 27,051 students – *more than 7,000 in excess of the Condition 8 cap*.  Ex. P to Shaibani Affid., at 1.  The Office of Institutional Research has indicated that GW's "unduplicated enrollment" in all campuses in Fall 2005 was 24,099 – more than 4,000 students in excess of the Condition 8 cap.[1]  Ex. Q to Shaibani Affid. GW's 2003 IRS Form 990 indicates that GW enrolled 23,417 students – more than 3,400 in excess of the Condition 8 cap.  Ex. K to Shaibani Affid., at 2.  GW's "on-campus enrollment" in Fall 2005 was 20,318.  Ex. R to Shaibani Affid., at 1.  Therefore, at a minimum, GW enrolled 318 students over the cap set forth in the Final Order.  The FBA suspects that GW's student headcount for the current Spring 2006 semester continues to exceed 20,000.

GW's violation of the Condition 8 student cap is not a recent development – GW has been in violation of Condition 8 for several years.  Significantly, GW has violated Condition 8's student enrollment cap since at least Fall 2004.  According to the Office of Institutional Research, GW's total student headcount for the Fall 2004 semester was

---

[1] Of the 24,099 students, only 530 were in GW's Virginia campus.  *See* Ex. Z to Shaibani Affid.

20,355.  GW was thus in violation of Condition 8 of the Final Order during the Fall 2004 semester by 335 students.

In its new campus plan, GW concedes that the "Total GW Student Body" in Fall 2005 was 24,099.  New Campus Plan, at Attachment Q (Ex. G to Shaibani Affid.).  GW then excludes the students in some of its campuses to arrive at a total student headcount of 20,318 for the Fall 2005 semester.  By its own calculation, therefore, GW concedes that it is in violation of Condition 8 by at least 318 students.  While it is plain that GW is presently in violation of Condition 8's student enrollment cap, the extent of GW's violation is unclear.  At a minimum, GW is presently in violation of Condition 8 by a substantial margin – 318 students.  *Id.*  However, documents produced by GW reveal that the true headcount likely violates Condition 8 by an incredible margin – *more than 7,000 students*.

The 20,318 student "headcount" claimed by GW severely understates the true headcount.  In the creative accounting used in GW's new campus plan, GW improperly *subtracts* various categories of students – students abroad (numbering 262), continuous enrollment students (numbering 329), and Mt. Vernon housed students (numbering 925) – to reach an illusory "headcount" of 18,802 for the Fall 2005 semester.  New Campus Plan at Attachment Q, (Ex. G to Shaibani Affid.); *See also* GW's February 28, 2006 Biannual Report to the Office of Zoning (Ex. J to Shaibani Affid.).  Further, GW has arbitrarily excluded from the "headcount" a large number of other students who take classes on campus, including foreign exchange students, English as a second language students, and the School Without Walls students.  These students, who number in the

thousands, contribute to the noise, congestion, pollution, and activities that the Foggy Bottom community finds objectionable.

In particular, the students housed at GW's Mt. Vernon campus create a particular problem. Their presence on campus creates the same degree of disruption as students housed in Foggy Bottom, *plus* the additional noise, traffic, and pollution caused by GW's around-the-clock bussing of these students between Mt. Vernon and Foggy Bottom. The students housed at GW's Mt. Vernon campus must be included in the headcount, because they take classes on the Foggy Bottom campus, travel to Foggy Bottom daily, and use the Foggy Bottom campus as their main campus. These non-resident students "continue to use [the main campus] for some activities and have a corresponding impact on traffic and parking in the vicinity." *Spring Valley – Wesley Heights Citizens Association, et al. v. District of Columbia Zoning Commission*, 856 A.2d 1174, 1177 (D.C. 2004) (involving the American University). GW's attempt at "compliance by subtraction" cannot – and does not – withstand the barest scrutiny. GW's own publications state that its true student headcount is much larger than 20,318.

In sum, GW's publications reveal that the true student headcount is at least 24,099 (New Campus Plan, Attachment Q), and may exceed 27,000. GW's "Enrollment and Persistence" statistics indicate that GW enrolls 27,051 students – *more than 7,000 in excess of the Condition 8 cap*. Ex. P to Shaibani Affid., at 1. GW's "Unduplicated Enrollment" statistics indicate that GW's student headcount is 24,099 – 4,099 in excess of the Condition 8 cap. Ex. Q to Shaibani Affid., at 1. Further, GW's 2003 IRS Form 990 indicates that GW enrolled 23,417 students – more than 3,400 in excess of the Condition 8 cap. Ex. K to Shaibani Affid., at 2. GW's "headcount" statistics are clearly

suspect.  The University's conflicting headcount calculations obscure the degree of GW's

violation.  However, it is clear that GW is in serious violation of Condition 8's student

cap.  In the unlikely event that GW's true student headcount is 20,318, it is in substantial

violation of Condition 8.  If, as is more likely, GW's true student headcount is 27,051, the

University's violation of Condition 8 is egregious.

### 2. GW's Violation Of The Faculty Headcount Cap

GW's faculty headcount exceeds the cap of 2,236 set forth in Condition 8.

According to GW's Office of Institutional Research, GW employed 4,478 faculty in Fall

2005.  *See* Ex. T to Shaibani Affid., at 1.  GW is in substantial violation of Condition 8

because it employs *more than double* the permissible number of faculty – 2,242 more

than the 2,236 permitted pursuant to Condition 8.

### B. GW's Violation of Conditions 9(a) and 9(b)

Noting the "adverse consequences of [GW's] failure to supply sufficient housing

for its full-time undergraduate students on campus," the BZA imposed Condition 9 upon

GW.  Final Order, at 20 (Ex. C to Shaibani Affid.).  Condition 9(a) requires that the

university provide housing on-campus or outside of Foggy Bottom for 70% (5,600) of the

first 8,000 undergraduate students.  Condition 9(b) requires that the university provide

one on-campus or non-Foggy Bottom bed for every full-time undergraduate student over

8,000.  After August 31, 2006, the 5,600 beds required by Condition 9(a) must be entirely

located on campus.  *Id.* at 20-21.  GW has been, and is presently, in serious violation of

Conditions 9(a)-(b), because it has failed to provide sufficient on-campus beds for its full-

time undergraduate students.

GW has failed to provide housing on-campus or outside of Foggy Bottom for 5,600 of its first 8,000 undergraduate students, plus one on-campus or non-Foggy Bottom bed for every full-time undergraduate student over 8,000, as required by Conditions 9(a)-(b) of the Final Order. According to GW's Office of Institutional Research, GW enrolled at least 9,590 full-time undergraduate students in the Fall 2005 semester[2]. GW was thus obligated to provide at least 7,190 beds on campus or outside of Foggy Bottom for its full-time undergraduate students.[3] However, GW has failed to do so. According to its February 28, 2006 bi-annual submission to the Zoning Commission, GW currently provides only 5,580 on-campus beds and no university-supplied beds outside of Foggy Bottom to its full-time undergraduate students. *See* Ex. J to Shaibani Affid., at 4. GW's on-campus beds are 1,610 below the minimum required by Conditions 9(a)-(b) of the Final Order. Therefore, GW is currently in violation of these Conditions.

Significantly, GW's violations of Conditions 9(a)-(b) are not recent developments – GW has been in violation of these Conditions for several years. GW violated these conditions from Fall 2002 through Fall 2004. According to GW's Office of Institutional Research, GW enrolled 8,883 full-time undergraduate students in the Fall 2002 semester. Ex. W to Shaibani Affid., at 1. GW was thus obligated to provide at least 6,483 beds on campus or outside of Foggy Bottom for its full-time undergraduate students. GW failed to provide the requisite number of on-campus and university supplied beds outside of Foggy Bottom in Fall 2002. According to GW's Office of Institutional Research, GW

_____

[2] Like GW's inconsistent student "headcount" statistics, numerous GW publications report a variety of calculations regarding full-time undergraduate enrollment. These figures include 9,660 and 9,741. *See* Ex. Q to Shaibani Affid.; Ex. P to Shaibani Affid..

[3] This figure is determined by adding the minimum 5,600 on-campus beds with one on-campus bed for each of the 1,590 full-time undergraduate students over the 8,000 threshold.

enrolled 9,206 full-time undergraduate students in the Fall 2003 semester.  Ex. V to Shaibani Affid., at 1.  GW was thus obligated to provide at least 6,806 beds on campus or outside of Foggy Bottom for its full-time undergraduate students.  GW failed to provide the requisite number of on-campus and university supplied beds outside of Foggy Bottom in Fall 2003.  According to GW's Office of Institutional Research, GW enrolled 9,687 full-time undergraduate students in the Fall 2004 semester.  Ex. S to Shaibani Affid., at 1.  GW was thus obligated to provide at least 7,287 beds on campus or outside of Foggy Bottom for its full-time undergraduate students.  GW failed to provide the requisite number of on-campus and university supplied beds outside of Foggy Bottom in Fall 2004.

GW's non-compliance with Condition 9 is even more egregious than its self-reported statistics suggest.  The statistics submitted by GW to the Zoning Commission wrongly excludes significant categories of full-time students, and artificially inflates the number of on-campus beds.  *See* New Campus Plan, at Attachment Q.  In its February 28, 2006 submission to the Zoning Commission, GW wrongly excluded certain categories of students from its full-time undergraduate student enrollment headcount.  Ex. J to Shaibani Affid., at 5.  GW's exclusion of these categories of students from its full-time undergraduate student headcount is contrary to the express language of the Final Order.

In its February 28, 2006 submission to the Zoning Commission, GW wrongly "included in the on-campus bed count those beds occupied by Foggy Bottom full-time undergraduates in facilities not owned by the University, but located within campus boundaries."  GW's inclusion of beds occupied by undergraduate students in facilities not owned by the University in Foggy Bottom is contrary to the Final Order, which expressly

directs GW to "provide beds . . . on campus or outside Foggy Bottom/West End" to its undergraduate students, rather than in buildings leased by GW in Foggy Bottom.

In its February 28, 2006 submission to the Zoning Commission, GW admittedly conducted the headcount for its full-time undergraduate students by averaging the number of students enrolled in the Fall 2005 and Spring 2006 semesters.  GW's determination of its full-time undergraduate student headcount by averaging the number of students enrolled in the Fall 2005 and Spring 2006 semesters is contrary to the Final Order, which requires GW to provide sufficient on-campus beds for its undergraduate student population "at any one time," rather than the average number of students in two semesters.  *See George Washington University*, 831 A2d. at 937.

C.     **The Clear Import Of Conditions 9(e) And 20**

Condition 20 of the Final Order prohibits the granting of new special exceptions to GW, "unless the University proves that it has consistently remained in substantial compliance" with all Conditions of the order, and further threatens revocation of existing permits and certificates of occupancy issued to GW as well as imposition of fines and penalties under the Civil Enforcement Act in the event GW violates the order.  March 29, 2001 Order, at 18 (Ex. A to Shaibani Affid.).  Further, Condition 9(e) prohibits the issuance of new special exceptions and permits to GW if the university is not in compliance with Condition 9.  Specifically, Condition 9(e) provides:

> No special exception shall be granted and no permit to construct or occupy buildings for nonresidential use on campus may be issued, and existing special exceptions and permits issued pursuant to the campus plan approved by this Order shall be subject to suspension and revocation, whenever a semiannual report reveals that the University is not in compliance with the provisions of this condition.

Final Order, at 21 (Ex. C to Shaibani Affid.).  The Court of Appeals for the District of

Columbia Circuit rejected GW's constitutional challenge to Condition 9(e).  *See George*

*Washington University v. District of Columbia*, 318 F.3d 203 (D.C. Cir. 2003).  The

District of Columbia Court of Appeals also sustained Condition 9(e), stating that it

> clearly serves two functions that advance the District's goals.  First, it
> strengthens the university's incentive to comply with the housing
> provisions.  Second, even though the new non-housing construction that
> Condition 9(e) holds hostage may not relate directly to new housing
> demands . . . , the condition as a general matter keeps housing and non-
> housing growth proceeding in parallel.

*George Washington University*, 831 A.2d at 935.

      Notably, in BZA hearings pertaining to GW's 2000-2010 campus plan, GW's

general counsel, speaking on behalf of the University, acknowledged that the BZA must

deny special exceptions for new buildings when GW is not in compliance with its

housing obligations.[4]

      Pursuant to Conditions 9(e) and 20 of the Final Order, GW's violations of

Conditions 8, 9(a) and 9(b) prohibit the Zoning Commission from granting new special

exceptions or issuing new permits to GW to construct or occupy buildings for

nonresidential use.  Similarly, GW's violations of Conditions 8, 9(a) and 9(b) prohibit the

Zoning Commission and the Office of Planning from considering GW's application and

new campus plan.

---

[4] "That's the stick that's hanging over one's head and it's driving our commitment. . . .
Can this Board reject a project because the University is not otherwise in compliance
with the campus plan? . . .  That's perfectly legitimate.  The Board has that authority."
*George Washington University*, 831 A.2d at 935.

## II.    The Office Of Planning's Set Down Recommendation

Despite the plain meaning of the Final Order and GW's continuous violations of its Conditions, the Office of Planning unlawfully considered and recommended on April 10, 2006 that the Zoning Commission set down for public hearing GW's application and new campus plan.  *See* April 10, 2006 Report from Ellen McCarthy to the Zoning Commission, at 1 (Ex. H to Shaibani Affid.).  Although the Office of Planning had specifically found in April 2000 that GW's aggressive expansion into Foggy Bottom had brought this neighborhood to its "tipping point," (*George Washington University*, 831 A.2d at 928) it now condones GW's application and new campus plan which seek to convert six additional square blocks of Foggy Bottom to commercial use. See April 10, 2006 Report, (Ex. H to Shaibani Affid.).

This change of position is troubling since Ms. McCarthy, the current Director of the Office of Planning, opposed GW's construction of a new hospital in Foggy Bottom in 1999 upon the grounds that "it is objectionable in terms of use, noise, traffic and parking, scale and bulk, and violates the University's own Campus Plan."  April 22, 1999 Report from Ellen McCarthy to the BZA, at 7 (Ex. I to Shaibani Affid.).  Ms. McCarthy now supports GW's application and new campus plan which entail 1.74 million square feet of development in Foggy Bottom, mostly for commercial use, and which will have significantly more impact on this neighborhood than GW's 1999 proposal to build a new hospital.  This hospital has been built and has its attendant environmental burden on Foggy Bottom.  Despite her opposition to construction of this hospital in 1999, Ms. McCarthy recommends significant additional development in Foggy Bottom without taking into consideration its environmental impacts on nearby residents.

In her April 10, 2006 report, Ms. McCarthy states that the "message that OP has consistently sent to the university has been that the university is reaching its maximum capacity, in terms of development and enrollment." April 10, 2006 Report, (Ex. H to Shaibani Affid., at 8). Ms. McCarthy further explains that "[f]rom the community perspective, the existing [campus] plan has not adequately protected it from the negative effects of an undergraduate student population. It has not adequately prevented GW from expanding university ownership and use outside of campus boundaries." *Id.* at 3. Nonetheless, Ms. McCarthy essentially adopts GW's application and new campus plan, redefining the unambiguous conditions of the BZA's Final Order with respect to student and faculty headcounts, so as allow GW to attain that which it could not in the absence of a radical amendment of the District's zoning regulations and the BZA's Final Order to the detriment of Foggy Bottom residents. *See id.* at 11-13.

Plaintiff is thus compelled to seek redress in this Court for the District's failure to enforce the BZA's Final Order, its own regulations, and the zoning laws, which have caused plaintiff irreparable injury and will continue to do so until GW complies with the Conditions of the Final Order.

## ARGUMENT

### I.    Standard Governing The Issuance Of Preliminary Injunctions

In determining whether plaintiff is entitled to a preliminary injunction, the Court should consider the following four factors: (1) the plaintiff's likelihood of success on the merits, (2) the threat of irreparable injury to plaintiff absent issuance of the injunction, (3) the possibility of substantial harm to other parties caused by issuance of the injunction, and (4) the public interest. *National Wildlife Federation v. Burford*, 835 F.2d

305, 319 (D.C. Cir. 1987); *accord Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).

When agency action is involved, the Court should balance the actual irreparable harm to

the plaintiff and the potential harm to the government. *Gonzales v. O Centro Espirita*

*Beneficente Uniao Do Vegetal*, 126 S. Ct. 1211, 1219 (2006).  The Court may issue a

preliminary injunction even if the evidentiary record is not fully developed.  *See id.*

A preliminary injunction is well suited for instances in which a private party

violates the District's zoning laws in a manner that causes special harm to neighboring

residents.  DC ST. § 6-641.09; *See Lund v. Watergate Investors Ltd. Partnership*, 728

A.2d 77, 83 (D.C. 1999).  Further, injunctive relief is warranted when a plaintiff shows a

likelihood of success on the merits of any *one* of the claims in its complaint.  *See*, *e.g.*,

*New York Pathological and X-Ray Lab. v. INS*, 523 F.2d 79, 82 (2d Cir. 1975) ("there

appears to be a sufficient likelihood of the appellants' success on the merits of at least

one claim to justify preliminary injunctive relief."); *McNeil-PPC, Inc. v. Granutec, Inc.*,

919 F. Supp. 198, 201 (E.D.N.C. 1995) ("Where multiple causes of action are alleged,

plaintiff need only show likelihood of success on one claim to justify injunctive relief.")

This is particularly so when the preliminary injunctive relief sought by the plaintiff is

more limited than the relief sought in its complaint, as is the case here.

A preliminary injunction should issue here because: (1) GW's application and

new campus plan violate DC ST. § 6-641.09 in that they seek a special exception and

zoning amendment while GW is in violation of Conditions 8 and 9(a)-(b) of the Final

Order; (2) GW's application and new campus plan fail to present "a plan for developing

the campus as a whole" by excluding major development that is to take place on Square

54 and Square 80 in contravention of 11 DCMR §§ 210.4 and 507.3; and (3) GW's

15

application and new campus plan constitute "major actions" likely to have substantial

negative impact on the environment by increasing beyond the tipping point population

density, noise, pollution, and traffic in Foggy Bottom, which require preparation of an

environmental impact statement prior to approval by the District pursuant to DC ST. § 8-

109.03 and 20 DCMR §§ 7200 *et seq.*

## II.    GW's Violations Of Conditions 8 And 9(a)-(b) Of The Final Order Preclude The District From Approving Its Application And New Campus Plan

### A.    Likelihood of Success On The Merits

Section 6-641.09 provides a private right of action against any person who violates the

District's zoning regulations. DC ST. § 6-641.09. Pursuant to the statute, neighboring property

owners or occupants who are harmed by the violations may "institute injunction, mandamus, or

other appropriate action to correct or abate such action." *Id.* "A private plaintiff must assert

'special damage' in order to enjoin a zoning violation." *Lund*, 728 A.2d at 82. A special damage

is one that is "distinct from that common to the public." *B & W Management, Inc. v. Tasea*

*Investment Company*, 451 A.2d 879, 882 (D.C. 1982). Special damages may impact a group of

persons, so long as the impact is suffered distinctly and specifically by the individuals.[5]

Condition 9(e) of the Final Order provides that "[n]o special exception shall be granted,

and no permit to construct or occupy buildings for nonresidential use on campus may be issued

… whenever a semiannual report reveals that the University is not in compliance with the

provisions of this condition." Final Order, at 21. Further, Condition 20 provides: "No special

exception application filed by the University for further processing under this plan may be

granted unless the University proves that it has consistently remained in substantial compliance

---

[5] *See District of Columbia v. Totten*, 5 F.2d 374, 380 (D.C. Cir. 1925) ( "where the acts which create a public nuisance cause also private and special injury to an individual, an action at law will lie.").

with Conditions 1 through 19 set forth in this Order." March 29, 2001 Order, at 18 (Ex. A to Shaibani Affid.).

As discussed above, GW is plainly in violation of Conditions 8, 9(a), and 9(b) of the Final Order. In Fall 2005, GW enrolled between 318 and 4,099 (and as high as 7,051) more students than the 20,000 permitted by Condition 8. New Campus Plan, at Attachment Q; Ex. Q to Shaibani Affid., at 1; Ex. P to Shaibani Affid. GW's violations of the student cap has been ongoing since at least Fall of 2004. Ex. S to Shaibani Affid., at 1; Ex. K to Shaibani Affid., at 2. GW further violates Condition 8 through its employment of 4,478 faculty, far in excess of the 2,236 faculty cap imposed by Condition 8. GW is thus in violation of Condition 8 because it enrolls more students and employs more faculty than that which is permitted under Condition 8 of the Final Order.

Apart from its violations of Condition 8, GW has consistently violated Conditions 9(a)-(b) of the Final Order. GW currently provides only 5,580 beds on campus or outside Foggy Bottom to its full-time undergraduate student population, in plain violation of the Condition 9 requirement that it provide at least 7,190 beds at its present enrollment level. *See* Ex. J to Shaibani Affid., at 4; Ex. A to Shaibani Affid., at 20; Ex. R to Shaibani Affid., at 1. These violations date back to Fall 2002. GW's on-campus student housing is so lacking that it is almost certainly impossible, as a practical matter, for the University to comply with Condition 9(a)-(b). Conditions 9(e) and 20 prohibit the processing or issuance of building permits to GW if, as now, GW is in violation of Conditions 8, 9(a), and 9(b) of the Final Order. *See* March 29, 2001 Order, at 21 (Ex. A to Shaibani Affid.); Final Order, at 18.

GW's violations of Conditions 8, 9(a), and 9(b) of the Final Order are unlawful, and adversely affect plaintiff's interests.  These violations constitute special damages in that they are distinct from those to the common public, and are suffered distinctly and specifically by plaintiff and others similarly situated.  Plaintiff is specially damaged by GW's violations of the Condition 8 student cap, because GW's violation increases Foggy Bottom's student population, which disturbs long-term residents, diminishes the quality of life, and has a deleterious impact on the neighborhood.  *See* Howell Affid., ¶¶ 6-8. Plaintiff is harmed by the GW students' malfeasance, boisterous manner, population pressure, displacement of long-time residents, and disturbance of the residential character of the neighborhood.  *Id*.  Plaintiff is particularly damaged by the students housed at GW's Mt. Vernon campus.  Their presence on campus creates the same degree of disruption as students housed in Foggy Bottom, *plus* the additional noise, traffic, and pollution resulting from GW's round-the-clock bussing of these students between Mt. Vernon and Foggy Bottom.

Plaintiff is further specially damaged by the increased traffic, pollution, and noise that result from the thousands of GW students and faculty members who exceed the caps in Condition 8.  These damages fall specially and distinctly upon plaintiff and others similarly situated.  The property owners and occupants near the GW campus bear the direct and harmful burden of GW's violations of Condition 8.

In addition, plaintiff is specially damaged by GW's violation of Conditions 9(a)- (b), because GW's violations cause plaintiff to suffer the negative effects of student pressure, as well as the deterioration of the neighborhood.  Howell Affid., ¶ 10.  Such negative effects are caused by, *inter alia*, increased university generated traffic, reduced

availability of parking, and the influx of students residing in off-campus housing. *Id*. These damages fall specially and distinctly upon plaintiff and others similarly situated. The property owners and occupants near the GW campus bear the direct and harmful burden of GW's violations of Condition 8.

Finally, plaintiff is specially harmed by the Office of Planning and the Zoning Commission's consideration of GW's application and new campus plan. Conditions 9(e) and 20 of the Final Order provide incentives for GW to comply with the other Conditions. These incentives depend upon the District's enforcement of Conditions 9(e) and 20 – namely, that the District refuse to process or issue special exception applications and building permits to GW if it is in violation of the Final Order. The District's inexplicable failure to enforce the Final Order's Conditions removes all incentive for GW to comply with the zoning laws. The Final Order's Conditions were adopted to specifically address potential harm to plaintiff and others similarly situated. Therefore, the Office of Planning's and the Zoning Commission's disregard of the Final Order specially and distinctly damage the property owners and occupants in the vicinity of the GW campus.

### B.    Irreparable Injury

Violation of zoning regulations is sufficient, as a matter of law, to establish irreparable harm. *See President & Directors of Georgetown College for Georgetown University v. Diavatis*, 470 A.2d 1248, 1251 (D.C. 1983) ("a showing that a zoning ordinance has been violated is sufficient as a matter of law to establish irreparable injury."); *see also Garcia v. Siffrin Residential Association*, 407 N.E.2d 1369, 1380 (Ohio 1980). The District of Columbia previously argued this very proposition before the

District of Columbia Court of Appeals.  In its amicus brief filed in *Diavatis*, the District argued:

> since the purpose of [§ 6-641.09] was to enable specially damaged property owners to enforce the zoning regulations … , such property owners need not ordinarily make a showing of irreparable injury, but only need to do so where they cannot make a clear showing that the practice that they challenge is unlawful. … [A] showing that the zoning ordinance has been violated is tantamount to a showing of irreparable injury.  *Amicus Curiae* Brief of the Corporation Counsel (Ex. M to Shaibani Affid., at 3).

Even if zoning violations are not sufficient, as a matter of law, to establish irreparable harm, the very kinds of injuries suffered by plaintiff here have been held to constitute irreparable harm.  *See*, *e.g.*, *Lund*, 728 A.2d at 83 ("unreasonable or increased parking rate … [and] denial of a right to a parking space at a reasonable rate in reasonable proximity to [the plaintiffs'] apartment" were irreparable harm); *Retter v. Russo, et al.*, 2000 Conn. Super. LEXIS 2879, at 6 (Conn. 2000) ("inconvenience, annoyance, and disturbance … [as well as] excess vehicular and pedestrian traffic" is irreparable harm to property owners when abutting property owner violates zoning regulations by engaging in commercial activity in a residential zone) (attached as Ex. X to Shaibani Affid.); *Cummings. v. Tripp, et al.*, 527 A.2d 230, 241-42 (Conn. 1987) (residents suffered irreparable harm when adjacent property owner undertook commercial operations in a residential zone, resulting in "annoyance, personal inconvenience . . . [and substantial] traffic and noise").

Plaintiff has suffered and continues to suffer irreparable harm on a daily basis as a result of the Office of Planning's and the Zoning Commission's failure to enforce Conditions 8, 9(a), 9(b), 9(e), and 20 of the Final Order.  Plaintiff will continue to suffer such irreparable harm unless a preliminary injunction is issued enjoining the Office of

Planning and the Zoning Commission from considering or approving GW's application and new campus plan.

As a result of GW's violations of Condition 8, GW enrolls and employs thousands more students and faculty than those permitted by the Campus Plan. These violations cause enormous increases in pedestrian and automobile traffic in the Foggy Bottom residential neighborhood. The violations overburden Foggy Bottom's infrastructure, increase pollution, create unbearable noise, and degrade the character of this residential neighborhood. Plaintiff endures these damages daily. Such damages are irreparable, and cannot be quantified.

As a result of GW's violations of Conditions 9(a) and 9(b), GW fails to provide the requisite on-campus housing for its vastly over-enrolled student body. These violations place tremendous pressure on the Foggy Bottom housing market, which is not zoned for such institutional dormitory use, and unable to sufficiently absorb the students. As the BZA's March 29, 2001 Order notes, "student renters have flooded the private market, turning apartment houses into *de facto* dorms, and row houses into informal frat houses." Ex. A to Shaibani Affid., at 9. The BZA intended Conditions 9(a) and 9(b) to obviate these damages, but such damages continue as a result of GW's reckless disregard and violation of these conditions. Such damages are irreparable, and cannot be quantified.

Defendants are directly responsible for Plaintiff's damages, because they have improperly failed to enforce Conditions 9(e) and 20 of the Final Order, which provide the most powerful incentives to GW. All relevant courts have held that Condition 9(e) "clearly serves two important functions that advance the District's goals." This condition

"strengthens the University's incentive to comply with the housing provisions" and it "keeps housing and non-housing growth proceeding in parallel." *George Washington University v. District of Columbia*, 318 F.3d 203, 211 (D.C. Cir. 2003); *George Washington University v. District of Columbia*, 391 F. Supp. 2d 109, 111-112 (D.D.C. 2005); *George Washington University*, 831 A.2d 935. Likewise, Condition 20 provides a strong incentive to GW to comply with Conditions 8, 9(a), and 9(b) of the Final Order.

GW's application and new campus plan seek permits to construct and occupy buildings for non-residential use, and GW is not in compliance with various conditions of the existing campus plan. Nonetheless, the Office of Planning and the Zoning Commission have unlawfully failed to enforce Conditions 9(e) and 20, thus removing powerful incentives for GW to comply with the Final Order, and causing plaintiff ongoing damages.

### C.    Substantial Harm To Others

The PUD regulations provide that "the PUD process shall not be used to circumvent the intent and purposes of the Zoning Regulations, nor to result in action that is inconsistent with the Comprehensive Plan." 11 DCMR § 2400.4. Moreover, the Final Order's Conditions were adopted by the BZA to specifically address the "insufficient supply of on-campus housing and expansion of university use through off-campus acquisition." Ex. A to Shaibani Affid., at 10. These dangerous "pressures associated with University expansion … threaten [Foggy Bottom's] livability and residential character." *Id*.

The attached affidavit of Joy Howell confirms that the "balance of hardships" tips overwhelmingly in favor of granting plaintiff injunctive relief. It is undeniable that GW

is in violation of Conditions 8, 9(a), and 9(b) of the Final Order, and that such violations

degrade and damage plaintiff's quality of life on a daily basis. *See* Howell Affid, ¶¶ 6-8.

GW's violations result in increased traffic, pollution and noise, as well as reduced

availability of parking and residential housing.

It is likewise undeniable that Condition 9(e) strengthens the University's incentive

to comply with Conditions 9(a) and 9(b). Condition 20 further provides GW with an

incentive to comply with the Final Order's Conditions, including Conditions 8, 9(a), and

9(b). The Office of Planning's and the Zoning Commission's wrongful actions threaten

to remove these vital incentives, and permit GW to disregard the zoning laws and run

roughshod over the Foggy Bottom neighborhood. These agencies' failure to enforce

Conditions 9(e) and 20, and their consideration of GW's application and new campus

plan, threaten irreparable harm to plaintiff and the Foggy Bottom neighborhood.

For their part, the only purported "hardship" incurred by the Office of Planning

and the Zoning Commission if the requested relief is granted is the inability to continue

their manifestly improper conduct. These agencies cannot plausibly argue that they will

be harmed by an injunction that simply requires them to enforce the Final Order's

Conditions – conditions that the BZA, a District of Columbia agency, itself created and

required. Accordingly, the "balance of hardships" unequivocally supports the granting of

a preliminary injunction enjoining the Office of Planning and the Zoning Commission

from further considering or approving GW's application and new campus plan.

### D.    The Public Interest

The public interest counsels strongly in favor of a preliminary injunction in this

case. The public has an "important public interest in the integrity and enforcement of the

zoning regulations." *Rafferty v. District of Columbia Zoning Commission*, 583 A.2d 169,

175 (D.C. 1990). The legislature recognized this important public interest, and enacted

section 6-641.09, which provides standing for a private party to seek injunctive relief as a

result of a zoning violation. *See Lund*, 728 A.2d at 83. These public interests are so

important that the District of Columbia itself recognized that "such private parties

ultimately *perform a public function* in enforcing the law." Ex. M to Shaibani Affid., at 4

(emphasis added).

Balanced against these public interests are the District agencies' interests in

regulatory independence. It almost goes without saying that the Office of Planning's and

the Zoning Commission's violations of Conditions 9(e) and 20, and GW's ongoing

violations of Conditions 8, 9(a), and 9(b), are contrary to the public interest. Plaintiff

does not seek to interfere with the District's independence. Rather, plaintiff merely

requests a preliminary injunction requiring the Office of Planning and the Zoning

Commission to enforce the relevant zoning regulations, including the Conditions adopted

by the BZA in its Final Order. Accordingly, the public interest, like the other injunctive

factors, strongly favors the granting of a preliminary injunction enjoining the District

agencies from further considering or approving GW's application and new campus plan.

**III.    GW's Failure To Submit "A Plan For Developing The Campus As A Whole"
        Should Preclude Approval Of Its New Campus Plan**

Pursuant to the District's zoning scheme, universities may locate in areas zoned

for high-density commercial use. However, for land zoned residential, such as most of

Foggy Bottom, university use requires a special exception. 11 DCMR § 210.1. The

application process for this consists of two stages. In the first stage, the university

submits a "campus plan" that describes its intentions for new land use over several years.

Upon approval by the Zoning Commission, the campus plan establishes the limitations

within which all future construction must occur.  In the second stage, the Zoning

Commission reviews the individual projects that the university proposes to undertake,

evaluating them both for consistency with the campus plan, the zoning regulations, and

the District's Comprehensive Plan.  *George Washington University*, 318 F.3d 205.

In evaluating a university's application for a special exception, the Zoning

Commission must ensure that the proposed university use is "not likely to become

objectionable to neighboring property because of noise, traffic, number of students or

other objectionable conditions."  11 DCMR § 210.2.  The Zoning Commission must also

ensure that the proposed university use is consistent with the Comprehensive Plan.  10

DCMR § 112.6(b).  The Zoning Commission must guard against "unreasonable campus

expansion into improved low-density areas."  11 DCMR § 210.3.

The District's zoning scheme directs universities to submit to the Zoning

Commission a campus plan encompassing all development for the duration of the plan.  It

provides:

> As a prerequisite to requesting a special exception for each college or
> university use, the applicant shall have submitted to the Commission for
> its approval *a plan for developing the campus as a whole*, showing the
> location, height, and bulk . . . of all present and proposed improvements,
> including . . . : (a) Buildings and parking and loading facilities. . . .  and
> (d) A description of all activities conducted or to be conducted on the
> campus, and of the capacity of all present and proposed campus
> development."  (emphasis added)

11 DCMR § 210.4.  The zoning regulations further provide that a university seeking a

special exception "shall have submitted and the Commission shall have approved *a plan*

*for developing the campus as a whole*." 11 DCMR § 507.3 (emphasis added).  *Glenbrook*

*Road Ass'n v. District of Columbia Board of Zoning Adjustment*, 605 A.2d 22, 30 (D.C.

1992).  GW's application and new campus plan specifically exclude major development that is to take place on Squares 54 and 80.  Instead, these sites are to be "the subject of separate consolidated PUD and rezoning applications."  Application, at 3.

The requirement in the "special exception" applications for colleges and universities, 11 DCMR §§ 210.4 and 507.3, that the university set forth a "plan for developing the campus as a whole" is of paramount importance in this instance.  The reason for the regulatory provision—apart from the need to balance and consider the needs of the university, the residents, and other stakeholders based on the totality of zoning implications—is to assure that the application and campus plan are not used to circumvent the zoning regulations.  For example, the relatively moderate showing required of colleges and universities for the approval of a campus plan and thereby the intrusion of a college or university into a residential setting, should not be used to permit, through the backdoor, a use that is either prohibited under the zoning map, or that would require a zoning variance.  But that is exactly the "sleigh of hand" that GW is attempting here.

Specifically, GW excludes from its application and new campus plan the huge commercial development planned for Square 54.  Although GW's application purportedly "involves" Square 54 (Application, at 3), Square 54 is to be "the subject of separate consolidated PUD and rezoning applications."  *Id.*  Under its "omnibus" PUD application, GW intends to amend the zoning map to change several square blocks in Foggy Bottom from R-5-D (residential, medium-high density) to C-3-C (commercial district, high bulk).  *Compare* GW Application, Attachment C *with* Attachment E (Ex. F to Shaibani Affid.).  To attain this objective, GW has requested that section 210.3 of the

26

District's zoning regulations, which limits the total bulk of all buildings in residential areas to 3.5 gross floor area (FAR), be changed to permit a 4.5 FAR with respect to universities.  However, section 210.3 was specifically designed to "prevent unreasonable campus expansion into improved low-density districts."  11 DCMR § 210.3.

GW is doing this under the cloak of the new campus plan that itself is based on the assumption that the development will be consistent with academic purposes, that is, schools and dormitories.  But once this "campus use" is approved, GW intends to spring forward and file a PUD for a huge "commercial district, high bulk," one million square foot commercial development for Square 54 and seek a zoning map amendment to convert one more square block "in its campus core" from R-5-D to C-3-C.  Square 54 (the site of the old GW hospital) admittedly is to be "redeveloped as a mixed use town center" containing 500,000 square feet of office space, 330,000 square feet of residential space, and 100,000 square feet of retail space.  Application, at H-19.  The increase of the total bulk of all buildings from 3.5 FAR to 4.5 FAR would allow GW to build its commercial development on Square 54.  Yet, such a PUD could never be approved except for "extraordinary" reasons because high-bulk commercial developments are outlawed in zoning areas reserved for residential use.

Thus, by wearing its "college" robes, GW has filed an application for a commercial development that could not be approved if GW were wearing its "business suit."  A private business would never be able to obtain the Office of Planning's and the Zoning Commission's approval for such a large-scale commercial development in an area subject to R-5-D residential zoning.  GW's status as a university should not provide it with a license to be above the law.  As the District of Columbia Court of Appeals held in

*Marjorie Webster Junior College, Inc. v. District of Columbia Board of Zoning Adjustment*, 309 A.2d 314, 318-19 (D.C. 1973):

> The Zoning Regulations of the District of Columbia . . . provide no privileged position to colleges and universities. . . . Under our zoning regulations, a college has no right to locate in a residentially zoned district unless it conforms to all of the requirements outlined in [the] zoning regulation[s]. . . . To extend logically the petitioner's arguments would allow the college to maintain an agricultural experiment station in the midst of this residential area. One could hardly argue that the keeping of several hundred animals on the campus would be in harmony with the general purpose and intent of the zoning regulations.

Acceptance of GW's application and new campus plan will lead to the gutting of the zoning regulations, and set a precedent of grave import to the Nation's Capitol. *See* 11 DCMR § 2400.4 ("the PUD process shall not be used to circumvent the intent and purposes of the zoning regulations, nor to result in action that is inconsistent with the Comprehensive Plan"). If GW wants to build a high-bulk commercial development in the Foggy Bottom neighborhood, it must seek legislation from the District of Columbia Council. The Court must not permit the outrageous assault on the zoning regulations explicitly condoned by the Office of Planning. *See* April 10, 2006 Report from Ellen McCarthy.

Plaintiff is thus likely to succeed on the merits of its claim. Plaintiff will suffer irreparable injury if GW's application and new campus plan are considered and approved by the Zoning Commission when they completely fail to "present a plan for developing the campus as a whole" in an attempt to undertake major commercial development in a residentially zoned area under the pretense of "university use." 11 DCMR §§ 210.4, 507.3. Nor will the District be substantially harmed by following its own regulations and making decisions when all the facts are before it. The public interest also dictates that

government agencies make informed decisions and uniformly enforce the zoning

regulations irrespective of the status of GW as a university.  The Court should prohibit

the Zoning Commission from further considering or approving GW's application and

new campus plan until GW submits "a plan for developing the campus as a whole."  *Id.*

IV.     **GW's Application And New Campus Plan Are "Major Actions" Requiring The Preparation Of An Environmental Impact Statement**

Despite requesting zoning amendments that would have far reaching effects on

the environment of the District, and despite seeking the approval of a campus plan

encompassing 18 development sites, 1.74 million square feet of property, the construction

of a mixed-use town center in Square 54, a new medical facility in Square 39, an I Street

retail corridor, several high-rise commercial buildings, and the conversion of six square

blocks of residentially zoned property to commercial property in Foggy Bottom, GW has

failed to submit an environmental impact screening form ("EISF") in support of its

application and new campus plan.  Worse yet, the Office of Planning has recommended

the approval, and the Zoning Commission has set down for public hearing, GW's

application and new campus plan without the preparation of an EISF in contravention of

the District's environmental regulations, 20 DCMR § 7200 *et seq*.  As demonstrated

below, a preliminary injunction should issue to compel the District to follow its

environmental regulations in processing GW's application and new campus plan.

A.     **Likelihood Of Success On The Merits**

The requirement for submission of an EISF is grounded in the District of

Columbia Environmental Policy Act, DC ST. § 8-109 *et seq.*, which requires the District

to "prepare or cause to be prepared . . . a detailed EIS at least 60 days prior to

implementation of the proposed major action" whenever it "proposes or approves a major

action that is likely to have substantial negative impact on the environment." DC ST. § 8-109.03(a). A "major action" is "any action that costs over $1,000,000 and that may have a significant impact on the environment." *Id.* § 8-109.02(2).[6] GW's application and new campus plan are clearly "major actions" because they cost well over $1 million and are likely to have a significant impact on the environment of Foggy Bottom. This environmental impact is negative because it will increase population density, noise, pollution, and traffic in Foggy Bottom. Heiser Affid., ¶¶ 9,17. GW's application and new campus plan therefore cannot be considered or approved by the Zoning Commission prior to preparation of an EIS and the conclusion of the requisite public comment and hearing procedures set forth in DC ST. § 8-109.03(b). *See Concerned Citizens of Brentwood v. District of Columbia Board of Zoning Adjustment*, 634 A.2d 1234, 1241 (D.C. 1993).

The purpose of an EIS is to inform government agencies and the public of the environmental consequences of a proposed major action so as to ensure that environmental harm does not go undiscovered and that "the public health, safety, or welfare" do not become "endangered by the action." *Id.* § 8-109.04. To this end, an EIS describes the nature of the proposed major action and its environment; the relationship of the action with local and federal environmental standards; the existence of any adverse environmental impacts that cannot be avoided from the action; alternatives and alternative locations for the action; mitigation measures designed to minimize any

---

[6] The "environment" is defined as "the physical conditions that will be affected by a proposed action, including but not limited to, the land, air, water, minerals, flora and fauna." DC ST. § 8-109.02(3). The statute defines "action" as "a project or activity that involves the issuance of a lease, permit, license, certificate, other entitlement, or permission to act by an agency of the District government." *Id.* § 8-109.02(1).

adverse environmental impact; "the cumulative impact of the major action;" the "environmental effect of future expansion or action" reasonably foreseeable from the major action; and responses to comments from affected Advisory Neighborhood Councils and interested members of the public.  DC ST. § 8-109.03.  If the District determines that the proposed major action would have an adverse effect on the environment that cannot be remedied through mitigating measures or reasonable alternatives, "the District government shall disapprove the action."  *Id.* § 8-109.04.

The District of Columbia environmental regulations direct District agencies not to "approve any major action, or issue any lease, permit, license, certificate, or other entitlement or permission to act for a proposed major action" before the District has adequately considered and reviewed "the environmental impact of the action."  20 DCMR § 7200.1.  The regulations further provide that District agencies:

> *shall integrate the Environmental Impact Statement (EIS) process with other planning processes at the earliest stages of their planning for major actions* they intend to propose, when the widest range of feasible alternatives is open for consideration, and before there has been any irretrievable commitment of resources, in order to ensure that planning and decisions reflect environmental values, in order to avoid delays later in the process, and to head off potential conflicts.

*Id.* § 7200.2 (emphasis added).  The regulations thus require District agencies to consider the environmental impact of major actions before issuing any permits or approving any projects that are likely to have environmental consequences.[7]

Pursuant to these regulations, an EISF "shall be prepared for any action that would cost over one million dollars . . . and that may have a significant impact on the

---

[7] *See Foggy Bottom Association v. District of Columbia Board of Zoning Adjustment*, 791 A.2d 64, 72 (D.C. 2002) ("the FBA's argument as to the appropriate construction of the EIS regulations might be persuasive under different circumstances").

environment." 20 DCMR § 7201.1. The applicant or the lead agency is responsible for

issuing an EISF for major actions. *Id.* § 7204.1. In determining whether an action will

have a significant impact on the environment and whether an EISF is needed, any one of

these factors is sufficient to require the preparation of an EISF: the proposed action

might induce significant growth or concentration of population; disrupt or divide the

physical arrangement of an existing community; cause significant adverse change in the

existing level of noise in the vicinity of the action; violate any ambient air quality

standard or contribute to an existing air quality violation; significantly deplete or degrade

ground water resources or interfere with ground water recharge; or "together with other

actions proposed concurrently by the applicant, have a cumulative impact that would be

significant." *Id.* § 7201.2.

Upon submission of an EISF, the lead agency must make a written determination

concerning the need for an EIS and notify the public by publishing the same in the D.C.

Register. 20 DCMR §§ 7203.3, 7205.1, 7205.4. If the lead agency determines that an

EIS is necessary, "no lease, permit, license, certificate, or other entitlement shall be

issued by the District government" until the EIS has been *prepared and approved* by the

government. *Id.* § 7205.2. The issuance of an EISF is therefore not discretionary for

major actions proposed by private parties, such as GW's application and new campus

plan. Indeed, District agencies are prohibited from issuing "any license, permit,

certificate, or authorization until completion of the environmental impact review process

by the lead agency." *Id.* § 7203.6.

The public has a 45-day period to comment on an EIS, *id.* § 7208.2, and may

demand a public hearing if "25 registered voters in an affected single member district

request a public hearing on an EIS." DC ST. § 8-109.03(b); 20 DCMR § 7209.2. The

lead agency must then make a written determination within 30 days whether the proposed

major action identifies an adverse effect. 20 DCMR § 7210.1. If the lead agency

determines that the proposed major action would have an adverse effect on the

environment or endanger the public health, safety, and welfare, "the District government

shall disapprove the action, unless the applicant proposes mitigating measures or

substitutes a reasonable alternative to avoid the danger." DC ST. § 8-109.04; 20 DCMR

§ 7210.3.

GW's application and new campus plan constitute major actions that would have

substantial negative impact on the environment of Foggy Bottom by increasing

population density, noise, pollution, and traffic in this area. Heiser Affid., ¶¶ 9,16. An

EISF must therefore be prepared, and the lead agency must issue a *written determination*

concerning the need for an EIS, prior to consideration and approval of GW's application

and new campus plan. Preparation of an EISF is unquestionably necessary in this case

because GW's application and new campus plan cost well in excess of $1 million and are

likely to induce significant growth or concentration of population, § 7201.2(e), disrupt

the physical arrangement of an existing community, § 7201.2(i), cause significant adverse

change in the existing level of noise in the vicinity of the action, § 7201.2(n), violate

ambient air quality standards or contribute to an existing air quality violation,

§ 7201.2(k), and have a cumulative impact that would be significant. *Id.* § 7201.2(p).

The Office of Planning's April 10, 2006 recommendation for approval of GW's

application and new campus plan prior to the preparation of an EISF was both misguided

and premature. The Zoning Commission has likewise impermissibly set down for public

hearing GW's application and new campus plan without preparing (or requiring GW to prepare) an EISF. The actions of these agencies are in contravention of 20 DCMR § 7200.2, which directs District agencies to "integrate the Environmental Impact Statement process with other planning processes at the earliest stages of their planning for major actions."

In light of the magnitude of GW's proposed development and the far reaching environmental consequences it would have on the District and on Foggy Bottom, in particular, the District and the public cannot make an informed decision on GW's application and new campus plan without the aid of an EIS. Heiser Affid., ¶¶ 9,14,15,16. Plaintiff is therefore likely to succeed on the merits of its claim. A preliminary injunction should issue directing the District to halt consideration and approval of GW's application and new campus plan until an EIS is prepared, a public hearing held thereon, and a finding made by the District that the proposed action will not have an adverse effect on the environment. *See Citizens Ass'n of Georgetown, Inc. v. Zoning Commission of the District of Columbia*, 477 F.2d 402, 410 (D.C. Cir. 1973) (granting preliminary injunctive relief when the Zoning Commission failed to require the preparation of an environmental impact statement concerning proposed down-zoning in Georgetown).

### B.    Irreparable Injury

Plaintiff will suffer irreparable injury if preliminary injunctive relief is not granted directing the District to evaluate the environmental consequences of GW's application and new campus plan prior to their consideration and approval. The injury suffered by plaintiff is in two forms: it consists of deprivation of plaintiff's procedural right to ensure that environmental harm would not go undiscovered in Foggy Bottom; and plaintiff's

inability to educate the community about the environmental impacts of GW's proposed development in Foggy Bottom. *See, e.g., Friends of Tilden Park v. District of Columbia*, 806 A.2d 1201, 1210-13 (D.C. 2002).

The Supreme Court has long recognized the procedural right of citizens to demand governmental scrutiny of the environmental consequences of a construction project adjacent to their home. In *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n. 7 (1992), the Supreme Court stated: "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." Plaintiff, whose members reside in Foggy Bottom, clearly has sufficient geographical nexus to the site of GW's proposed development project to suffer its environmental consequences.

The District's failure to prepare (or to require GW to prepare) an EISF, and its failure to evaluate the need for an EIS, when the environmental impact of GW's project is likely to be substantial and negative, deprives plaintiff of its procedural right to ensure that environmental harm would not go undiscovered in Foggy Bottom where its members reside. The injury suffered by plaintiff is irreparable—should the District continue with its processing and approval of GW's first-stage PUD and rezoning application without preparing an EIS, the environmental impact of this project would not be known until it were too late. Indeed, for this very reason, the District's environmental regulations direct agencies to evaluate the environmental consequences of major actions *at the earliest stages of planning* and well before issuing any permits or authorizations to private

35

parties.  20 DCMR §§ 7200.1, 7200.2.  In the absence of an EIS, plaintiff (and interested members of the public, including the Advisory Neighborhood Council), cannot present their views to the District concerning the environmental impact of GW's project and whether mitigating measures or reasonable alternatives should instead be pursued.[8]  This is particularly so because GW's application requests zoning amendments and land-use deviating from local zoning procedures, warranting "a hard look at the decision not to file an impact statement."  *Maryland-National Capital Park and Planning Comm'n v. U.S. Postal Serv.*, 487 F.2d 1029, 1037-38 (D.C. Cir. 1973).

As the Court of Appeals for the District of Columbia Circuit held in *Jones v. District of Columbia Redevelopment Land Agency*, 499 F.2d 502, 511 (D.C. Cir. 1973), environmental impact statements are "not to be merely post hoc environmental rationalizations of decisions already fully and finally made.  Rather, their purpose is to ensure meaningful consideration of environmental factors at all stages of agency decision making, and to inform both the public and agencies implicated at subsequent stages of decision-making of environmental costs of the proposal."  Yet, the Office of Planning's April 10, 2006 set-down recommendation is a decision "fully and finally made" without considering its environmental consequences.  The District of Columbia Circuit in *Jones* held that preliminary injunctive relief is warranted for failure of government agencies to follow the mandates of the National Environmental Policy Act (not implicated in this case), even though there is no imminent harm to the environment, because "the

---

[8] Plaintiff has concurrently demanded a public hearing with respect to the requisite EIS pertaining to GW's application and new campus plan pursuant to DC ST. § 8-109.03(b) and 20 DCMR § 7209.2.  *See* Ex. A to Howell Affid. (containing signatures from 25 registered voters in Foggy Bottom).

imminence of physical steps [to carry out a project] is not an indispensable condition to preliminary injunctive relief." *Id.* at 512. The court explained:

> We think that the District Court defined too narrowly the kind of harm that, under NEPA, may be sufficient to warrant the intervention of a court of equity, even at a preliminary stage. The harm against which NEPA's impact statement requirement was directed was not solely or even primarily adverse consequences to the environment . . . . Rather, NEPA was intended to ensure that decisions about federal actions would be made only after responsible decision-makers had fully adverted to the environmental consequences of the actions, and had decided that the public benefits flowing from the actions outweighed their environmental costs. Thus, the harm with which courts must be concerned in NEPA cases is not, strictly speaking, harm to the environment, but rather the failure of decision-makers to take environmental factors into account in the way that NEPA mandates. And, for purposes of deciding whether equitable relief is appropriate, we think this harm matures simultaneously with NEPA's requirements, i.e., at the time the agency is, under NEPA obliged to file the impact statement and fails to do so. 499 F.2d 512.

Although NEPA is not implicated in this case, the District of Columbia Environmental Policy Act and its implementing regulations were intended to further the same objectives and policies served by NEPA. Indeed, the District of Columbia Circuit has held that the environmental mandates of NEPA should apply to the District government in view of its "unique physical presence at the seat of the government." *See Citizens Ass'n of Georgetown, Inc.*, 477 F.2d 410. This is so because the "various activities of the various District agencies and departments do, in fact, affect the quality of the environment in both the District of Columbia and the National Capitol Region as a whole and should, therefore, also meet the objectives and policies of [NEPA]." *Id.*

Irrespective of the application of NEPA to this case, the District's failure to observe its own environmental laws and regulations has caused plaintiff irreparable harm by depriving it of an opportunity to ensure against undiscovered environmental harm in Foggy Bottom arising from GW's application and new campus plan.

C.    **Substantial Harm To Others**

The District will not be substantially harmed by following the environmental impact review procedures set forth in DC ST. §§ 8-109 *et seq.*, and 20 DCMR §§ 7200 *et seq.* The "harm" suffered by the District in preparing an EIS and issuing written determinations concerning the environmental impact of GW's application and new campus plan is neither substantial nor cognizable in determining whether a preliminary injunction should issue in this case. In contrast, the harm to plaintiff is both substantial and irreparable.

D.    **The Public Interest**

The public interest will similarly be served by compelling District agencies to consider the environmental impact of their decisions. The public interest factor alone mandates issuance of a preliminary injunction in this case directing the District to prepare an EIS. Plaintiff and the public are entitled to know the environmental consequences of major development in their vicinity. As the District of Columbia Circuit held in *Citizens Ass'n of Georgetown, Inc.*, 477 F.2d 410, "[w]here, as here, the potential environmental effects of the Commission's decision are substantial, it must at least consider the environmental issue to fulfill its public interest mandate."

## CONCLUSION

For the above reasons, plaintiff respectfully requests the Court to grant its motion

for a preliminary injunction.

Respectfully submitted,

Dated: April 25, 2006

/s/ William Bode
William H. Bode (Bar No. 113308)
Peter Grenier (Bar No. 418570)
Stefan Shaibani (Bar No. 490024)
BODE & GRENIER, LLP
1150 Connecticut Avenue, N.W.
Ninth Floor
Washington, DC 20036
Tel:  (202) 862-4300
Fax: (202) 828-4130

*Attorneys for Foggy Bottom Ass'n*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 25, 2006, I electronically filed and on April 26, 2006

caused to be served by hand-delivery copies of (1) "PLAINTIFF'S MOTION FOR A

PRELIMINARY INJUNCTION," (2) "AFFIDAVIT OF JOY HOWELL,"

(3) "AFFIDAVIT OF SCOTT HEISER," and (4) "AFFIDAVIT OF STEFAN

SHAIBANI," addressed as follows:

> Robert Spagnoletti
> Office of the Corporation Counsel
> 441 4th Street, NW, Suite 1060N
> Washington, DC 20001
> Tel: (202) 727-3400
>
> <u>/s/ William Bode</u>