UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FOGGY BOTTOM ASSOCIATION, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>) Court No. 06 Civ. 0746 (RJL)<br>DISTRICT OF COLUMBIA OFFICE OF )<br>PLANNING, *et al.*, )<br>)<br>Defendants. )<br>) | |

### AFFIDAVIT OF SCOTT D. HEISER, P.E.

I, Scott D. Heiser, declare as follows:

1. I have been retained by the Foggy Bottom Association ("FBA") through EFI Global, Inc. to present my expert views concerning the environmental impact of the George Washington University's ("GW") February 16, 2006 "Application to the District of Columbia Zoning Commission for First-Stage Review and Approval of A Planned Unit Development and Zoning Map Amendment for the Foggy Bottom Campus" and the "Foggy Bottom Campus Plan: 2006-2025." (hereinafter referred to as "GW Application and GW Campus Plan"). This material has been designated by the District of Columbia Zoning Commission ("Zoning Commission") as case number 060-11 and 060-12, respectively.

2. My qualifications are as follows: I received a B.S. in Mechanical Engineering from Virginia Polytechnic Institute & State University in 1991 and an M.S. in Engineering Management with a concentration in Environmental Studies from the University Maryland University College in 1998. I am a licensed Professional Engineer in the District of Columbia. I have been an environmental consultant since 1991. Attached as Exhibit A is my resume and summary of project related experience.

3. My professional opinion is based upon my review of documents provided to me by plaintiff's counsel, Bode & Grenier, LLP, and my knowledge of environmental science. The following documents were provided for my review:

   a) The George Washington University Foggy Bottom Campus Plan: 2006 – 2025, dated February 16, 2006;
   b) The George Washington University Application to the District of Columbia Zoning Commission for First Stage Review and Approval of a PUD and Zoning Map Amendment for the Foggy Bottom Campus, dated February 16, 2006;
   c) Environmental Assessment, George Washington University Hospital Raze Project, District of Columbia Department of Health, dated May 2003.

4. The District of Columbia Environmental Policy Act of 1989, D.C. LAW § 8-36, *et seq.* and subsequently promulgated in Title 20 DCMR Chapter 72, requires that "Before an agency, board, commission, or authority of the District of Columbia government shall approve any major action, or issue any lease, permit, license, certificate, or other entitlement…..the environmental impact of the action must be adequately considered and reviewed by the District government, as provided in these regulations." § 7200.1. Furthermore, "Agencies, Boards, and commissions under the mayor's authority shall integrate…the Environmental Impact Statement (EIS) process with other planning processes at the earliest stages of their planning for major actions they intend to propose, when the widest range of feasible alternatives is open for consideration, and before there has been any irretrievable commitment of resources, in order to ensure that planning and decisions reflect environmental values, …." § 7200.2.

5. WHERE AS, an "action" is defined as a "project or activity that involves the issuance of a lease, permit, license, certificate, or other entitlement, or permission to act by an agency of the District government" and a "major action" is defined as "any action that costs over 1 million dollars and that under §7201.2 may have a significant impact on the environment".

6. WHEREAS, a "major action" requires the submission of an Environmental Impact Screening Form (EISF) in accordance with §7204 to determine if the "action is likely to have substantial negative impact on the environment, and whether an Environmental Impact Statement (EIS) is required." §7205.1

7. WHEREAS, if determined to be required, the EIS shall, in part, analyze the following pursuant to §7206.2:

> d) Alternatives to the proposed major action, including alternative locations and the adverse and beneficial effects of the alternatives;
> f) Mitigation measures proposed to minimize any adverse environmental impact;
> h) The cumulative impact of the major action when considered in conjunction with other proposed actions;
> i) The environmental effect of future expansion or action, if expansion or action is a reasonably foreseeable consequence of the initial major action and the future expansion or action will likely change the scope or nature of the initial major action or its environmental effects;

8. Based on my review of the GW's Campus Plan, GW proposes to develop 18 sites within the boundaries of the GW Campus, leading to an increase of 1,732,590 square feet of Gross Floor Area (excluding Square 54 and Square 80 planned developments), and 1,027 additional parking spaces (including of Square 54 and 80 development sites). This development will far exceed $1 million in costs; and in fact will likely exceed $100 million.

9. An action costing more than $1 million and meeting any of the conditions listed in §7201.2 is classified as a major action. Based on my experience and training as an environmental consultant, the following conditions listed in §7201.2 are relevant to GW's Application and Campus Plan:

> (e) The action might induce significant growth or concentration of population;
> (i) The action might disrupt or divide the physical arrangement of existing community;
> (k) The action might violate any ambient air quality standard, contribute significantly to an existing or projected air quality violation, or expose sensitive receptors to significant pollution concentration;

 (n) The action might cause significant adverse change in the existing level of noise in the vicinity of the action; and

 (p) The action, together with other actions proposed concurrently by the applicant, might have a cumulative impact that would be significant under the criteria described in Sections 7201.2(a) – (o).

In conclusion, it is my professional opinion that GW's Application constitutes a major action, as defined by Title 20 DCMR Chapter 72, and thus is subject to the environmental review process, or more specifically, requires the submission of an EISF.

10. Furthermore, the EISF evaluates each major action by a series of questions and criteria. Specifically, if an applicant answers any one of the Questions #10 through #15 in Section III in the affirmative, the applicant is required to prepare and submit an air quality analysis of emissions for carbon monoxide, volatile organic compounds, and nitrogen oxide resulting from mobile sources associated with the proposed project in accordance with the District of Columbia Department of Health's guidance. The following EISF questions are relevant to GW's Application and Campus Plan:

 EISF Q#10 Will the proposed project provide 50 or more new parking spaces?
 EISF Q#11 Will the proposed project consist of shopping and/or commercial facilities having 50,000 or more square feet of gross floor space?
 EISF Q#12 Will the proposed project consist of entertainment and/or recreational facilities, including but not limited to theaters, auditorium, sports stadiums, bowling alleys, etc. having a capacity to accommodate more than 400 persons at one time?

11. As a starting point, I note that in an Environmental Assessment prepared for the GW Hospital Raze Project in May 2003, the Department of Health addressed environmental conditions in the Foggy Bottom area in conjunction with an agency proceeding relating to the new GW Hospital. A copy of this report in attached as Exhibit B to this affidavit.

12. Primarily because the new GW Hospital replaced an existing hospital, the Department of Health determined that an EIS was not required. However, in its report, the Department of

health found that, "The EPA has designated the region as a "severe non-attainment area" for ozone." The Department of Health further found that in the Washington area, "28 percent of the volatile organic compounds (VOCs) that form ozone come from mobile sources." The Department of Health concluded that approximately one-third of the 'mobile source" pollution "is attributed to commuting traffic and the rest comes from the trips throughout the day, such as business travel or truck deliveries." (Report, at 11). The Department of Health thus identified vehicular traffic as a factor of particular relevance to assessing the environmental impact of future development in the Foggy Bottom area.

13.    Based on my review of GW's Application for First Stage Review and Approval of a Planned Unit Development (PUD) and Zoning Map Amendment, GW is seeking approval and adoption by the District's Zoning Commission for GW's PUD, along with concessions regarding zoning changes and increases in allowable Floor to Area Ratios.

14.    Approval or adoption of GW's Application or Campus Plan prior to completing the environmental review process, is contrary to §7200.1. Additionally, §7200.2 requires the DC government's agencies, Boards, and commissions to integrate the environmental review process at the earliest stages of planning so that all feasible alternatives may be considered. By approving GW's Applications at this time, no other alternatives or mitigating measures will be considered.

15.    Consequently, it is my opinion that the District of Columbia must require that the environmental review process commence and be completed prior to considering GW's Applications for a PUD and new Campus Plan. This includes the preparation and submission of an EISF by GW, and the preparation of an EIS by the D.C. Department of Health.

16. In my opinion, the environmental impact of GW's Application and Campus Plan must take into account the cumulative environmental impact of all developments currently planned by GW in the Foggy Bottom campus, including those introduced by GW's new Hospital, the mixed use town center proposed to be developed on Square 54, the I Street retail corridor, and the cancer center and other developments on Square 80.

17. In sum, I can declare with a high degree of confidence that the duration, extent, and magnitude of GW's expansion and development plans, as set forth in its Application and Campus Plan, has the potential for causing a significant negative impact on the environment of the District of Columbia in general, and Foggy Bottom, in particular. The expansion and development by GW could result in significantly increased air and noise pollution.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: April 24, 2006

_____
Scott D. Heiser, P.E.
EFI Global, Inc.
8100 Professional Place
Suite 113
Landover, MD 20785

# SCOTT D. HEISER, P.E., PMP
*Senior Consultant*

**YEARS OF EXPERIENCE:** 14

**EDUCATION**

Master of Science, Engineering Management, University Maryland University College, 1998

Bachelor of Science, Mechanical Engineering, Virginia Tech, 1991

**REGISTRATIONS**

Professional Engineer:
  Virginia, #0402 028855
  Maryland, #26184
  District of Columbia, #PE900320

**LICENSES AND CERTIFICATIONS**

Project Management Professional, Project Management Institute, #505428

Certified Risk Assessor, District of Columbia

40-HR HAZWOPER

**AFFILIATIONS**

American Society for Mechanical Engineers

Project Management Institute

**PROFESSIONAL EXPERIENCE**

EFI Global, Inc., Senior Consultant, 2005 – Present

EMCOR Facilities Services, Inc., Senior Consultant, 1998 – 2005

Larox, Inc., Project Engineer, 1997 – 1998

BDM International, Inc., Staff Engineer, 1994 – 1997

Environmental Elements Corporation, Field Engineer, 1991 - 1994

**PROFESSIONAL SUMMARY**

Mr. Heiser has more than fourteen years of experience as a project manager and engineering/environmental consultant for multi-disciplinary and complex projects. While his primary duties include successful management and execution of various environmental contracts, Mr. Heiser specializes in contract management and administration. Projects include hazardous materials surveys and assessments, due diligence, remedial work plans and specifications, hazardous waste management, and environmental compliance planning.

**RELEVANT PROJECT EXPERIENCE**

**U.S. General Services Administration, Drum Remediation Project – Lorton, VA**

Mr. Heiser was the project manager for the remediation of a drum burial site for the U.S. General Services Administration Property Disposal Division. The drums were encountered on a parcel of property conveyed from federal ownership to local government. Over 1,000 drums were excavated and characterization for off-site disposal as a mixture of petroleum based products. The drums were buried as a result of vehicle maintenance facility dating back into the 1960's. Approximately 3,500 tons of residually impacted soils were disposed off-site. The clean-up standards were for unrestricted residential use.

**Confidential Client, Luxury High Rise Forensic Engineering Project – Washington DC**

Mr. Heiser acted as the client's primary project manager and point of contact for a multi-tasked engineering project at a luxury residential high rise. The scope of work includes four basic tasks including forensic piping inspection, evaluation, and repair, forensic roofing inspection, evaluation, and repair, a common element engineering study, and a unit element engineering study. The forensic investigations were of faulty piping mechanical systems and roofing membrane structures and flashing details. Mr. Heiser coordinated and managed the progress for each of the technical teams performing on the four tasks. The project's objectives were to perform a comprehensive evaluation of the building systems, make recommendations, and oversee the repairs necessary to restore the building systems. The consulting services rendered are valued at approximately $2 million.

**RELEVANT PROJECT EXPERIENCE (continued)**

**Heery International, Inc./U.S GSA/DC Department of Corrections, Lorton Correctional Complex – Lorton, VA**

Mr. Heiser performed as the Project Director for the Lorton Environmental Remediation Project, responsible for all phases of contract management.  The project involves the preparation of a Phase I and Phase II Environmental Site Assessment for the 3,000 acre property, developing a cost estimate for remediation, conducting a comprehensive site investigation into areas of concern identified as requiring remediation, developing Remedial Designs, and executing the successful remediation of the areas of concern.  The areas of concern include several outdoor firing ranges (20,000 tons lead contaminated soil requiring on-site macro-encapsulation and stabilization), a non-permitted landfill (150,000 tons of lead and petroleum contaminated soils), and a large diesel petroleum spill site (50,000 tons of petroleum contaminated soils).  Additionally, Mr. Heiser managed a contract to perform an unexploded ordnance (UXO) survey and sweep in several locations where crowd control training was conducted.  Mr. Heiser was responsible for managing from 6 to 12 full-time, on-site professional staff charged with oversight, documenting, and supervising the remediation efforts, to make sure the objectives of the Remedial Design were met.  The remedial efforts managed on behalf of the General Services Administration are valued at approximately $18 million dollars.

In addition to the remedial activities, the project requires the development and implementation of a comprehensive hazardous waste management program and a complete underground and aboveground storage tank management program for the prison's industrial operations network.  The hazardous waste program includes training the correction's employees.  The hazardous waste and storage tank programs were brought into full compliance within 18 months and involved extensive training of personnel, contract management for disposal of hazardous waste, 28 tank removals and closures, 14 petroleum site characterizations, and the preparation and execution of two Corrective Action Plans.  Contracts managed on behalf of the District Department of Corrections are valued at approximately $750 thousand dollars.

The professional consulting and project management services rendered under Mr. Heiser's guidance and supervision for the Lorton Project is valued at approximately $4 million over 4 years.

**Confidential Client, Former Recycling & Scrap Facility – Wilmington, NC**

Mr. Heiser provided contract management and consulting services for the remediation of an industrial site in North Carolina that was used as a ship scrap and recycling yard.  The Site was remediated pursuant to an approved Corrective Action Plan by the state.  Bioremediation of petroleum soils with off-site disposal of asbestos and lead contaminated soils was considered by performing a treatability study, which indicated unfavorable conditions for this method.  The method employed was excavation and off-site disposal of impacted soils.  Contaminants of concern are petroleum, lead, and asbestos.  Tasks included contract management, evaluating treatability studies, and preparing proposal specifications.  The value of the remediation contract is approximately $1.8 million; and required the removal of 28,000 tons of impacted soils.

**Heery International, Inc./Court Services Offendor Supervision Agency, Indoor Air Quality Surveys – Washington DC**

Mr. Heiser provided environmental consulting services for performing indoor air quality surveys of multiple facilities occupied by the Court Services Offender Supervision Agency.  Industry standard protocols were followed for measuring carbon dioxide, carbon monoxide, internal space temperature, and humidity using direct read instruments and comparing the results to established comfort zones.  Respirable dust and bioaerosol sampling was also performed to determine the general condition of indoor air quality and potential adverse impacts on occupants.

**Potomac Electric Power Company, Indoor Air Quality Surveys/Demolition Contract Administration – Maryland & Washington DC**

Mr. Heiser provides ongoing environmental and engineering consulting services to the project management and contracting division of the PEPCO. Mr. Heiser has performed indoor air quality surveys at three major PEPCO facilities: Forestville, Benning, and Rockville sites. Mr. Heiser also provides consulting services for the preparation of specifications, environmental planning, cost estimating and construction administration for demolition of facility buildings.

**U.S. Department of State, Spill Prevention Planning – Various Locations**

Mr. Heiser has prepared, reviewed, and approved Spill Prevention, Control and Countermeasures (SPCC) plans in accordance with the newly updated regulations for six facilities in the District of Columbia and southeastern states.

**Hensel Phelps Construction Company, Environmental Consulting – Various Locations**

Mr. Heiser has provided environmental consulting services for several of Hensel Phelps major renovation projects. For the Social Security Administration building in Baltimore, Maryland, Mr. Heiser has provided consulting on asbestos abatement design, surveys, and oversight, lead based paint surveys, air quality monitoring, and PCB electrical equipment assessments. For the U. S. Patent Office in the District of Columbia, Mr. Heiser provided disposal and profiling assistance for arsenic and lead contaminated soils. For the Masonic Temple located in Providence, Rhode Island, Mr. Heiser developed a lead in soil abatement specification. Mr. Heiser developed a corporate wide Hazardous Materials and Waste Management Program to be implemented at all construction sites nationwide.

**Confidential Mission Critical Facility, Indoor Air Quality Assessment – Hayward, CA**

Mr. Heiser conducted a multi-disciplined analysis of a building's systems and their contribution to adverse air quality. The building was a mixed production and disaster recovery mission critical data center. The factors that were evaluated as potential contributors to poor air quality were release of fibrous building materials, the mechanical air distribution systems, and decay of structural building systems, e.g. concrete and plaster. The analysis included recommendations for enhancing best practices and security for the building, while considering environmental, mechanical, electrical, fire protection, and structural engineering property condition assessment elements.

**Vornado-Smith, Discharge Permit & Monitoring – Bethesda, MD**

Mr. Heiser evaluated and prepared applications for environmental cooling water discharge permits in the State of Maryland for a cluster of six individual properties. Subsequent to the approval of the discharge permits, Mr. Heiser was responsible for managing the monthly sampling events, evaluation of the data, and preparing quarterly reports to the state regulatory agency.

**Urban Opportunity Fund, Due Diligence Environmental Site Assessments – Washington DC**

Mr. Heiser provides due diligence environmental assessment services to the Urban Opportunity Fund, LLC in its ongoing efforts to acquire and redevelop target properties in the District of Columbia. Mr. Heiser has performed environmental site assessment due diligence for over 10 properties, implementing a remediation action plan and conducting a Risk Based Closure for a leaking underground storage tank at one of the acquired properties.