UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FOGGY BOTTOM ASSOCIATION, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>DISTRICT OF COLUMBIA OFFICE OF )<br>PLANNING, *et al.*, )<br>)<br>Defendants. )<br>) | Court No. 06 Civ. 0746 (PLF) |

## PLAINTIFF'S FIRST REQUESTS FOR ADMISSIONS

COMES NOW Plaintiff Foggy Bottom Association, by undersigned counsel, pursuant to Rule 36 of the Federal Rules of Civil Procedure and the Court's Expedited Discovery Schedule in this matter, and propounds the following Requests for Admissions to be answered in writing and under oath by Defendant within fourteen (14) days of the date of service. Please answer the Requests separately and fully in writing and under oath, and serve a copy of your answers upon undersigned counsel at the offices of Bode & Grenier, L.L.P., 1150 Connecticut Avenue, N.W., 9th Floor, Washington, DC 20036-4192.

### Instructions and Definitions

A.   These Requests seek all information that is known to you, your agents, servants, consultants, investigators or anyone acting for or on your behalf, and unless otherwise privileged, your counsel and their employees, representatives, agents, servants, investigators, consultants or anyone acting for or on their behalf.

B.   Unless otherwise indicated, the term "Plaintiff" as used herein shall refer to the Foggy Bottom Association, and, to the extent not privileged, shall include all of its agents, representatives, and all other persons acting or purporting to act on their behalf.

**Exhibit 2**

C.     In accordance with Fed. R. Civ. P. 36), your responses shall be signed by the person making them.

D.     If you perceive any ambiguities in a question, instruction, or definition, set forth the matter deemed ambiguous and the construction used in answering.

E.     Whenever in these Requests a request for information is framed in the conjunctive, the request should also be interpreted in the disjunctive, and vice versa, so as to interpret the request broadly, rather than narrowly. The singular of a noun should be interpreted as including the plural form and vice versa.

F.     If you object on grounds of privilege (or for any other reason) to answering any request calling for certain information or for the identification of certain documents, you shall set forth all grounds for your refusal to answer.

G.     The term "document" as used herein means all materials so defined in the broadest sense of Fed. R. Civ. P. 34(a), and includes any written, printed, typed, recorded, or graphic matter, however produced or reproduced, of any kind or description; any other tangible thing by which information or data is stored, including any writing, drawing, film, graph, chart, photograph, phonograph record, mechanical or electrical sound recording or transcript thereof, computer printout or display; as well as any retrievable data or information (whether in computer storage or on computer hard-drive or disk), and all information carded, taped, coded or stored (electrostatically, electromagnetically or otherwise), and any other data compilation from which this information can be obtained. Without limiting the generality of the foregoing, "document" shall include all computer disks, computer e-mails, computer printouts, correspondence, letters, telegrams, telephone messages, notices, notes of conversations, memoranda, reports, diaries, minutes, recitals, statements, work sheets, abstracts, resumes, summaries, notes, jottings, market

data, books, journals, ledgers, audits, charts, diagrams, statutes, regulations, policies, procedures, rules, guidelines, manuals, handbooks, brochures, audio and/or video tapes, training materials, teaching materials, research documents, newspapers, appointment books, desk calendars, and expense reports. It also shall include drafts and non-identical copies of any such documents.

H. The term "GW" shall refer to The George Washington University, and include all employees, subdivisions, agents, assigns, or persons acting of its behalf.

## REQUESTS FOR ADMISSION

**Request #1:** The document attached to these requests is a true and correct copy of the December 7, 1999 memorandum from Bernard Bloom (Air Quality Division of the D.C. Department of Health) to Jim Sweeny (Hazardous Waste Division of the D.C. Department of Health) regarding "George Washington University Replacement Hospital Project Air Quality Impact."

**Request #2:** The Internet document located at http://www.gwu.edu/~ire/on_campus_e05.htm is a true and correct copy of GW's Fall 2005 "on-campus enrollment" statistics.

**Request #3:** The Internet document located at http://www.gwu.edu/~ire/unduplicated_e05.htm is a true and correct copy of GW's Fall 2005 "unduplicated enrollment" statistics.

**Request #4:** The Internet document located at http://www.gwu.edu/~ire/ep.htm is a true and correct copy of GW's Fall 2005 "enrollment and persistence" statistics.

3

**Request #5:** The document attached to GW's proposed "Foggy Bottom Campus Plan (2006-2025)" at Attachment Q-1 is a true and correct copy of "Total GW Student Body" calculations for Fall 2005.

Respectfully submitted,

/s/ William Bode
William H. Bode (Bar No. 113308)
Peter Grenier (Bar No. 418570)
Stefan Shaibani (Bar No. 490024)
BODE & GRENIER, LLP
1150 Connecticut Avenue, N.W.
Ninth Floor
Washington, DC 20036
Tel: (202) 862-4300
Fax: (202) 828-4130
*Attorneys for Foggy Bottom Ass'n*

### Memorandum

**TO:** Jim Sweeney
Hazardous Waste Division

**FROM:** Bernard Bloom
Air Quality Division

**DATE:** December 7, 1999

**SUBJECT:** George Washington University Replacement Hospital Project Air Quality Impact

The air quality impact of the George Washington University Replacement Hospital has now been reviewed two times. An initial review was completed on October 10, 1999. The result of that review, which was a review of a consultant-performed air quality study, resulted in a determination that the analysis performed by the consultant was an unreliable guide for determining the air quality impact of the replacement hospital. The results of that review were reported in a memorandum from myself to Donald Wambsgans, the AQD Program Manager. The results were also shared with the hospital and its air quality consultant.

Subsequently, the consultant, Delon Hampton and Associates, performed a second study. This study used some, but not all, of the written technical guidance that we provided. A formal review of the consultant's second study was held at the consultant's office on November 23, 1999. Subsequently, the formal study report (dated November 22, 1999) was delivered to this office and reviewed against the oral presentation at the consultant's office.

As a result of these interactions, I have drawn the conclusion that the potential for the project to exceed any criteria pollutant's ambient air quality standard in the vicinity of the replacement hospital is small. Secondly, I have concluded that the hospital has developed mitigations to offset the potential for nuisance odors that could emanate from the loading dock on the western face of the hospital.

### Criteria Pollutant Review

The hospital was asked to perform an assessment of the impact of the project on ambient carbon monoxide concentrations. The hospital was not asked to evaluate impacts on ground-level ozone, fine particulate matter, lead, or nitrogen dioxide for the following reasons.

- **Ozone:** This is a regional problem, not amenable to project-specific analysis

- **Particulates:** We are only now deploying and making first year PM2.5 measurement. The assessment of PM2.5 impact is premature.

- **Nitrogen Dioxide:** The entire region, including the District of Columbia is experiencing NO2 levels that are approximately half the National Ambient Air Quality Standard (NAAQS) for this contaminant. I judged that this project would not contribute enough NO2 to cause any analytically discernable increase

in NO2 levels and could not possibly jeopardize our current attainment status.

Lead: There is no activity within this project that could increase lead ambient concentrations. The city is already two orders of magnitude below the relevant NAAQS.

With respect to carbon monoxide, the concern has been that the precise location of the hospital is along the congested 23rd St. corridor south of Washington Circle. Therefore, even if the hospital's CO impact were small, it could be impinging on already-high CO levels. This Division monitors CO on L St., NW at a location where average daily traffic (ADT) is approximately 17,000 vehicles per day. On 23rd St. the ADT figures are in the range 23,500-29,000 vehicles per day. Insofar as the L St. measured 2nd highest 8-hour concentrations are currently 67% of the CO NAAQS, and insofar as the 23rd St. traffic flow is 38% higher than at our monitor location, I asked the consultant to pay significant attention to the pre-build case.

The analysis that was rerun indicates that the prebuild 8-hour carbon monoxide levels in the vicinity of George Washington University Replacement Hospital (the 23rd St. corridor between H St and Washington Circle) will be in the range 7.1 to 8.4 ppm under meteorological conditions that produce 2nd highest annual 8-hour concentrations.[1] The most important reasons for the range are uncertainties in background concentration (3.4 to 5.0 ppm)[2] and uncertainties in the traffic densities in between the AM and PM commuter peaks[3]. The project will result in changes (both upwards and downwards, depending on specific receptor location) of approximately 0.25 ppm. Therefore, I have concluded that the most probable annual 2nd highest annual 8-hour concentration will be in the range 7.3 to 8.7 ppm. For comparison, the 8-hour carbon monoxide National Ambient Air Quality Standard is 9.0 ppm, not to be exceeded more than once each year.

The final result of these studies and of our review of the methodology and results is that the 23rd Street corridor just south of Washington Circe will experience peak CO concentrations that are just below the applicable health standard, with essentially no room to spare on the high side of the estimated range.

The significance of this result is important because the replacement hospital project does not include any use of the existing facility, located on the east side of 23rd Street. The consultant's study does not take into account any traffic that may be generated by future uses for the existing building or the land, which that structure occupies. Future uses for that building will need to take into account that it appears that for now, the air resource south of Washington Circle is essentially used up by this project (and by existing traffic).

Odor Review

The review of the original Delon Hampton Air Quality Study noted that there was no description of the potential for odors on the west side of the replacement hospital nor of the equipment that

---

[1] That is, wind direction-persistent calms (0-2 mph) in the winter, during times that include AM and PM traffic peaks.
[2] Delon Hampton obtains a background concentration of 3.4 ppm. Apex Environmental's assessment of the GWU Parking Garage project in the same neighborhood obtains a background level of 5.0 ppm.
[3] Delon Hampton used peak flows developed by Gorove/Slade for UHS. Delon Hampton reasonably scaled these downwards to obtain mid-morning and mid-afternoon traffic flow estimates. They are only estimates, however.

might be used to mitigate such odors. In the November 22, 1999 report, two significant mitigations are described. First, the consultant states that the hospital intends to sterilize all wastes, including food and medical wastes, prior to temporary storage on the loading dock. This practice, which should be required as a condition for project approval, should mitigate odors from wastes. Secondly, the November 22, 1999 report describes a loading dock door locking system that will, if used, force truck drivers not to idle trucks within the loading dock area. Again, such a mitigation should be incorporated into a formal condition for plan approval.


Cc. Don Wambsgans, J. Collier, D. Thompson