**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

FOGGY BOTTOM ASSOCIATION,    )
                                )
       Plaintiff,         )
                                )
       vs.             )
                                )  Court No. 06 Civ. 0746 (RJL)
DISTRICT OF COLUMBIA OFFICE OF    )
PLANNING, *et al.*,         )
                                )
       Defendants.       )
_____)

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS


Dated: June 9, 2006                /s/ William Bode
                                        William H. Bode (Bar No. 113308)
                                        Peter Grenier (Bar No. 418570)
                                        Stefan Shaibani (Bar No. 490024)
                                        BODE & GRENIER, LLP
                                        1150 Connecticut Ave, NW, 9th Fl.
                                        Washington, DC 20036
                                        Tel:  (202) 862-4300

                                        *Attorneys for Foggy Bottom Ass'n*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………..iii

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS...................1

BACKGROUND……………………………………………………………………….2

ARGUMENT……………………………………………………………………………...4

      I.   DEFENDANT'S MOTION TO DISMISS IS MOOT ……………........4

      II.   *YOUNGER* ABSTENTION IS INAPPROPRIATE ……..……..............4

      III.   PLAINTIFF POSSESSES ORGANIZATIONAL STANDING …..........7

      IV.   PLAINTIFF ALLEGES A VIABLE TAKINGS CLAIM ………..........10

            A.  Plaintiff's Takings Claim Requires An *Ad-Hoc* Factual
               Inquiry.................................................................10

            B.  Plaintiff Asserts A Viable Takings Claim Under *Loretto*….13

            C.  Plaintiff Asserts A Viable Takings Claim Under *Penn
               Central*……………………………………………………..16

                  a.  Character Of The Government Action………………18
                  b.  Economic Impact Of The Regulation………………..19
                  c.  Interference With Investment-Backed
                     Expectations……………………………………………20

            D.  The District Mischaracterizes Plaintiff's Takings Claim…..20

      V.   PLAINTIFF'S TAKINGS CLAIM IS RIPE…………………………..22

      VI.   EXHAUSTION IS NOT A DEFENSE TO PLAINTIFF'S TAKINGS
           CLAIM……………………………………………………………………25

      VII.   THE COURT POSSESSES SUPPLEMENTAL JURISDICTION TO
           ENTERTAIN PLAINTIFF'S NON-FEDERAL CLAIMS……………26

            A.  Plaintiff's Section 6-641.09 Claim………………………...27

i

B.  Plaintiff's Section 8-109.03(a) Claim…………………...…30

C.  Plaintiff's 11 DCMR § 210.2 Claim………………………35

D.  Plaintiff's 11 DCMR §§ 210.4, 507.3 Claim………………35

CONCLUSION……………………………………………………………………..38

## **TABLE OF AUTHORITIES**

### **CASES**

*American Towers, Inc. v. Williams*, 146 F.Supp.2d 27 (D.D.C. 2001)……………………………7

*Arnett v. Myers*, 281 F.3d 552 (6th Cir. 2002)……………………………………………...............24

*Autozone Development Corp., et al. v. The District of Columbia, et al.*,

2006 WL 522437 (D.D.C. 2006)…………………………...……………………… ……...............4

*B & W Management, Inc. v. Tasea Investment Company*, 451 A.2d 879 (D.C. 1982)…… …….27

*Bancoult v. McNamara*, 214 F.R.D. 5 (D.D.C. 2003)……………..……… ……………………...4

*Bannum, Inc. v. District of Columbia Board of Zoning Adjustment*,

2005 WL 1076179 (D.D.C. 2005)…… …………………………………………………..……7

*Bridges v. Kelly*, 84 F.3d 470 (D.C. Cir. 1996)……………………………………… ……...........4,6

*Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003)……………… ……………17

*City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687 (1999)…………..........6,20

*Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976)………………..4

*Concerned Citizens of Brentwood v. District of Columbia Board of Zoning Adjustment*,

634 A.2d 1234 (D.C. 1993)……………… ……………………………………….........................30

*Conely v. Gibson*, 355 U.S. 41 (1957)……………… ………………………....……………...17

*DaimlerChrysler Corp. v. Cuno*, 126 S.Ct. 1854 (2006)…………………………………………9

*Del Monte Dunes at Monterey, Ltd. v. City of Monterey*,

920 F.2d 1496, 1507 (9th Cir. 1990)……………………………………………………………24

*Devon Energy Corp. v. United States*, Fed. Cl. 519, 529 (1999)……………...………………26

*District Intown Properties Limited Partnership, et al. v. District of Columbia, et al.*,

*198 F.*3d 874 (D.C. Cir. 1999)……………………………………………………………..23,24

*District of Columbia v. Totten*, 5 F.2d 374 (D.C. Cir. 1925)……………………………………27

*District Properties Associates. v. District of Columbia*, 743 F.2d 21 (D.C. Cir. 1984)……….5,21

*DLX, Inc. v. Kentucky*, 381 F.3d 511 (6th Cir. 2004)……………………………………………25

*Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998)………………… …………………………...11

*Family Div. Trial Lawyers of the Superior Court v. Muoultrie*,

725 F.2d 695 (D.C. Cir. 1984)………………… …………………………………………………6

*First English Evangelical Lutheran Church of Glendale v. Los Angeles*,

482 U.S. 304 (1987)………………… ……………………………………………………………..19

*George Washington University v. District of Columbia*, 318 F.3d 203 (D.C. Cir. 2003)……….29

*George Washington University v. District of Columbia*, 391 F. Supp. 2d 109 (D.D.C. 2005)…...29

*George Washington University v. D.C. Bd. of Zoning Adjustment*, 831 A.2d 921 (D.C. 2003)...29

*Glenbrook Road Ass'n v. District of Columbia Board of Zoning Adjustment*,

605 A.2d 22 (D.C. 1992)…………………………… ……………………………………………..35

*Holland v. County of Maui*, 100 Fed. Appx. 683 (9th Cir. 2004) (unpublished disposition)........23

*Hornstein v. Barry*, 560 A.2d 530 (D.C. 1989)………………………… ………………………13

*Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333 (1977)……….................8

*I.A.M Nat'l Pension Fund Benefit Plan v. Stockton Tri Industries*,

727 F.2d 1204 (D.C. Cir. 1984)………………………… ………………………………………25

*JMM Corp. v. District of Columbia*, 378 F.3d 1117 (D.C. Cir. 2004)………………………...6,7

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979)………………….......…………………11,15

*LaShawn v. Kelly*, 990 F.2d 1319 (D.C. Cir. 1993)………….…………………......................6

*Lerner v. Fleet Bank*, 318 F.3d 113 (2nd Cir. 2003)…………………………………………21,26

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) ………..………...3,13,21

iv

*Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992)……………...................11,15,17

*Lund v. Watergate Investors Ltd. Partnership*, 728 A.2d 77 (D.C. 1999)……………………….27

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)……… ……………………………………….8

*Maryland-National Capital Park and Planning Comm'n v. U.S. Postal Serv.*,

487 F.2d 1029, (D.C. Cir. 1973)…… …………………………... ……………………………...33

*Mekuria et al.  v. Washington Metropolitan Area Transit Auth.*,

975 F. Supp. 1 (D.D.C. 1997)……………………………………………….……11,12,13,17

*Mekuria, et al. v. Washington Metropolitian Area Transit Authority*,

45 F.Supp. 2d 19 (D.D.C. 1999)…………………………………………………....11,12,18,24

*National Taxpayers Union, Inc. v. United States*, 68 F.3d 1428 (D.C. Cir. 1995)………………..8

*New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350 (1989)……4,5

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001)………………………….....……………..16,17,22

*Penn Central Transportation co. v. New York City*, 438 U.S. 104 (1978)………………2,3,15,16

*Preschool Development, Ltd. v. City of Springboro*,

2005 WL 1038849, at *6-17 (S.D. Ohio 2005)……………………………………………...26

*Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996)……………………………………..15

*Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996)…………………………………………..6

*Rio Grande Community Health Center, Inc. v. Rullan*, 397 F.3d 56 (1st Cir. 2005)……………..6

*Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 126 S.Ct. 1297 (2006)…………8

*Shear v. National Rifle Association of Amerca,* 606 F.2d 1251 (D.C. Cir. 1979)………………..17

*Silverman v. Barry*, 727 F.2d 1121 (D.C. Cir. 1984)…………………………….……………5,13,21

*Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725 (1997)……………………………...22

*United States v. Causby*, 328 U.S. 256 (1946)…………………………………………….13,14

*United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669 (1973)…...9

*Warth v. Seldin*, 422 U.S. 490 (1975)…………………………………………………………10

*Washington Legal Clinic for the Homeless v. Kelly*, 1994 WL 823564 (D.D.C. 1994)…………..6

*Wilhelmsen v. Board of Commissioners*, 694 F. Supp. 809 (D. Wyo. 1988)……………………26

*Williamson County Regional Planning Commision v. Hamilton Bank*,

473 U.S. 172 (1985)……………………………………………………………...22,23,24,25

*Younger v. Harris*, 401 U.S. 37 (1971)…………………………………….…...….…1,4,5,6,7

## STATUTES & REGULATIONS

DC ST. § 6-641.09…………………………………………………………………3,21,26,27

DC ST. § 8-109………………………………………………………………………………..29

10 DCMR § 112.6………………………………………………………………….........34

11 DCMR § 210…………………………………………………...……………………3,26,34,35

11 DCMR § 507.3……………………………………………………………………..3,26,35

20 DCMR § 7200.2…………………………………………………………………………31,32

20 DCMR § 7201.2……...……………………………………………………………………32

16 U.S.C. § 470……………………………………………………………………….…...2

28 U.S.C. § 1367(a)………………………………………………………………………26

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
FOGGY BOTTOM ASSOCIATION,        )
                                 )
        Plaintiff,               )
                                 )
        vs.                      )
                                 )  Court No. 06 Civ. 0746 (RJL)
DISTRICT OF COLUMBIA OFFICE OF   )
PLANNING, *et al.*,              )
                                 )
        Defendants.              )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

Plaintiff, the Foggy Bottom Association ("FBA"), respectfully submits its opposition to defendants' motion to dismiss.  As discussed below, defendants' motion to dismiss is now moot because on May 26, 2006, plaintiff filed a motion for leave to amend its complaint and a proposed First Amended Complaint ("FAC").

Further, defendants' jurisdictional arguments lack merit:  plaintiff clearly possesses organizational standing to maintain this action on behalf of its members who own or lease property in Foggy Bottom, where the George Washington University ("GW") is located and seeks to pursue major construction in connection with its new campus plan; plaintiff has suffered concrete injury as a result of GW's violations of the zoning laws for the past four years and the District's failure to enforce the Final Order; *Younger* abstention is inapplicable because there are no pending state court or administrative enforcement proceedings against plaintiff, and the First Amended Complaint seeks monetary damages for a taking; the locality of zoning does not provide a basis for the Court not to exercise jurisdiction, where federal jurisdiction already exists over plaintiff's takings claim; plaintiff has suffered a regulatory taking cognizable under *Penn*

*Central* and its progeny, and determination of this claim requires an individualized *ad-hoc* inquiry that simply cannot be resolved "as a matter of law"; plaintiff's First Amended Complaint alleges a viable physical takings claim under *Loretto*; plaintiff need not exhaust its administrative remedies to pursue its takings claim; and plaintiff's takings claim is ripe because it alleges injuries that have occurred in the past and because a final agency decision has already been reached with respect to GW's existing campus plan.  The Court should thus deny defendant's motion to dismiss.

## BACKGROUND

On April 25, 2006, plaintiff filed its complaint for injunctive and declaratory relief— against the District of Columbia Office of Planning, the Zoning Commission for the District of Columbia, the District of Columbia Department of Health, the District of Columbia Department of Consumer and Regulatory Affairs, the District of Columbia Historic Preservation Review Board, and the District of Columbia Public Schools—arising from GW's violations of the Corrected Final Order on Remand dated January 23, 2002 ("Final Order") of the District of Columbia Board of Zoning Adjustment ("BZA") and GW's February 16, 2006 submission of "an application to the District of Columbia Zoning Commission for first stage review and approval of a planned unit development and zoning map amendment for the Foggy Bottom Campus" and "the Foggy Bottom Campus Plan:  2006-2025."  ("application and new campus plan").

Plaintiff's complaint contained counts for (1) a regulatory taking under *Penn Central Transportation Co. v. New York City*, 438 U.S. 104 (1978), arising from the District's failure to enforce the Final Order despite GW's violations of the same, (2) the National Historic Preservation Act, 16 U.S.C. § 470 (requiring observance of laws when substantially altering historic properties), (3) violation of DC ST. § 8-109.03(a) (setting forth environmental guidelines

for implementing major actions), (4) violation of DC ST. § 6-641.09 (giving rise to a private right of action to enjoin violations of the zoning laws), (5) 11 DCMR § 210.2 (prohibiting universities from seeking land-use "objectionable to neighboring property"), and (6) 11 DCMR §§ 210.4, 507.3 (requiring universities to submit a plan for developing the campus as a whole).

Plaintiff's complaint sought a permanent injunction "prohibiting the Office of Planning and the Zoning Commission from approving GW's application and new campus plan until the District of Columbia provides just compensation . . . to the members of the Foggy Bottom Association for the regulatory taking of their property" (Comp., prayer, ¶ (b)).

On May 19, 2006, defendant filed a motion to dismiss in which it contested the Court's jurisdiction to entertain plaintiff's complaint. On May 26, 2006, plaintiff concurrently filed a motion for leave to amend the complaint and a proposed First Amended Complaint. Plaintiff's First Amended Complaint seeks monetary damages against the District in connection with the takings count, alleges both a regulatory taking under *Penn Central* and a partial physical taking under *Loretto v. Teleprompter Manhattan CATV*, 458 U.S. 419 (1982). The First Amended Complaint further adds the District of Columbia as a defendant, and it does not contain a count for violation of the National Historic Preservation Act.

As discussed below, amendment of plaintiff's complaint effectively renders moot defendants' motion to dismiss. Therefore, the Court should deny defendants' motion to dismiss and order defendants to respond to plaintiff's First Amended Complaint. Even if defendants' motion to dismiss is not moot, the motion should be denied on substantive grounds.

**ARGUMENT**

**I.     DEFENDANT'S MOTION TO DISMISS IS MOOT**

An amended pleading supersedes the pleading it modifies and thus renders moot outstanding motions to dismiss the superseded pleading.  *See Autozone Development Corp. v. District of Columbia*, 2006 WL 522437, *4 (D.D.C. 2006).  Plaintiff's motion for leave to amend and proposed First Amended Complaint were filed on May 26, 2006, after defendants filed their motion to dismiss.  Should the Court grant plaintiff's motion for leave to amend, the First Amended Complaint would become the operative pleading, superseding plaintiff's original complaint.  Because defendants' motion to dismiss seeks dismissal of plaintiff's original complaint, the motion should be denied as moot.  *See Autozone,* 2006 WL 522437, at *4; *Bancoult v. McNamara*, 214 F.R.D. 5, *13 (D.D.C. 2003) ("Because the original complaint is now superseded by the amended complaint, the court denies . . . all pending motions pertaining to the original complaint").  The Court should thus order defendants to respond to plaintiff's First Amended Complaint.

**II.    *YOUNGER* ABSTENTION IS INAPPROPRIATE**

Defendants wrongly claim that the "local" nature of this case requires *Younger* abstention over plaintiff's constitutional claim.  This contention, however, has been repeatedly rejected by the Supreme Court and the District of Columbia Circuit.  *See New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans*, 491 U.S. 350, 364 (1989) (the *Younger* doctrine must be applied with "the rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States"); *Bridges v. Kelly*, 84 F.3d 470, 475 (D.C. Cir. 1996) ("Because of the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them, the appropriateness of refraining 'from the exercise of federal jurisdiction is the exception, not the rule.'") (quoting *Colorado River Water Conservation Dist. v. United States*,

424 U.S. 800, 817 (1976)); *Silverman v. Barry*, 727 F.2d 1121, 1124 n. 4 (D.C. Cir. 1984) (declining to exercise abstention in condominium conversion dispute and stating that "sensitivity and the notion of localism alone do not provide a principled rationale for abstention where federal jurisdiction admittedly exists. Federal courts routinely decide local matters of great sensitivity"); *District Properties Assocs. v. District of Columbia*, 743 F.2d 21, 29 and n. 5 (D.C. Cir. 1984) (declining to exercise abstention in action involving District rent control laws and stating that "[t]he mere sensitivity or importance of the state law questions in a case have never been sufficient in themselves to require a federal court to abstain").

Defendants' motion to dismiss centers around the tenuous contention that *Younger* abstention precludes exercise of jurisdiction in this case. Def.s' Mot. to Dismiss, at 7. However, *Younger* abstention is entirely inappropriate here because (1) there are no state court or administrative *enforcement* proceedings pending against the Foggy Bottom Association (or GW), (2) plaintiff is not a party to the administrative agency proceedings involving GW's application and new campus plan, and (3) plaintiff's First Amended Complaint asserts monetary damages against the District for its regulatory taking of plaintiff's property.

Courts have repeatedly held that *Younger* abstention is inappropriate where there are no state criminal prosecution, civil litigation, or administrative enforcement proceedings pending against the party that seeks to enjoin those proceedings in federal court. *See NOPSI*, 491 U.S. 368 ("Although our concern for comity and federalism have led us to expand the protection of *Younger* beyond state criminal prosecutions, to civil enforcement proceedings, . . . it has never been suggested that *Younger* requires abstention in deference to a state judicial proceeding reviewing legislative or executive action. Such a broad abstention would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case in

deference to the States."); *Rio Grande Community Health Center, Inc. v. Rullan*, 397 F.3d 56,

69-70 (1st Cir. 2005) (declining to exercise *Younger* abstention in hospital's action seeking an

injunction requiring Puerto Rico to provide Medicaid payments to hospital, despite hospital's

pending state court action against Puerto Rico because "[t]his is not an enforcement proceeding

brought by the state or an agency").[1]  Indeed, *Younger v. Harris*, 401 U.S. 37 (1971) involved a

federal suit seeking to enjoin an ongoing state criminal prosecution against the plaintiff.

Further, the Supreme Court has held that abstention is inappropriate in suits seeking

monetary damages, such as the instant case.  *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706,

721, 731 (1996) ("Under our precedents, federal courts have the power to dismiss or remand

cases based on abstention principles only where the relief sought is equitable or discretionary");

*See also City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 710 (1999)

("Damages for a constitutional violation are a legal remedy").

Defendants' reliance upon *JMM Corp. v. District of Columbia*, 378 F.3d 1117 (D.C. Cir.

2004) is misguided.  *JMM* involved an administrative enforcement proceeding against an adult

video store that had violated the zoning laws by operating a sexually-oriented business in a zone

not designated for such use.  378 F.3d 1119.  Even though JMM's certificate of occupancy had

---

[1] *Accord Bridges*, 84 F.3d 476 ("For the *Younger* doctrine to apply, a rigid three-prong test must be satisfied: first, a federal court may dismiss a federal claim only when there are ongoing state proceedings that are judicial in nature; second, the state proceedings must implicate important state interests; third, the proceedings must afford an adequate opportunity in which to raise the federal claims"); *LaShawn v. Kelly*, 990 F.2d 1319, 1323 (D.C. Cir. 1993) (*Younger* abstention did not apply to class action by children in foster care under supervision of the District even though they were parties to ongoing judicial proceedings in the Family Division of the Superior Court); *Washington Legal Clinic for the Homeless v. Kelly*, 1994 WL 823564, at *8, n. 8 (D.D.C. 1994) ("The need or wisdom of extending *Younger* to all constitutional claims that *might* be adjudicated in state as well as federal courts . . . is far more problematical.  This extension would make federal courts cinderellas to their sister state courts in adjudicating federal constitutional rights, their natural area of competence and jurisdiction.") (quoting *Family Div. Trial Lawyers of the Superior Court v. Muoultrie*, 725 F.2d 695, 702 (D.C. Cir. 1984)).

been revoked by the District and an administrative law judge had issued a cease and desist order against it, JMM refused to cease its operation. *Id.* at 1120. The District thus sued JMM at the Superior Court to enforce the ALJ's cease and desist order. *Id.* When JMM sought to enjoin the state court and administrative enforcement proceedings against it by filing suit in federal court, the court denied JMM's motion for a preliminary injunction and dismissed its complaint on abstention grounds. The court stated that the "Supreme Court has extended *Younger* to pending administrative enforcement actions where the state proceedings are judicial in nature and the state interests are important." *Id.* at 1126.

The instant case is entirely distinguishable. Unlike *JMM*, there are no state court or administrative enforcement proceedings pending against plaintiff. Indeed, plaintiff is not even a party to the non-judicial agency proceedings involving GW's application and new campus plan. Further, plaintiff's First Amended Complaint seeks monetary damages against the District. Consequently, abstention is wholly improper in this case.[2]

## III.    PLAINTIFF POSSESSES ORGANIZATIONAL STANDING

Defendants' contention that plaintiff lacks standing is even more tenuous than its claim that this suit is barred by *Younger* abstention. Plaintiff is an association composed of owners and

---

[2]     Defendants' reliance on *American Towers, Inc. v. Williams*, 146 F. Supp.2d 27 (D.D.C. 2001), and *Bannum, Inc. v. District of Columbia Board of Zoning Adjustment*, 2005 WL 1076179 (D.D.C. 2005), is similarly to no avail. Abstention was not an issue in *American Towers*. The passage quoted in defendants' brief (Mot. to Dismiss, at 8) from *American Towers* is from the court's dismissal of the plaintiff's equal protection claim because rational basis supported the District's revocation of a permit issued to the builder of a tower.

*Bannum* is also distinguishable from the instant case. *Bannum* involved a federal suit seeking to enjoin administrative enforcement proceedings against the plaintiff arising from the District's revocation of a building permit and certificate of occupancy. Unlike *Bannum*, the Foggy Bottom Association is not seeking to enjoin administrative enforcement proceedings pending against it. Indeed, plaintiff is not even a party to the non-adjudicatory agency proceedings concerning GW's application and new campus plan.

lessors of property in Foggy Bottom, the neighborhood in which GW is located and where it has violated the zoning laws and announced its intent to pursue major construction.  Plaintiff clearly has organizational standing to maintain this action on behalf of its members who daily suffer the adverse consequences of GW's violations of the zoning laws and the District's failure to enforce the Final Order.  *See National Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1435 (D.C. Cir. 1995) (taxpayer organization challenging constitutionality of statute raising maximum federal and state gift tax rates had associational standing to bring suit on behalf of its members); *accord Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 342 (1977) (associational standing exists where an organization's members would otherwise have standing to sue on their own right, the interests sought to be protected by the organization are germane to its purpose, and the claim asserted does not require participation of individual members in the lawsuit).

Should GW's campus expansion proceed further in a neighborhood already acknowledged by the District to be beyond "the tipping point" (despite GW's continuing violations of the Final Order), plaintiff would suffer further and increasing injury.  Indeed, if residents living next to a construction project cannot maintain an action seeking redress for injuries suffered from the effects of the construction on their properties, the doctrine of standing would be a jurisdictional bar to every suit brought by a private party.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 573 n. 7 (1992).  There can be no doubt that plaintiff possesses associational standing to maintain this action on behalf of its members.  *See Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 126 S. Ct. 1297, 1303 n. 2 (2006) (association composed of law schools had standing to maintain constitutional challenge to Solomon Amendment on behalf of its members).

The injuries suffered by plaintiff are also concrete and individualized. As a result of GW's violations of Condition 8 of the Final Order, GW enrolls and employs thousands more students and faculty than those permitted by the Campus Plan. These violations cause enormous increases in pedestrian and automobile traffic in Foggy Bottom, increase pollution and noise, and degrade the residential character of this neighborhood. As a result of GW's violations of Conditions 9(a) and 9(b) of the Final Order, GW fails to provide the requisite on-campus housing for its vastly over-enrolled student body. These violations place tremendous pressure on the Foggy Bottom housing market, which is not zoned for such institutional dormitory use, and unable to sufficiently absorb the students.

Defendants' contention that plaintiff's injuries are generalized because they are suffered by "everyone in the neighborhood," including GW's students and staff, office workers, and tourists (Def.'s Mot. to Dismiss, at 15) lacks merit. *See United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 688 (1973) ("To deny standing to persons who are in fact injured because many others are also injured, would mean that the most injurious and widespread government actions could be questioned by nobody. We cannot accept that conclusion"). The doctrine of generalized grievances is pertinent to cases in which plaintiffs assert standing as taxpayers to object to governmental expenditure of funds. *See, e.g.*, *DaimlerChrysler Corp. v. Cuno*, -- S. Ct. -- 2006 WL 1310731 (May 15, 2006). In contrast, plaintiff's members here occupy a distinct position because they reside in Foggy Bottom and have statutory and property rights recognized by the District's zoning laws, regulations, and the Comprehensive Plan. The violation of these statutory and constitutional rights gives plaintiff standing. *See Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("The actual or threatened injury

required by Article III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing").

For this reason alone, defendants' contention that plaintiff does not have a right to be free from increased traffic, noise, or incursion on open space (Def.'s Mot. to Dismiss, at 19) is without merit. Plaintiff's injuries arise, in part, because of GW's violations of the District's regulations and zoning laws governing universities, and the District's failure to enforce these laws against GW. Plaintiff's deprivation of its right to use its residential property for its intended purpose as a result of GW's violations of the Final Order is clearly sufficient to confer standing upon plaintiff.

## IV.     PLAINTIFF ALLEGES A VIABLE TAKINGS CLAIM

### A.     Plaintiff's Takings Claim Requires An *Ad-Hoc* Factual Inquiry

Defendant's motion to dismiss should be denied because plaintiff's First Amended Complaint asserts a viable claim for the physical invasion and regulatory taking of its property. Disposition of plaintiff's regulatory takings count requires a highly fact-specific and individualized inquiry that simply cannot be resolved "as a matter of law" (Def.'s Mot. to Dismiss, at 18). Defendants' contention to the contrary was rejected by the Supreme Court in *City of Monterey*, where the Court held that disposition of a plaintiff's regulatory takings claim "is a predominantly factual question . . . for the jury." 526 U.S. at 721. The court explained:

> Almost from the inception of our regulatory takings doctrine, we have held that whether a regulation of property goes so far that there must be an exercise of eminent domain and compensation to sustain the act depends upon the particular facts. Consistent with this understanding, we have described determinations of liability in regulatory takings cases as essentially "ad hoc, factual inquiries," requiring complex factual assessments of the purposes and economic effects of government actions. (internal marks and citations omitted)

*Id.* at 720.

10

The Supreme Court has consistently followed this mandate in resolving regulatory takings disputes. *See, e.g., Eastern Enterprises v. Apfel*, 524 U.S. 498, 523 (1998) (the taking "inquiry, by its nature, does not lend itself to any set formula, and the determination whether justice and fairness require the economic injuries caused by public action must be compensated by the government, rather than remain disproportionately concentrated on a few persons, is essentially ad hoc and fact intensive"); *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992) ("In 70-odd years of succeeding regulatory takings jurisprudence, we have generally eschewed any set formula for determining how far is too far, preferring to engage in essentially ad hoc, factual inquiries"); *Kaiser Aetna v. United States*, 444 U.S. 164, 175 (1979) (the Supreme Court "has examined the 'taking' question by engaging in essentially ad hoc, factual inquiries").

Pursuant to the Supreme Court's mandate, this Court has held that a regulatory takings claim cannot be disposed on the pleadings. In *Mekuria v. Washington Metropolitan Area Transit Auth.*, 975 F. Supp. 1 (D.D.C. 1997) ("*Mekuria I*"), the Court denied the defendant's motion to dismiss a regulatory takings claim and subsequently found the District liable for the unlawful taking of the plaintiffs' property without just compensation. *Mekuria v. Washington Metropolitan Area Transit Authority*, 45 F. Supp.2d 19 (D.D.C. 1999) ("*Mekuria II*"). The plaintiffs in *Mekuria* alleged that the transit authority's construction of a new metrorail station adjacent to their property resulted in the temporary taking of their leasehold interests in commercial buildings by partially blocking vehicular and pedestrian access to their properties. *Mekuria II*, 45 F. Supp.2d 28. The District moved to dismiss the plaintiffs' takings count on the grounds that there was neither a physical taking nor a regulatory taking cognizable under *Penn*

*Central*, and that the "pre-existing case law" strongly favored dismissal of the complaint.

*Mekuria I*, 975 F. Supp. at 6. In denying the District's motion to dismiss, the Court explained:

> It is axiomatic that the motion to dismiss for failure to state a claim is viewed with disfavor . . . . This admonition is perhaps nowhere so apt as in cases involving claims of inverse condemnation where the Supreme Court has admitted its inability to develop any "set formula" for determining when compensation should be paid resorting instead to essentially "ad hoc, factual inquiries" to resolve this difficult question. While dismissal of a complaint for inverse condemnation is not always inappropriate, such a dismissal must be reviewed with particular skepticism to assure that plaintiffs are not denied a full and fair opportunity to present their claims. (internal marks and citation omitted)

*Mekuria I*, at 7.

Following a five-day bench trial, this Court in *Mekuria II* found that the transit authority's construction of a metrorail station adjacent to the plaintiffs' commercial properties resulted in a temporary regulatory taking because it curtailed reasonable access to the plaintiff's properties despite the existence of a rear access route for vehicles and a narrow pedestrian sidewalk available during construction. Applying the three-prong test announced in *Penn Central*, the Court held that the restricted access to the plaintiff's commercial properties for the duration of the construction (three years) amounted to a regulatory taking of the plaintiffs' leasehold interests in their commercial properties because of the character of the government action, the economic impact of the construction, and its interference with the plaintiffs' distinct investment-backed expectations. *Mekuria II*, 45 F. Supp.2d at 28-29.

If restricted access to the plaintiffs' commercial property in *Mekuria II* constituted a regulatory taking, the inability of plaintiffs here to use their property for its intended purpose— residential occupancy—as a result of GW's intrusive campus expansion onto plaintiff's Foggy Bottom property is clearly sufficient to withstand a motion to dismiss.

This Court cannot resolve plaintiff's takings claim without the benefit of fact and expert witness testimony concerning the effect of GW's campus expansion in Foggy Bottom and an individualized analysis of plaintiff's claim.  Plaintiff submits that its regulatory takings claim is highly fact-specific and multifaceted, hinging on numerous economic, demographic, environmental, and transportation-related factors, and that it should be resolved through trial. Dismissal of plaintiff's takings count on the pleadings would deprive plaintiff of a full and fair opportunity to present its claim and be highly prejudicial.  *See Silverman*, 727 F.2d 1126 (reversing trial court's dismissal of regulatory takings count and stating that in light of the Supreme Court's "emphasis upon an individualized inquiry in takings clause cases, this claim should not be dismissed on jurisdictional grounds"); *Hornstein v. Barry*, 560 A.2d 530, 538 (D.C. 1989) (reversing grant of summary judgment on regulatory takings count because "the record as to uncompensated taking is deficient, which is problematical in a situation in which . . . an *ad hoc* case by case inquiry is called for").

**B.      Plaintiff Asserts A Viable Takings Claim Under *Loretto***

A regulatory taking may occur when government regulation results in a third-party's physical invasion of another's property.  The physical invasion need not be by the government itself, and the magnitude of the physical invasion is immaterial to determination of whether a taking has occurred.  *See Loretto*, 458 U.S. 438 and n. 16; *Mekuria I*, 975 F. Supp. at 4.  A physical invasion occurs whenever "an intrusion [is] so immediate and direct as to subtract from the owner's full enjoyment of the property and to limit his exploitation of it." *United States v. Causby*, 328 U.S. 256, 265 (1946) (cited in *Lucas*, 505 U.S. at 1015).

In *Loretto*, the Supreme Court held that New York's law requiring landlords to allow television cable companies to emplace cable facilities in their apartment buildings constituted a

taking even though the facilities occupied at most 1.5 cubic feet of the landlord's property.
*Loretto*, 458 U.S. 435-440.  The Court stated that once physical occupation is shown, there is
"less need to consider the extent of the occupation in determining whether there is a taking in the
first instance."  *Id.* at 438.  This is so because the physical invasion of property, no matter how
small, effectively destroys the owner's rights to "possess, use, and dispose of" his property.  *Id.*
at 435.  Indeed, "the power to exclude [others from occupying one's property] has traditionally
been one of the most treasured strands in an owner's bundle of property rights."  *Id.*

       Plaintiff's First Amended Complaint alleges that the District's failure to enforce the Final
Order, which was designed to curtail GW's expansion of its campus in Foggy Bottom, has
resulted in a physical invasion of plaintiff's property amounting to a regulatory taking under
*Loretto*.  FAC, ¶¶ 90-93.  The First Amended Complaint describes the Final Order's
requirements that GW provide on-campus housing for the majority of its undergraduate students
and that it limit its enrollment of students and its employment of faculty to the caps set forth in
the Final Order.  The physical invasion of plaintiff's property in Foggy Bottom results from
unauthorized off-campus GW student housing in Foggy Bottom and increased population
density, noise, pollution, traffic, and parking congestion on plaintiff's property, all of which are
consequences of GW's campus expansion in this neighborhood.  These physical intrusions
constitute a taking of plaintiff's Foggy Bottom property.

       The District itself recognized the nature of this physical intrusion in administrative
hearings concerning GW's existing campus plan.  As discussed in plaintiff's First Amended
Complaint, the Office of Planning concluded in its April 2000 report that "if the University
continues to purchase land outside the campus plan boundaries and the number of students living
the small, constrained Foggy Bottom community continues to increase, the residential

community will reach a 'tipping point' where the Foggy Bottom community simply transforms into a 'University area.' " *George Washington University v. District of Columbia Board of Zoning Adjustment*, 831 A.2d 921, 928 (D.C. 2003). The BZA similarly found in 2000 that "the University's aggressive expansion into Foggy Bottom and the West End area has brought those neighborhoods to the 'tipping point,' if not beyond." *Id.* The physical taking alleged by plaintiff here, then, arises from GW's housing of its students in Foggy Bottom outside the campus boundaries, and by necessity, on plaintiff's property, and deprivation of plaintiff's full enjoyment of its residential property by an increase in student population, traffic, pollution, noise, and parking congestion in Foggy Bottom. The extent of this taking will increase if GW's application and new campus plan are approved, which would result in conversion of six additional square blocks of Foggy Bottom to non-residential use.

The District's failure to enforce the Final Order against GW despite its invasion of plaintiff's Foggy Bottom property therefore amounts to a taking. *See Causby*, 328 U.S. 265 (government regulation authorizing military aircraft to fly over plaintiff's chicken farm constituted a taking because it deprived the owner of the intended use of his land and resulted in "an intrusion so immediate and direct as to subtract from the owner's full enjoyment of the property and to limit his exploitation of it"); *Kaiser Aetna*, 444 U.S. at 178 (imposition of a navigational servitude on a private marina was a regulatory taking, as "the Government's attempt to create a public right of access to the improved pond goes so far beyond ordinary regulation or improvement for navigation as to amount to a taking"); *Preseault v. United States*, 100 F.3d 1525, 1550-52 (Fed. Cir. 1996) (federal government's authorization of Vermont to convert unused right-of-way easement reserved for railroad use to public recreational trail on plaintiff's property amounted to a physical taking).

15

C.    **Plaintiff Asserts A Viable Takings Claim Under *Penn Central***

"While property may be regulated to a certain extent, if regulation goes too far, it will be recognized as a taking."  *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1014 (1992). The Supreme Court has eschewed a set formula for determining when government regulation constitutes a taking, preferring instead to engage in "essentially ad hoc, factual inquiries."  *Id.* at 1015.  When government regulation does not deny all beneficial or productive use of land, *Penn Central* sets forth a three-prong test in determining whether a regulatory taking has occurred. The factors considered under *Penn Central* are the character of the government action, the economic impact of the regulation, and the extent to which the regulation interferes with the owner's distinct investment-backed expectations.  *Penn Central*, 438 U.S. 124.

Plaintiff's First Amended Complaint alleges that "GW's repeated and continuous violations of the District's zoning laws and the Final Order have deprived plaintiff's members of legitimate interests to enjoy residential use of their property in Foggy Bottom by increasingly transforming this neighborhood to a university campus."  FAC, ¶ 90.  The First Amended Complaint further alleges that the District's failure to enforce the Final Order has resulted in unauthorized off-campus GW student housing, increased population density, noise, pollution, traffic, and parking congestion in Foggy Bottom, all of which deprive plaintiff's members of their "legitimate interests in enjoying residential use of their property, detrimentally impact the economic value of their property, and interfere with their distinct investment-backed expectations."  FAC, ¶ 92.  The extent of this taking will increase commensurately with the length of the District's delay and failure to enforce the Final Order against GW.  FAC, ¶ 93.

The District has failed to enforce the provisions of the Final Order limiting GW's student enrollment and faculty caps and requiring GW to provide sufficient on-campus housing to the

majority of its undergraduate students.  The District has thus authorized GW to excessively

expand into the predominantly residential Foggy Bottom neighborhood, transform this

residentially-zoned area into an expanded university campus at the expense of the prior variety of

uses, employ neighborhood property in a manner "objectionable to the surrounding

neighborhoods," and reduce the value of the residential properties through population pressure,

student malfeasance, and resident displacement.  Defendants' motion to dismiss completely fails

to address these issues and instead resorts to the "locality defense" in an attempt to downplay the

District's unlawful conduct for the past several years and its selective application of the zoning

laws with respect to GW at the expense of Foggy Bottom residents.

  Defendants' contention that there can be no taking of plaintiff's property as a result of the

District's failure to enforce the zoning laws against GW, because the District's actions do not

deny plaintiff all economically viable use of its land (Def.'s Mot. to Dismiss, at 16), reflects a

fundamental misconception of the Supreme Court's regulatory takings doctrine announced in

*Penn Central* and its progeny.  The very same argument raised by the District here was rejected

in *Palazzolo v. Rhode Island*, 533 U.S. 606 (2001), where the Supreme Court held:  "Where a

regulation places limitations on land that fall short of eliminating all economically beneficial use,

a taking nonetheless may have occurred, depending on a complex of factors including the

regulation's economic effect on the landowner, the extent to which the regulation interferes with

reasonable investment-backed expectations, and the character of the government action."  *Id.* at

617.  In *Palazzolo*, the Supreme Court found that there was no regulatory taking under *Lucas*

when the government regulation precluding the owner from building a beach club on 18 acres of

wetlands did not deprive him all economically viable use of his land, despite its diminution in

value from $3.5 million to $200,000.  The Supreme Court, nonetheless, remanded the case to the

17

trial court because it had failed to examine whether a regulatory taking had occurred under *Penn Central*. *Id.* at 632. *See also Cienega Gardens v. United States*, 331 F.3d 1319, 1340 (Fed. Cir. 2003) ("There is not, however, an automatic numerical barrier preventing compensation, as a matter of law, in cases involving a smaller percentage diminution in value").

Plaintiff's First Amended Complaint alleges that it has suffered a regulatory taking under *Penn Central*. Plaintiff has pleaded sufficient facts to support its regulatory takings claim, and these facts must be accepted as true and liberally construed in favor of plaintiff in ruling on defendants' motion to dismiss. *See Shear v. National Rifle Association of America*, 606 F.2d 1251, 1253 (D.C. Cir. 1979); *Mekuria I,* 975 F. Supp. at 2-3, and n. 4 ("A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief.") (citing *Conley v. Gibson*, 355 U.S. 41, 45 (1957)).

### a.    Character Of The Government Action

The First Amended Complaint describes the injuries suffered by plaintiff as a result of GW's unlawful campus expansion in Foggy Bottom and violation of the Final Order and the District's zoning laws. Defendants have permitted and authorized through their inaction GW's institutional use of the predominantly residentially-zoned Foggy Bottom neighborhood. Defendants have effectively authorized GW to transform Foggy Bottom into an extension of its university campus at the expense of Foggy Bottom residents.

Defendants' wrongful behavior dramatically limits plaintiff's ability to utilize its property for its intended purpose–residential occupancy. In *Mekuria II*, this Court found a regulatory taking when the District's construction of a metrorail station adjacent to the plaintiffs' commercial properties restricted vehicular and pedestrian access to their properties, despite the

18

existence of a rear vehicular access and a narrow pedestrian side-walk for the duration of the

construction. *Mekuria II*, 45 F. Supp.2d 25.  Similarly, here, plaintiff's residential use of its

property is degraded and impaired by GW's intrusive campus expansion onto plaintiff's

property.  The District's failure to enforce the Final Order against GW for the past several years

and implicit authorization of GW to transform Foggy Bottom into a university campus at the

expense of Foggy Bottom residents is the type of government action that shifts public burdens

onto a select few property owners, thereby requiring just compensation.  *See Florida Rock

Industries, Inc. v. United States*, 45 Fed. Cl. 21, 24, 37 (1999) ("A partial taking occurs when a

regulation singles out a few property owners to bear burdens, while benefits are spread widely

across the community.") (citations omitted).

**b.**     **Economic Impact Of The Regulation**

The First Amended Complaint alleges that defendants' failure to enforce the Final Order

and limit GW's intrusive campus expansion onto plaintiff's Foggy Bottom property

"detrimentally impacts the economic value of their property."  FAC, ¶ 92.  The detrimental

impact of defendants' actions is evidenced by the reduced value of plaintiff's property.  Because

such property suffers from the negative impacts of an extended university campus, its economic

value is significantly diminished.  Plaintiff intends to provide expert testimony from a real estate

broker and economist to support its regulatory takings claim in this regard.  In addition, plaintiff

intends to present testimony from witnesses who reside in Foggy Bottom concerning the

deleterious impact of GW's campus expansion on residential life in this neighborhood.  This

evidence will establish that defendants' failure to enforce the Final Order against GW has

severely hindered residential use of plaintiffs' property and diminished its market value.  The

economic impact of the government regulation therefore supports the finding of a regulatory

taking in this case.  *See Bowles v. United States*, 31 Fed. Cl. 37, 45 (1994) (regulatory taking occurred when plaintiff suffered a severe but not total loss of economic viability).

### c.    Interference With Investment-Backed Expectations

The First Amended Complaint alleges that defendants' failure to enforce the Final Order and curtail GW's campus expansion in Foggy Bottom has interfered with plaintiff's distinct investment-backed expectations.  FAC, ¶ 92.  Plaintiff purchased and leased property in Foggy Bottom with the expectation that it would use the property for its intended (and zoned) purpose—residential occupancy.  Plaintiff expected the District to enforce the zoning laws and the Final Order against GW and curtail its transformation of Foggy Bottom into a commercially-zoned university campus.

In direct contravention of these expectations, the District has failed to enforce the zoning laws against GW and has effectively endorsed GW's transformation of Foggy Bottom into a sprawling university campus, replete with institutional and non-residential uses.  The negative impacts of GW's campus expansion in Foggy Bottom directly interfere with plaintiff's investment-back expectation that Foggy Bottom remain residential in character.  Therefore, this factor also supports the finding of a regulatory taking.  *See First English Evangelical Lutheran Church of Glendale v. Los Angeles*, 482 U.S. 304, 318 (1987) (land-use regulation temporarily depriving owner all economically viable use of his property constituted a taking).

### D.    The District Mischaracterizes Plaintiff's Takings Claim

Defendants mischaracterize plaintiff's takings claim by stating that it merely alleges diminution of value of plaintiff's property.  Plaintiff's First Amended Complaint, however, alleges a taking based on the increasing inability of plaintiff to use its property for its intended

purpose—residential occupancy—by the District's failure to halt GW from transforming Foggy

Bottom into an extended university campus.  FAC ¶¶ 87-93; *see also* Comp. ¶¶ 94, 96-98.

Defendants contend that because GW's takings claim against the District was ultimately

rejected by the District of Columbia Circuit, plaintiff's takings claim must outright be rejected.

Defendants thus contend that because the Final Order was found not to constitute a taking of

GW's property, "the results of that regulation" cannot "constitute a taking of the neighbor's

property."  Defendants' contention completely mischaracterizes plaintiff's position and is

contrary to the individualized *ad-hoc* analysis required by the Supreme Court in resolving

regulatory takings disputes.  Plaintiff does not argue that the "results" of the Final Order

constitute a taking of its property.  Instead, plaintiff alleges that the District's *failure to enforce*

the Final Order against GW, despite its egregious violations of the same for the past four years,

has deprived plaintiff of the intended use of its property (residential use), conflicted with

plaintiff's reasonable investment-backed expectations, and diminished the economic value of

plaintiff's property, which together constitute a regulatory taking under *Penn Central*.  *See City*

*of Monterey*, 526 U.S. 722 ("Del Monte Dunes' argument . . . was not that the city had followed

its own zoning ordinances and policies but rather that it had not done so").

Further, plaintiff's First Amended Complaint alleges a physical invasion of its property

amounting to a taking under *Loretto* as a result of GW's expansion of its campus onto plaintiff's

property and the District's failure to provide just compensation to plaintiff for authorizing this

intrusion.

That GW's takings claim against the District ultimately failed provides no basis for

dismissal of plaintiff's takings claim on the pleadings.  GW, a university subject to the District's

zoning laws, occupies a different position than plaintiff, an association composed of owners and

lessors of residential property in a neighborhood threatened by GW's continuing violations of the zoning laws and intrusive campus expansion.  The District's inaction and favoritism of GW despite its egregious disregard of the Final Order are among reasons why plaintiff has been compelled to institute this action.

Plaintiff further alleges significant violations of the zoning laws that are actionable under DC ST. § 6-641.09, authorizing plaintiff to seek injunctive relief to halt GW's zoning violations. Contrary to defendants' contention, the locality of zoning does not deprive this Court of jurisdiction when federal jurisdiction already exists by virtue of plaintiff's takings claim. *See Silverman*, 727 F.2d 1124 n.4; *District Properties Assocs.*, 743 F.2d 21, 29 & n. 5.[3]  This Court clearly possesses supplemental jurisdiction over plaintiff's non-federal claims.  *See* 28 U.S.C. § 1367(a); *Lerner v. Fleet Bank,* 318 F.3d 113, 125 (2nd Cir. 2003).

## V.    PLAINTIFF'S TAKINGS CLAIM IS RIPE

In *Williamson County Regional Planning Comm'n v. Hamilton Bank*, 473 U.S. 172 (1985), the Supreme Court held that a regulatory takings claim is ripe when a plaintiff demonstrates that it has met two hurdles:  (1) "the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue" *id.* at 186; and (2) if the State has "an adequate procedure for seeking just compensation, the property owner . . . [must have] used the procedure and been denied just compensation."  *Id.* at 195.  *Williamson*'s finality requirement is met when application of the land-use regulation to the property is known.  *See Palazzolo*, 533 U.S. 620-21 (once "the

---

[3] Nor does section 6-641.09 limit plaintiff's right of action to the Superior Court.  Instead, the statute provides that the District may institute *criminal prosecution* at the Superior Court against those violating the zoning laws.  The private right of action contemplated by this statute does not vest the Superior Court with exclusive jurisdiction over section 6-641.09.  This Court's supplemental jurisdiction clearly extends to plaintiff's section 6-641.09 claim.

permissible uses of the property are known to a reasonable degree of certainty, a takings claim is likely to have ripened"); *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 739 (1997) ("The demand for finality is satisfied by [plaintiff's] claim, however, there being no question here about how the regulations at issue apply to the particular land in question").

The first prong of the *Williamson* ripeness doctrine—finality—is satisfied here because the violations alleged by plaintiff have occurred in the past and persist to this day. Nor does the District have yet to make a final decision concerning GW's existing campus plan and its limitations with respect to Foggy Bottom. Indeed, the BZA's Final Order, upheld by the District of Columbia Circuit and the District of Columbia Court of Appeals, imposed specific requirements upon GW's land-use in Foggy Bottom. The Final Order was undoubtedly a final agency decision. There is no agency determination to be made concerning GW's existing campus plan and application of the Final Order. Plaintiff's allegations of a regulatory taking are ripe because they related to GW's *past violations of the Final Order* and the District's failure to enforce the Final Order since 2002 (and possibly earlier). That plaintiff alleges a commensurate increase of the extent of this regulatory taking with the District's delay in enforcing the Final Order does not render plaintiff's takings claim unripe.

In this regard, the Ninth Circuit's decision in *Holland v. County of Maui*, 100 Fed. Appx. 683 (9th Cir. 2004) (unpublished disposition), is instructive. In *Holland*, the plaintiff alleged a taking as a result of the government's revocation of a building permit. The trial court dismissed the plaintiff's suit for lack of ripeness. The Ninth Circuit reversed, holding that the takings claim was ripe because it concerned injuries that had occurred in the past and were not dependent on the agency's final decision. The court explained: "Challenges to county acts that amount to actual concrete injuries which . . . have already occurred and do not depend on the finality of the

County's determination of the permissible uses of the property are not subject to the ripeness constraints applicable to regulatory takings." *Id.* at 684.

Similarly, here, plaintiff's injuries have already occurred and do not depend on a final agency decision concerning GW's application and new campus plan. Indeed, irrespective of the Zoning Commission's forthcoming decision concerning GW's application and new campus plan, the violations committed by GW since 2002 pertain to the BZA's Final Order and have inflicted concrete injury upon plaintiff for which it seeks redress now. These violations cannot be "reversed" by a new final agency decision on GW's application and new campus plan, even if the Final Order is superseded by a new agency decision that endorses GW's current land-use in Foggy Bottom.

The second prong of the *Williamson* ripeness doctrine is also met here because there is no inverse condemnation procedure by which plaintiff could seek monetary damages against the District for its regulatory taking of plaintiff's property. *See District Intown Properties Ltd. Partnership v. District of Columbia*, 23 F. Supp.2d 30, 35 (D.D.C. 1998) ("District law does not provide a procedure to compensate plaintiffs for denial of their building permit applications. Their claim that such denial amounts to an unconstitutional taking is thus ripe for review in this forum"); *Mekuria II*, 45 F. Supp.2d 31 (awarding plaintiffs damages for inverse condemnation without imposing a requirement for seeking redress under a District statute or administrative procedure). The absence of an inverse condemnation statute in the District at the time plaintiff alleged a taking disposes of the second prong of the *Williamson* ripeness inquiry. *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1507 (9th Cir. 1990).

Because plaintiff alleges a regulatory taking as a result of the District's failure to enforce the Final Order against GW for the past several years, plaintiff's takings claim is ripe. *See Arnett*

*v. Myers*, 281 F.3d 552, 563 (6th Cir. 2002) (reversing trial court's dismissal of takings claim on

the basis of ripeness and holding that the State's removal and destruction of the plaintiff's duck

blinds on a lake regulated by the State and denial of riparian rights to plaintiff constituted final

decisions and amounted to a taking); *Cooley v. United States*, 324 F.3d 1297, 1302 (Fed. Cir.

2003) (takings claim was ripe because final agency decision had been rendered and it would

have been futile for the plaintiff to pursue further permit applications).

## VI.    EXHAUSTION IS NOT A DEFENSE TO PLAINTIFF'S TAKINGS CLAIM

Exhaustion of administrative remedies is not a jurisdictional requirement for instituting a

regulatory takings action.  This is, in part, due to the fact that the District provides no

administrative remedy for a plaintiff seeking damages for a regulatory taking.  Nor, as explained

above, is there an inverse condemnation statute under which plaintiff could seek monetary

damages against the District for its taking of plaintiff's Foggy Bottom property.  *See District

Intown Properties*, 23 F. Supp.2d 35.

In *Williamson*, the Supreme Court held that administrative exhaustion is not a

jurisdictional prerequisite to a regulatory takings claim.  *Williamson*, 473 U.S. 194, n. 13.  The

Court distinguished between the finality requirement, which is necessary to render a takings

claim ripe, and the exhaustion of administrative remedies, which is not a jurisdictional

requirement.  The Court stated that the "question whether administrative remedies must be

exhausted is conceptually distinct . . . from the question whether an administrative action must be

final before it is judicially reviewable."  *Id.* at 192.  "[T]he finality requirement is concerned with

whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an

actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial

procedures by which an injured party may seek review of an adverse decision and obtain a

remedy if the decision is found to be unlawful or otherwise inappropriate." *Id.* at 193.  The Court then held that "[e]xhaustion of review procedures is not required" for a regulatory takings claim. *Williamson*, 473 U.S. 194, n. 13.  *See also I.A.M Nat'l Pension Fund Benefit Plan v. Stockton Tri Industries*, 727 F.2d 1204, 1208 (D.C. Cir. 1984) ("Only when Congress states in clear, unequivocal terms that the judiciary is barred from hearing an action until the administrative agency has come to a decision . . . has the Supreme Court held that exhaustion is a jurisdictional prerequisite").

Plaintiff has no administrative remedies to exhaust with respect to its regulatory takings claim.  Plaintiff alleges injuries that have occurred in the past as a result of the District's failure to enforce the Final Order against GW since 2002.  Because exhaustion of administrative remedies is not a jurisdictional requirement for a regulatory takings claim, and because plaintiff has no administrative remedies to pursue in connection with this claim, defendants' invocation of the exhaustion defense in connection with plaintiff's takings claim is futile.  *See DLX, Inc. v. Kentucky*, 381 F.3d 511, 517 (6th Cir. 2004) ("administrative exhaustion is explicitly not a component of a federal takings claim"); *Montgomery v. Carter County*, 226 F.3d 758, 765 (6th Cir. 2000) ("The requirement that takings claims be ripe, however, is not the same as an exhaustion requirement"); *Devon Energy Corp. v. United States*, Fed. Cl. 519, 529 (1999).

## VII.   THE COURT POSSESSES SUPPLEMENTAL JURISDICTION TO ENTERTAIN PLAINTIFF'S NON-FEDERAL CLAIMS

This court may exercise supplemental jurisdiction over plaintiff' non-federal claims because they "are so related" to the federal claims that "they form part of the same case or controversy under Article III."  28 U.S.C. § 1367(a); *accord Lerner*, 318 F.3d 125.  Courts have previously exercised supplemental jurisdiction over state law claims that relate directly to constitutional takings claims. *See, e.g., Preschool Development, Ltd. v. City of Springboro*, 2005

WL 1038849, at *6-17 (S.D. Ohio 2005) (concluding that the government's installation of a curb on the plaintiff's property amounted to a taking and exercising supplemental jurisdiction over plaintiff's breach of contract claims because they arose out of the same set of facts); *Wilhelmsen v. Board of Commissioners*, 694 F. Supp. 809, 810 (D. Wyo. 1988) (exercising pendent jurisdiction over a state claim arising out of the county's alleged regulatory taking of plaintiff's property because both claims "derived from a common nucleus of operative fact").

This Court should exercise supplemental jurisdiction over plaintiff's non-federal claims because they are so related to plaintiff's takings claim that they form part of the same case or controversy. Plaintiff's claims under DC ST. §§ 6-641.09, 8-109.03(a), and 11 DCMR §§ 210.2, 210.4, and 507.3 arise out of GW's unlawful campus expansion in Foggy Bottom and the District's failure to enforce the Final Order. These allegations also form the basis for plaintiff's takings claim. Trial of plaintiff's constitutional and non-federal claims will involve common issues of law and fact. The Court's exercise of supplemental jurisdiction over plaintiff's non-federal claims would thus serve judicial economy and provide a single forum for disposition of plaintiff's claims.

### A.    Plaintiff's Section 6-641.09 Claim

Section 6-641.09 provides a private right of action against any person who violates the District's zoning regulations. DC ST. § 6-641.09. Pursuant to this statute, neighboring property owners or occupants who are harmed by zoning violations may "institute injunction, mandamus, or other appropriate action to correct or abate such action." *Id.* "A private plaintiff must assert 'special damage' in order to enjoin a zoning violation." *Lund v. Watergate Investors Ltd. Partnership*, 728 A.2d 77, 82 (D.C. 1999). A special damage is one that is "distinct from that common to the public." *B & W*

*Management, Inc. v. Tasea Investment Company*, 451 A.2d 879, 882 (D.C. 1982). Special damages may impact a group of persons, so long as the impact is suffered distinctly and specifically by them.[4]

Condition 9(e) of the Final Order provides that "[n]o special exception shall be granted, and no permit to construct or occupy buildings for nonresidential use on campus may be issued … whenever a semiannual report reveals that the University is not in compliance with the provisions of this condition." Condition 20 of the Final Order provides that "[n]o special exception application filed by the University for further processing under this plan may be granted unless the University proves that it has consistently remained in substantial compliance with Conditions 1 through 19 set forth in this Order."

As discussed in plaintiff's motion for a preliminary injunction, GW is plainly in violation of Conditions 8, 9(a), and 9(b) of the Final Order. In Fall 2005, GW enrolled between 318 and 4,099 (and as high as 7,051) more students than the 20,000 permitted by Condition 8. GW's violation of the student cap has been ongoing since at least Fall of 2004. GW further violates Condition 8 through its employment of 4,478 faculty, far in excess of the 2,236 faculty cap imposed by Condition 8.

In addition to its violations of Condition 8, GW has consistently violated Conditions 9(a)-(b) of the Final Order. GW currently provides only 5,580 beds on campus or outside Foggy Bottom to its full-time undergraduate student population, in plain violation of the Condition 9 requirement that it provide at least 7,190 beds at its present enrollment level. These violations date back to Fall 2002.

GW's violations of Conditions 8, 9(a), and 9(b) of the Final Order are unlawful, and adversely affect plaintiff's interests. These violations constitute special damages in that they are

---

[4] *See District of Columbia v. Totten*, 5 F.2d 374, 380 (D.C. Cir. 1925) ( "where the acts which create a public nuisance cause also private and special injury to an individual, an action at law will lie.").

distinct from those to the public. Plaintiff is specially damaged by GW's violations because they increase Foggy Bottom's student population, which disturbs long-term residents, diminishes the residential quality of life, and has a deleterious impact on the neighborhood. Plaintiff is harmed by the GW students' malfeasance, boisterous manner, population pressure, displacement of long-time residents, and disturbance of the residential character of the neighborhood. Plaintiff is further specially damaged by the increased traffic, pollution, and noise that result from the thousands of GW students and faculty members who exceed the caps in Condition 8. These damages fall specially and distinctly upon plaintiff.

Further, plaintiff is specially harmed by the Office of Planning's and the Zoning Commission's consideration of GW's application and new campus plan when GW is clearly in violation of the Final Order. Condition 9(e), precluding the District from approving special permits to GW while it is in violation of the Final Order, "clearly serves two important functions that advance the District's goals." This condition "strengthens the University's incentive to comply with the housing provisions," and it "keeps housing and non-housing growth proceeding in parallel." *George Washington University v. District of Columbia*, 318 F.3d 203, 211 (D.C. Cir. 2003); *George Washington University v. District of Columbia*, 391 F. Supp. 2d 109, 111-112 (D.D.C. 2005); *George Washington University*, 831 A.2d 935. Likewise, Condition 20 provides a strong incentive to GW to comply with Conditions 8, 9(a), and 9(b) of the Final Order. These incentives depend upon defendants' enforcement of Conditions 9(e) and 20, and defendants' inexplicable failure to do so removes all incentive for GW to comply with the zoning laws. The Final Order's Conditions were adopted to specifically address potential harm to plaintiff and others similarly situated. Therefore, the Office of Planning's and the Zoning Commission's

disregard of the Final Order specially and distinctly damage the property owners and occupants in the vicinity of the GW campus.

Defendants' motion to dismiss entirely fails to address these violations and the District's failure to enforce the Final Order against GW. Defendants merely contend that these zoning violations are "local matters" in an attempt to downplay the District's selective application of the zoning laws against GW when it has egregiously violated the Final Order for the past several years. The Court should exercise supplemental jurisdiction over this claim because it involves serious violations of the zoning laws and governmental disregard of the same which have resulted in the unconstitutional taking of plaintiff's Foggy Bottom property without just compensation.

**B.    Plaintiff's Section 8-109.03(a) Claim**

The requirement for GW's submission of an environmental impact screening form ("EISF") is grounded in the District of Columbia Environmental Policy Act, DC ST. § 8-109 *et seq.*, which requires the District to "prepare or cause to be prepared . . . a detailed EIS at least 60 days prior to implementation of the proposed major action" whenever it "proposes or approves a major action that is likely to have substantial negative impact on the environment." DC ST. § 8-109.03(a). A "major action" is "any action that costs over $1,000,000 and that may have a significant impact on the environment." *Id.* § 8-109.02(2).[5] GW's application and new campus plan are clearly "major actions" because they cost well over $1 million and are likely to have a significant impact on the environment of Foggy Bottom. This environmental impact is negative

---

[5] The "environment" is defined as "the physical conditions that will be affected by a proposed action, including but not limited to, the land, air, water, minerals, flora and fauna." DC ST. § 8-109.02(3). The statute defines "action" as "a project or activity that involves the issuance of a lease, permit, license, certificate, other entitlement, or permission to act by an agency of the District government." *Id.* § 8-109.02(1).

because it will increase population density, noise, pollution, and traffic in Foggy Bottom.  GW's application and new campus plan therefore cannot be considered or approved by the Zoning Commission prior to preparation of an EIS and the conclusion of the requisite public comment and hearing procedures set forth in DC ST. § 8-109.03(b).  *See Concerned Citizens of Brentwood v. District of Columbia Board of Zoning Adjustment*, 634 A.2d 1234, 1241 (D.C. 1993).

GW failed to submit an EISF with its application and new campus plan.  The Office of Planning unlawfully failed to require such submission prior to its recommendation that the Zoning Commission set down for hearing GW's application and new campus plan.  Nor has the Zoning Commission required GW to prepare an EISF prior to the forthcoming set-down hearing. Defendants' contention that GW's application and new campus plan, which admittedly cost approximately $250 million and encompass major construction in six square blocks of Foggy Bottom, do not constitute "major actions" (Defs.' Mot. to Dismiss, at 24) is ludicrous.  Indeed, courts have recognized the necessity for issuance of an EIS in connection with construction projects costing far less than GW's and involving a fraction of the space contemplated by GW's proposed development in Foggy Bottom.  *See, e.g.*, *Friends of Tilden Park, Inc. v. District of Columbia*, 806 A.2d 1201, 1204-1205 (D.C. 2002) (issuing a stop work order halting the erection of an apartment building due to omissions in the builder's EISF even though a permit had already been issued);  *Citizens Coalition v. District of Columbia Bd. Of Zoning Adjustment*, 619 A.2d 940, 950 (D.C. 1993) (noting that Georgetown University property prepared an EIS in connection with construction of a cogeneration facility to demonstrate compliance with environmental regulations).

The purpose of an EIS is to inform government agencies and the public of the environmental consequences of a proposed major action so as to ensure that environmental harm

does not go undiscovered and that "the public health, safety, or welfare" do not become

"endangered by the action." DC ST. § 8-109.04. If the District determines that the proposed

major action would have an adverse effect on the environment that cannot be remedied through

mitigating measures or reasonable alternatives, "the District government shall disapprove the

action." *Id.*

> The District of Columbia environmental regulations provide that District agencies:

> *shall integrate the Environmental Impact Statement (EIS) process with other planning processes at the earliest stages of their planning for major actions* they intend to propose, when the widest range of feasible alternatives is open to consideration, and before there has been any irretrievable commitment of resources, in order to ensure that planning and decisions reflect environmental values, in order to avoid delays later in the process, and to head off potential conflicts.

20 DCMR § 7200.2 (emphasis added). The regulations thus require District agencies to consider

the environmental impact of major actions before issuing any permits or approving any projects

that are likely to have environmental consequences.

In determining whether an action will have a significant impact on the environment and

whether an EISF is needed, any one of these factors is sufficient to require the preparation of an

EISF: (1) the proposed action might induce significant growth or concentration of population;

(2) disrupt or divide the physical arrangement of an existing community; (3) cause significant

adverse change in the existing level of noise in the vicinity of the action; (4) violate any ambient

air quality standard or contribute to an existing air quality violation; (5) significantly deplete or

degrade ground water resources or interfere with ground water recharge; or (6) "together with

other actions proposed concurrently by the applicant, have a cumulative impact that would be

significant." *Id.* § 7201.2.

GW's application and new campus plan constitute major actions that would have substantial negative impact on the environment of Foggy Bottom because they cost approximately $250 million and are likely to induce significant growth or concentration of population, § 7201.2(e), disrupt the physical arrangement of an existing community, § 7201.2(i), cause significant adverse change in the existing level of noise in the vicinity of the action, § 7201.2(n), violate ambient air quality standards or contribute to an existing air quality violation, § 7201.2(k), and have a cumulative impact that would be significant. *Id.* § 7201.2(p).

The Office of Planning's April 10, 2006 set-down recommendation for approval of GW's application and new campus plan prior to the preparation of an EISF was both misguided and premature. The Zoning Commission has likewise impermissibly set down for public hearing GW's application and new campus plan without requiring GW to prepare an EISF. These actions are in contravention of 20 DCMR § 7200.2, which directs District agencies to "integrate the Environmental Impact Statement process with other planning processes at the earliest stages of their planning for major actions."

The Supreme Court has long recognized the procedural right of citizens to demand governmental scrutiny of the environmental consequences of a construction project adjacent to their home. In *Lujan*, the Supreme Court held that "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." 504 U.S. 573, n. 7. Plaintiff, whose members reside in Foggy Bottom, clearly has sufficient geographical nexus to the site of GW's proposed development project to suffer its environmental consequences. This is particularly so because

GW's application requests zoning amendments and land-use deviating from local zoning procedures, warranting "a hard look at the decision not to file an impact statement." *Maryland-National Capital Park and Planning Comm'n v. U.S. Postal Serv.*, 487 F.2d 1029, 1037-38 (D.C. Cir. 1973).

The Zoning Commission's review of the application and new campus plan is a two-stage process. In the first stage, the Zoning Commission will review GW's "campus plan" which broadly describes GW's intentions for new land use over several years. Upon approval by the Zoning Commission, the campus plan establishes the limitations within which all future construction must occur. In the second stage, the Zoning Commission reviews the individual projects that the university proposes to undertake, evaluating them both for consistency with the campus plan, the zoning regulations, and the District's Comprehensive Plan. *George Washington University*, 318 F.3d 205.

Defendants' failure to require an EIS at the PUD-one stage is based on the misguided notion that the environmental review process need not begin until the eve of construction. However, should the District approve GW's PUD-one application and new campus plan without requiring the issuance of an EIS, the environmental consequences of this major action would go undiscovered, and it would be too late to amend the campus plan at the PUD-two stage which merely colors the sketch previously approved. This approach severely harms plaintiff and the public by depriving them of critical environmental information that is required to satisfactorily review the first stage of the campus plan approval process. Even if an EIS is eventually required prior to construction, the Zoning Commission's first-stage approval will have already irrevocably established the general rules governing GW's development. Unless defendants are compelled to

perform their statutory duties now, there will be no meaningful environmental input regarding the application and new campus plan on the eve of construction.

### C.    Plaintiff's 11 DCMR § 210.2 Claim

In evaluating a university's application for a special exception, the Zoning Commission must ensure that the proposed university use is "not likely to become objectionable to neighboring property because of noise, traffic, number of students or other objectionable conditions."  11 DCMR § 210.2.  The Zoning Commission must also ensure that the proposed university use is consistent with the Comprehensive Plan.  10 DCMR § 112.6(b).  The Zoning Commission must guard against "unreasonable campus expansion into improved low-density areas."  11 DCMR § 210.3.

As discussed above, GW's expansion into the Foggy Bottom neighborhood has resulted in the very objectionable conditions proscribed by § 210.2.  The Foggy Bottom neighborhood suffers from "increased population density, noise, pollution, traffic, and parking congestion ... all of which are consequences of GW's campus expansion in this neighborhood."  FAC, ¶ 90. These violations arise from defendants' unlawful failure to enforce the Final Order against GW. Plaintiff therefore alleges a viable claim under 11 DCMR § 210.2.

### D.    Plaintiff's 11 DCMR §§ 210.4, 507.3 Claim

The District's zoning scheme directs universities to submit to the Zoning Commission a campus plan encompassing all development for the duration of the plan.  It provides that, "[a]s a prerequisite to requesting a special exception for each college or university use, the applicant shall have submitted to the Commission for its approval *a plan for developing the campus as a whole*."  11 DCMR § 210.4 (emphasis added)  The zoning regulations further provide that a university seeking a special exception "shall have submitted and the Commission shall have

approved *a plan for developing the campus as a whole*." 11 DCMR § 507.3 (emphasis added).

*Accord Glenbrook Road Ass'n v. District of Columbia Board of Zoning Adjustment*, 605 A.2d

22, 30 (D.C. 1992).

GW's application and new campus plan specifically exclude major development that is to

take place on Squares 54 and 80.  Instead, these sites are to be "the subject of separate

consolidated PUD and rezoning applications."  On May 30, 2006, GW filed a separate PUD

application for the development of Square 54.  This application proposes the development of

870,000 square feet of gross floor area, 333 dwelling units, 454,000 square feet of office space,

and 84,000 square feet of retail space.  The District has not indicated whether it will consider

GW's application for Square 54 in the same review process as GW's application and new

campus plan.

The requirement in the "special exception" applications for colleges and universities, 11

DCMR §§ 210.4 and 507.3, that the university set forth a "plan for developing the campus as a

whole" is of paramount importance in this instance.  The reason for the regulatory provision is to

assure that the application and campus plan are not used to circumvent the zoning regulations.

For example, the relatively moderate showing required of colleges and universities for the

approval of a campus plan and thereby the intrusion of a college or university into a residential

setting, should not be used to permit, through the backdoor, a use that is either prohibited under

the zoning map, or that would require a zoning variance.  But that is exactly the "sleigh of hand"

that GW is attempting here.

In a further illustration of the perils of GW's failure to submit a plan for the campus as a

whole, GW has requested that section 210.3 of the District's zoning regulations, which limits the

total bulk of all buildings in residential areas to 3.5 gross floor area (FAR), be changed to permit

36

a 4.5 FAR with respect to universities.  This request runs afoul of section 210.3's specific goal of "prevent[ing] unreasonable campus expansion into improved low-density districts."  11 DCMR § 210.3.  Even more troubling, GW's application for the Square 54 PUD requests a re-zoning of Square 54 from residential to commercial status so that the property can support a *7.5 FAR*.  The dramatic disparity between the FAR requested in the Square 54 PUD and GW's application new campus plan reveals why defendants' unlawful actions obscure the true extent of GW's proposed commercial expansion in Foggy Bottom.

## CONCLUSION

For the above reasons, plaintiff respectfully requests the Court to deny defendants'
Motion to Dismiss.  Plaintiff further respectfully requests the Court to order defendants to
answer plaintiff's First Amended Complaint.

Respectfully submitted,

Dated: June 9, 2006

/s/ William Bode
William H. Bode (Bar No. 113308)
Peter Grenier (Bar No. 418570)
Stefan Shaibani (Bar No. 490024)
BODE & GRENIER, LLP
1150 Connecticut Avenue, N.W.
Ninth Floor
Washington, DC 20036
Tel:  (202) 862-4300
Fax: (202) 828-4130

*Attorneys for Foggy Bottom Ass'n*

38

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 9, 2006, I electronically filed "PLAINTIFF'S OPPOSITION

TO DEFENDANTS' MOTION TO DISMISS" and that service was thus effected upon

defendants' counsel in accordance with Local Civil Rule 5.4(d).


<u>/s/ William Bode</u>