GOVERNMENT
OF
THE DISTRICT OF COLUMBIA

+ + + + +

ZONING COMMISSION

+ + + + +

REGULAR MEETING
1207th MEETING SESSION (9th OF 2006)

Case Number 06-12
George Washington University

+ + + + +

THURSDAY
APRIL 20, 2006

+ + + + +

The Regular Meeting of the District of
Columbia Zoning Commission convened at 7:13 p.m. in
the Office of Zoning Hearing Room at 441 4th Street,
Northwest, Washington, D.C., Carol J. Mitten,
Chairperson, presiding.


ZONING COMMISSION MEMBERS PRESENT:

| | |
|---|---|
| CAROL J. MITTEN | Chairperson |
| ANTHONY J. HOOD | Vice Chairman |
| MICHAEL TURNBULL | Commissioner (AOC) |
| GREGORY JEFFRIES | Commissioner |
| JOHN G. PARSONS | Commissioner (NPS) |

OFFICE OF ZONING STAFF PRESENT:

SHARON SCHELLIN, Acting Secretary, Office of
    Zoning

**NEAL R. GROSS**
COURT REPORTERS AND TRANSCRIBERS
1323 RHODE ISLAND AVE., N.W.
(202) 234-4433    WASHINGTON, D.C. 20005-3701    www.nealrgross.com

**Exhibit A**

OFFICE OF PLANNING STAFF PRESENT:

       ELLEN McCARTHY
       MAXINE BROWN-ROBERTS
       JENNIFER STEINGASSER
       TRAVIS PARKER
       JOEL LAWSON
       STEVE COCHRAN
       KAREN THOMAS

D.C. OFFICE OF THE ATTORNEY GENERAL PRESENT:

       JACOB RITTING, ESQ.
       MARY NAGELHOUT, ESQ.
       LORI MONROE, ESQ.

       This transcript constitutes the minutes from the Regular Meeting held on Thursday, April 20, 2006.

3

A G E N D A

Hearing Action - Office of Planning

Z.C. Case Number 06-12 (George Washington University -- 1st Stage PUD and Related May Amendment)............................. 4

Vote to Set Down........................... 35

**NEAL R. GROSS**

COURT REPORTERS AND TRANSCRIBERS

1323 RHODE ISLAND AVE., N.W.

(202) 234-4433      WASHINGTON, D.C. 20005-3701      www.nealrgross.com

4

1                    P-R-O-C-E-E-D-I-N-G-S

2                                        7:13 p.m.

3           CHAIRPERSON MITTEN:  Now, we're ready for

4    the first item.  Actually, we'll take up the two --

5    two items which are A and B because they're related

6    cases under hearing action.

7           The first is Zoning Commission Case Number

8    06-12 and the second is 06-19.

9           Before I turn to the Office of Planning

10   for their report, I did want to say a few things

11   because we've had requests to speak on this matter and

12   I understand there's an ANC resolution related to this

13   and I just wanted to -- I wanted to say a few things

14   so people understood the position of the Commission.

15          We don't have discussion about set down.

16   The only time we invite people forward to testify

17   regarding set down is when we're poised to deny a

18   request for a hearing.  That's point number one.

19          Point number two is the campus plan itself

20   is not before us for set down.  We use the BZA rules

21   for campus plans.  There is no set down process for

22   campus plans and they are merely scheduled for hearing

23   at the time the application is complete.

24          So, what's before us tonight in Case

25   Number 06-12 is the first stage PUD and related map

1      amendment that is related to the campus plan and then

2      we have a proposed text amendment that is also related

3      to the campus plan and I just -- I'll read the section

4      of our -- of our rules -- procedure that's -- that

5      relates to the Commission taking testimony or -- or

6      what we consider in the context of the set down which

7      is in Subsection 3011.3.

8              After considering the application or

9      petition and the recommendations of the Office of

10     Planning and after reasonable opportunity for the

11     applicant or petitioner to present the applicant's or

12     petitioner's view which they typically do in writing,

13     the Commission may dismiss the application or petition

14     or set it down for public hearing or other proceeding.

15             Further I just want to on the point of the

16     request from the ANC read from the ANC Act and this is

17     in Section 13C1 regarding giving great weight.

18             It says Of this section, each agency,

19     board and commission shall before the award of any

20     grant funds to a citizen organization or group or,

21     this is the relevant part, before the formulation of

22     any final policy decision or guideline with respect to

23     grant applications, comprehensive plans, requested or

24     proposed zoning changes, variances and so on that the

25     ANC has given great weight.

1        We are nowhere near final action in the

2   case.  We are at the very initial stages of this case.

3        So, I just wanted to clarify the -- the

4   Commission's position on that and so, we will not be

5   taking any public testimony on this matter and I'd

6   like to turn now to the Office of Planning for their

7   report.  Thank you.

8        MR.  PARKER:   Good evening, Madam Chair,

9   Members of the Commission.

10       My name is Travis Parker with the D.C.

11  Office of Planning.

12       There -- as you've mentioned, there are

13  three parts of the campus plan before you tonight that

14  are the result of a year and a half of collaborative

15  effort by GW with the Office of Planning and the

16  surrounding community.

17       The three applications are a new campus

18  plan, a campus-wide PUD and a proposed text amendment.

19  The submitted report on this presentation discusses

20  all three applications as one project.

21       This process began a year and a half ago

22  when GW came to OP with a desire to develop the old

23  hospital site on square 54 with non-university uses.

24  The existing campus plan allows for commercial

25  development of the site.  However, OP informed GW that

1    neither we nor the community would support non-

2    university uses on square 54 without detailed

3    information on how future university uses would be

4    accommodated on the remainder of the campus.

5          A ULI panel that was convened early last

6    year to discuss the development of this site met --

7    met with stakeholders on all sides of the issue and

8    determined that commercial use of the site was

9    appropriate assuming that the university could

10   reasonably plan for the future university uses on the

11   existing campus.

12         This requirement ultimately led to the

13   plan in front of you today.

14         The first step OP took was to insist that

15   any process undertaken by GW must be as open and

16   participatory as possible.  In addition to attempting

17   a mediated process, GW held a series of meetings last

18   year cosponsored by ANC 2A and OP to present ideas to

19   the community and gather neighborhood input.  Through

20   these meetings, OP and the university collected

21   community comments that formed a picture of

22   neighborhood issues and resulted in substantive

23   changes to the plan.

24         The development plan included in your

25   application is a result of these community meetings

1    and GW discussion with OP. Over the course of the

2    community involvement site after site of GW's

3    development wish list was dropped from their original

4    plan. The sites that are left mainly in the center of

5    campus along 22nd Street represent the areas that are

6    appropriate for development and will not have negative

7    impact on residential neighbors or historic

8    properties.

9         The problem that OP ran into is that

10   protections afforded by this development plan are not

11   achievable under the existing campus plan or even the

12   existing campus regulations. They really required us

13   to take a fresh look at the campus plan process.

14        The existing campus plan regulations and,

15   therefore, the existing 2000 GW plan allow the

16   university to take its available density and spread it

17   around however it sees fit which could mean

18   concentrating it in some areas and not in others, but

19   in any case, does not limit where -- where on the

20   campus the density can go.

21        The situation works well for all other

22   university campuses in D.C. which are lower zoned and

23   less space constrained than -- than GW. It presents a

24   real problem, however, for the Foggy Bottom campus.

25        In this case, we don't necessarily want

9

1  the university to build wherever it sees fit and

2  spread the density around where it might result, for

3  example, in 110 feet on 24th or demolition of an

4  historic structure like the JJ Early Studio. Instead,

5  we want to specifically define the sites appropriate

6  for development and restrict development in those

7  sites where it's not appropriate.

8          GW has no obligation to limit itself in

9  this manner.    It has done so entirely at the

10  suggestion of OP for the benefit of the city and the

11  community.

12          The tradeoff for the university is

13  hopefully twofold.  First, by defining exactly what

14  development site are appropriate and how the campus

15  can be developed, all future projects will be on

16  predetermined sites known well in advance and ideally

17  will be less contentious.

18          Second, the overall building density

19  achieved by clustering development in the center of

20  the campus is greater and more efficient than what

21  could be achieved by spreading it around various

22  campus sites under the existing plan.

23          The unique situation faced by Foggy Bottom

24  campus and the development plan proposed required a

25  paradigm shift for implementation.  The flexibility to

1  locate any development anywhere on campus allowed by

2  Section 210.3 is not appropriate for this urban

3  location.  Moreover, the areas that are appropriate

4  for development are reasonably developable to a higher

5  density than would be allowed by 210.3.  The solution

6  was to file a campus-wide PUD in conjunction with a

7  campus plan similar to what was done by the -- by the

8  commission for the Washington Hospital Center in 2002.

9        OP has recommended that the entire campus

10  be submitted as a first-stage PUD with each

11  development project being submitted later as

12  individual second-stage PUDs similar to further

13  processing.

14        The PUD process would solve the problems

15  of limiting development to specific sites.  It would

16  provide design review of buildings.  It would provide

17  assurance that the plan could not change significantly

18  from what is approved and it would provide the ability

19  to build extra density in the center of campus through

20  map amendments.

21        The map amendments would extend the C3C

22  zoning currently on the northern portion of campus

23  through the center of campus along 22nd Street.  The

24  remainder of campus not rezoned would retain the

25  existing height restrictions and have a total FAR of

1    approximately 3.65.

2            OP  originally  assumed  that  a  text

3    amendment  to  Section  210.3  would  be  required  to

4    accommodate  the  extra  0.15  FAR  requested  under  the

5    plan  and  submitted  a  text  amendment  accordingly.

6    However,  subsequent  conversations  with  OAG  have  led  to

7    the  interpretation  that  the  campus-wide  PUD  --  that

8    with  the  campus-wide  PUD,  the  PUD  guidelines  for  FAR

9    would  apply  and  no  text  amendment  would  be  necessary.

10           The  university  has  not  agreed  to

11   withdrawal  of  the  text  amendment  and  has  requested

12   that  it  remain  part  of  the  application  in  order  to

13   accommodate  future  buildings  not  completed  in  the  20-

14   year  time  frame  of  the  plan.

15           This  is  the  one  issue  that  has  changed

16   from  the  written  --  filed  written  report  and  a  single

17   issued  in  front  of  you  that  has  not  been  fully  agreed

18   to  by  GW.   The  conditions  of  the  plan  that  they  have

19   agreed  to  are  significant.

20           The  plan  as  presented  to  you  today  brings

21   forward  nearly  all  the  elements  of  the  2000  plan  and

22   adds  several  new  and  important  improvements  in  terms

23   of  neighborhood  protections.

24           First,  the  university  has  agreed  to  a

25   potential  historic  district  encompassing  much  of  the

1    campus.   This district will be further defined prior

2    to the public hearing.   It will not only identify

3    buildings on campus worthy of protection, but will

4    provide protection for contributing buildings and

5    their neighbors in the -- in the historic district.

6         The university will prevent -- present its

7    proposal to the HR -- HPRB in May and will have

8    graphics and historic district requirements available

9    prior to the public hearing on this plan.

10         A huge issue for the neighborhood over the

11   years including the formulation of the 2000 plan has

12   been the negative affects of GW students living in the

13   area surrounding campus.   As a part of this plan, GW

14   has agreed to phase out all undergraduate housing from

15   the surrounding neighborhood and move these students

16   onto campus.   GW will remove all undergrads from the

17   hall on Virginia Avenue by this fall, all

18   undergraduates from the Aston by next fall and all new

19   undergrads from Columbia Plaza in the fall of 2008.

20   Undergrads will be removed from City Hall on 24th

21   Street at the end of the existing lease in 2016.

22         This is a significant change that is not

23   required under the current plan and could not be

24   contemplated without the density to build additional

25   dorms on campus.

1          Another concern has been the issue of GW

2     purchasing property in the Foggy Bottom area and

3     potentially driving our residents.  GW in this plan

4     has committed not to purchase any properties in the

5     residential parts of Foggy Bottom in the west end for

6     university use.

7          Of course, they have agreed not to develop

8     any campus property not identified specifically in

9     this plan through the PUD process which in itself is a

10    huge commitment.

11         Throughout the process, OP has maintained

12    that we will support no increases in the student

13    enrollment caps.  GW has recognized that they are

14    reaching the maximum capacity of students on this

15    campus and have carried forward the enrollment cap

16    from the previous two plans.

17         The attempt with the new plan is to more

18    explicitly define what is counted in student

19    enrollment.  OP's intent is to count every student

20    physically on the Foggy Bottom campus each semester

21    for classes.  The definition in the plan mainly

22    follows the methodology accepted by the Zoning

23    Commission for further processing cases over the past

24    five years with an additional attempt to add students

25    attending Mount Vernon and Foggy -- both Mount Vernon

1  and Foggy Bottom classes who had not previously be

2  counted in the Foggy Bottom number.

3         OP recognizes that the definition of

4  student enrollment is an important issue for the

5  community and expects that this will be an important

6  discussion at the public hearing.

7         Many other commitments are listed in the

8  attachment to the report including the potential

9  historic district, including the streetscape plan

10  which lists the -- which will list detailed

11  streetscape improvements throughout the campus, the

12  undergraduate bed requirement and nearly all of the

13  previous conditions from the 2000 plan.

14         OP has recommended a 20-year time plan --

15  time frame for both the plan and the PUD.  Both of

16  which would expire together.  This serves several

17  purposes.

18         First, it provides assurance to the

19  community and the city that the development plan and

20  commitments negotiated in this process are not short-

21  term requirements that will be lost in 2015.

22         Second, since this is a detailed long-term

23  plan, it provides a more realistic -- the 20 years

24  provides a more realistic window for the time frame

25  contemplated in the development of the campus.  But,

1    most importantly, this plan is considered by OP to be

2    the ultimate layout of the Foggy Bottom campus.

3              The historic districts, the neighborhood

4    commitments and the time frame are all meant to

5    reinforce the message to the university and to the

6    community that this campus is reaching its final

7    build-out.  Whereas other universities in the city

8    have larger, more open campuses and may continue to

9    build or grow, this plan is seen as the final

10   configuration of the university at this campus for the

11   foreseeable future.

12             It is important to note that while the

13   plan would be binding to the university for 20 years,

14   nothing would prevent the Zoning Commission from

15   stepping in to amend it or request a new plan at

16   anytime.  The first condition of the plan approves it

17   until 2025 or until such time prior to that date as

18   the Zoning Commission determines conditions warrant a

19   change or amendment.

20             OP is aware that some members of the

21   surrounding community are questioning GW's compliance

22   with the existing 2000 campus plan.  GW has agreed to

23   voluntarily participate in an independent audit of

24   their enrollment numbers to insure compliance with the

25   2000 plan prior to approval of the proposed plan.  The

1   Zoning Administrator's in the process of procuring an

2   audit firm and intends to have an audit completed

3   prior to public hearing on this case.

4          Based on the numbers provided by GW and

5   the methodology previously accepted by the Zoning

6   Commission and further processing cases, OP has no

7   reason to believe that the university is out of

8   compliance with the current plan and cannot recommend

9   denying set down of the PUD for a process that's

10  voluntary by the university and will be completed

11  prior to the public hearing.

12         Since neither GW nor any parties in

13  opposition can be heard tonight, OP feels that it is

14  important to move the application forward to a public

15  hearing where all sides can express their views.

16         Moreover, since it is my understanding

17  that the campus plan itself does not require a set

18  down and is heard at the discretion of the Commission,

19  only the PUD and text amendment would need to be set

20  down tonight in order to move forward to public

21  hearing.

22         OP believes that GW has met the technical

23  requirements for set down of the PUD application,

24  recommends that it be set down for a public hearing so

25  all sides can be heard on these complicated issues.

1        I'm happy to take any questions.

2            CHAIRPERSON MITTEN:   Thank you, Mr.

3    Parker.  Before we lose Mr. Jeffries, did you want to

4    ask any questions or make any comments?

5            COMMISSIONER JEFFRIES:   No, I think I've

6    -- I've --

7            CHAIRPERSON MITTEN:   Okay.  And we have

8    absentee ballots from Mr. Jeffries for these cases.

9            Questions from the Commission for Mr.

10   Parker?

11           Well, being the veteran of the wars of the

12   last campus plan, I -- I just want to make a -- I

13   think I just want to make a couple of comments and

14   then if you want to respond in anyway, you can.

15           One of the things that I was disappointed

16   to read in your -- in the Office of Planning report is

17   basically that you didn't have anything good to say

18   about the campus plan that's in place now and I think

19   there's something that's very good about the campus

20   plan that's in place now and that is there is a

21   tremendous amount of on-campus housing that was built

22   that would never have been built without that campus

23   plan and I -- I want that to be acknowledged and I

24   know that the university wasn't happy with it and I

25   know that the community was not happy with it because

1    it didn't go far enough.

2              But, you wouldn't be here proposing what

3    you're proposing now if you didn't have that campus

4    plan.

5              So, wanted to say that because that was

6    hard fought.

7              Secondly, there's -- in describing the --

8    what's -- what's not working now, there's -- there --

9    there are woven into the report and woven into some of

10   the conditions expectations that I don't think we will

11   ever achieve through a campus plan and one of them is

12   -- one of the comments that you make is that the

13   campus plan has not promoted cooperation between the

14   community and the university.  That's not what we're

15   here for.

16             I have -- I -- on some occasions, this

17   body has been a forum for sort of mediating between

18   parties.  I have no expectation that that's going to

19   happen here and I don't want people to expect that

20   that's going -- going to be an outcome of the campus

21   plan process.

22             I also don't want -- I would like to have

23   a -- as we move through this process, I would like to

24   have a better comparison between the existing campus

25   plan and why what it is being proposed -- I understand

1    from the PUD aspect of it density-wise and design-wise

2    why it's -- that that could be a better tool, but I'd

3    like to know why -- what we're putting in place that

4    -- that differs from the existing plan.  Why -- why

5    that's superior.

6        The other thing that I'd just like folks

7    to keep in mind is -- is one of the sticking points

8    that Mr. Parker mentioned which is there's this --

9    there's this persistent perception that -- that

10   whatever formulas we put in place or whatever kind of

11   checks and balances we put in place, we -- we don't --

12   we don't say enough words or we don't put enough teeth

13   into that.  I -- you know, we're going to struggle

14   with the same things.  The same -- the same level of

15   distrust and the same -- what people perceive as

16   ineffective control mechanisms unless we come up with

17   -- with better language and so, that -- that's another

18   area that, you know, we're not going to get anywhere

19   if we keep using the same methods.

20       So, I -- I hope I'm not here 2026 when --

21   if -- if this gets approved that it expires, but I'm

22   -- I'm looking forward to trying to find a new way to

23   -- to have this campus controlled the way that we all

24   had -- that -- that I think the BZA had intended given

25   the imperfect tools that they were given several years

1    ago and I'd also just like to I guess revisit the

2    notion that we had made a commitment that we were

3    going to rewrite the campus plan regulations after we

4    had heard all of the campus plans that had been coming

5    forward and here we are without -- we're -- we're --

6    we're still kind of cobbling together the tools that

7    are existing.    We don't have new campus plan

8    regulations to guide us.

9         So, that's sort of just my reaction to the

10    whole thing.

11         MR. PARKER:  My only comment was I in no

12    way intended to -- to disparage the original plan.  In

13    fact, this -- this new plan is an attempt to build on

14    it.  I mean I -- there are a lot of good things in the

15    existing plan and we tried to take that further this

16    time rather than replace it and -- and -- and -- and

17    tear down what's -- what's in place, but other than

18    that, I can agree with you.

19         MS. MCCARTHY:  Yes, I -- I really wanted

20    to echo that, Madam Chair.  That I mean as you know,

21    we were very involved and fought really hard on that

22    first campus plan as well.

23         We look at this as taking all of the

24    positive aspects of that plan and extending them and

25    then taking what we've learned about the experience

1    with that plan and trying to add some additional

2    guarantees and some additional commitments that we

3    weren't able to get from the university the first time

4    around.    But, we in no way want to disparage the

5    existing plan.

6              CHAIRPERSON MITTEN:    I -- I just -- I

7    don't know.  Maybe just my ego needed to hear that or

8    I think the -- the -- the BZA was -- I mean that was

9    torturous and they need to be acknowledge.  I mean the

10   -- the -- the group needs to be acknowledged for the

11   hard work that they did and, you know, court case

12   after court case and -- and, you know, I don't think

13   we're in a bad place.  So.

14             Anyone else?

15             VICE CHAIRMAN HOOD:    Madam Chair, you

16   brought up a very good point.    The campus plan

17   regulations, I'm -- I'm wondering if we're preempting

18   the move forward.    What happened?    I know we're

19   getting a status report later, but I'm going to ask

20   you what's the status of that?    I think -- are you

21   working on that, Mr. Parker?

22             MR. PARKER:    I'm not.  I'm not aware that

23   we're under -- under process of changing the campus

24   plan regulations at this time.  Are we?

25             VICE CHAIRMAN HOOD:    We've been doing that

1    now for how -- it's been awhile.

2            MS. MCCARTHY:  Yes.  No, we --

3            VICE CHAIRMAN HOOD:  Matter of fact, it

4    was when I was the chairman and I haven't been the

5    chairman in awhile.

6            CHAIRPERSON MITTEN:  Anytime you want.

7            VICE CHAIRMAN HOOD:  No.  Uh-huh.

8            MS. MCCARTHY:  We -- we have had a few

9    different variations of different approaches to campus

10   plans.  Unfortunately, the person who was our campus

11   plan expert and who had taken a lead on that was Dave

12   McGettigan who left us several months ago.

13           So, we got to collect -- he -- he was kind

14   enough to leave us his files and hopefully, there in

15   fairly good shape so we haven't lost a lot of -- of

16   the learning that we did in that process.

17           VICE CHAIRMAN HOOD:  Okay.  Let me go back

18   to this case.  I think we're talking 6-19, too.  Yes.

19    Okay.  You're asking now for a new 20-year campus

20   plan.  Is that -- is that going to be the model for --

21   for other campuses here in the city or are we just

22   talking about GW?

23           MR. PARKER:  Absolutely not.  The -- the

24   point was that -- that GW has reached -- reached the

25   portion of its development where it's -- we're kind of

1  seeing this as the end.  This -- we're kind of seeing

2  this as the -- the end game for the GW campus.

3  Whereas, other campuses throughout the city are still

4  going to evolve.  They have a lot more space.  They're

5  a lot less dense and are still going to evolve over

6  the years and grow.  We see this as -- as the build

7  out for GW and, therefore, we recommended a longer-

8  term plan that -- that represents that.

9         VICE CHAIRMAN HOOD:  Okay.  Thank you.

10        COMMISSIONER TURNBULL:  So, is this a -- a

11 unique situation where you would make the whole campus

12 a PUD?  You see this as a one time.

13        MR. PARKER:  Absolutely.  As -- as I talk

14 about, this was really our method to -- to handle the

15 unique situation that we have here in terms of we

16 don't -- we didn't want to move forward with the --

17 the way the 2000 or that 210.3 works where GW can

18 spread its density wherever it wants.

19        We wanted to limit the -- limit the

20 density to the sites that are appropriate for it and

21 that isn't necessarily the case on other universities

22 in the city.  They aren't quite as space constrained

23 or have the same surrounding neighborhood.

24        COMMISSIONER TURNBULL:  And it would be

25 under the R5D?

1        MR. PARKER:  I'm sorry.

2        COMMISSIONER TURNBULL:   And it would be

3    under R5D?

4        MR. PARKER:   Most of the campus -- the

5    majority of the campus would remain R5D.   There are

6    the sites along 22nd that would be rezoned through the

7    PUD process to C3C.

8        COMMISSIONER PARSONS:   I want to talk a

9    little about square 54.

10        MR. PARKER:  Okay.

11        COMMISSIONER PARSONS:   Your report says

12    that -- that GW approached you as saying that -- that

13    they would use it for investment purposes.

14        MR. PARKER:  Um-hum.

15        COMMISSIONER PARSONS:  And the report kind

16    of dies about that or at that point.  What -- what --

17    what do you understand the proposal for square 54 and

18    its timing to be?

19        MR. PARKER:   I understand that a -- that a

20    PUD will likely be submitted in the next few months.

21    The community process that I spoke about that happened

22    last year didn't just deal with this plan.   It also

23    dealt with plans for square 54.   So, there were

24    presentations to the community of what the university

25    was -- was looking at and so, I expect that -- yes,

1    the ULI panel looked at square 54 as well.  So, I

2    expect that in the next few months once this process

3    gets started you'll see square 54.  One of the things

4    that we've continuously insisted to the university is

5    that square 54 will follow this.  So, that -- I mean

6    it -- it will be likely submitted before this process

7    is through, but will not be approved until after this

8    would be approved.

9              COMMISSIONER PARSONS:  But -- but, you see

10   it as -- as a -- a non-university use?  I mean that's

11   what's coming forward.  It will not be used for

12   university purposes.

13             MR. PARKER:  That's -- that's what we

14   expect to come forward.  Yes.

15             COMMISSIONER PARSONS:  And that's the

16   logic to not including it even though it's within the

17   campus plan boundaries?

18             MR. PARKER:  Correct.

19             COMMISSIONER PARSONS:  It's a stand-alone

20   project like any other PUD is -- is the rationale?

21             MR. PARKER:  Correct.

22             COMMISSIONER PARSONS:  Okay.

23             MS. MCCARTHY:  And the -- and the other

24   part of the rationale is what -- what looks like it

25   will emerge in the square 54 PUD which would be

26

1    consistent with the Urban Land Institute panel is a

2    combination of market-rate housing which we thought if

3    the university were not going to put university use

4    there, at least making up for the residential fabric

5    that's been eroded over the years by GW's expansion

6    made some sense.

7         There would be office on the Washington

8    Circle side mostly likely, the residential and then

9    one of the things that we had observed about the site

10   is by virtue of being right across the street from the

11   Foggy Bottom Metro Station which has an uncommonly

12   large amount of activity because of not only the high

13   residential population and high student population so

14   there's a lot of coming and going from the Metro

15   throughout the day, but there's also the Kennedy

16   Center which brings a lot of people there in the

17   evening and shuttles depart from the Metro Stations.

18        So, we had had over the years concerns

19   expressed by people in Foggy Bottom west end about the

20   lack of local serving retail in the area.  So, that

21   seemed like a good location for a retail

22   concentration, maybe some additional public space to

23   -- to recognize the fact that this was sort of the --

24   the center or could be sort of a town center of Foggy

25   Bottom and our understanding is there's a grocery

1    store and a number of -- of additional retail stores

2    as well as public space and market-rate housing and

3    office use.

4        COMMISSIONER PARSONS:  When you say market

5    rate, you mean rental as opposed to condominium?

6        MR. PARKER:  I believe so.  Yes.

7        MS. MCCARTHY:  I believe so, but the PUD

8    has not been submitted yet.  So.

9        COMMISSIONER PARSONS:  So, being market

10   rate, you don't think it will be occupied by students?

11       MR. PARKER:  I don't think the university

12   has the option to -- to prohibit students, but it

13   won't be marketed to students.

14       COMMISSIONER PARSONS:  Well, that's

15   another case.

16       Let's talk about the audit results from

17   the Office of the -- of the Zoning Administrator.

18       MR. PARKER:  Um-hum.

19       COMMISSIONER PARSONS:  What is that going

20   to tell us?  What -- what you're saying is that will

21   be made available to the Commission prior to the

22   hearing.  Sounds like the kind of thing that comes in

23   the night of the hearing.  So, what --

24       MR. PARKER:  I -- I -- I think the goal is

25   to have it done by early June which should be

1    significantly before a hearing time would be available

2    for this case, but it -- it will confirm that the

3    numbers that GW are reporting are accurate and if the

4    Zoning Administrator has any problems with the

5    methodology that -- that the university has used, he

6    will report those as well.

7         MS. MCCARTHY:  We -- we fully expect that

8    to -- to -- there were -- there were a number of

9    concerns raised by the community about the fact that

10   the university was out of compliance and, therefore,

11   we shouldn't proceed.

12        COMMISSIONER PARSONS:  Correct.

13        MS. MCCARTHY:  And we said we ought to

14   test whether the university is in compliance or not,

15   do a formal process, agree everybody on what should be

16   counted and what shouldn't be counted, bring in an

17   outside auditor which the university agreed to and as

18   the rules say, we can't proceed with further action on

19   the -- on the GW's part if they're not in compliance.

20    So, if it turns out that they're not in compliance,

21   then the hearing gets postponed and the university has

22   to go back into compliance before they could proceed

23   with the PUDs which in effect would be further

24   processing.

25        COMMISSIONER PARSONS:  Well, that's the

1    answer I was looking for.  Because I couldn't see how

2    we could proceed if we were out of compliance.

3                MS. MCCARTHY:  Oh, you know, we -- we

4    don't think we should proceed if the university's out

5    of compliance.

6                CHAIRPERSON MITTEN:   That's  actually  a

7    provision of the -- of the existing campus point.

8                COMMISSIONER PARSONS:  Right.

9                CHAIRPERSON MITTEN:  Yeah.

10               COMMISSIONER PARSONS:  Right.  So --

11               MS. MCCARTHY:  A provision that was tested

12   legally and upheld specifically by a judge.

13               COMMISSIONER PARSONS:  Right.  So, here we

14   are  asked  to  set  this  down  awaiting  an  audit  that

15   should be available you say when?

16               MR. PARKER:  I'm told early June, but I

17   don't -- I -- it hasn't been contracted yet.  It's in

18   -- he's in the process now.

19               COMMISSIONER PARSONS:  So,  why  shouldn't

20   we wait for that?  I mean I know you're ready to go.

21               MR. PARKER:  Right.

22               COMMISSIONER  PARSONS:   That's  a  good

23   reason, but --

24               MR. PARKER:  Well, we have no reason to

25   believe at this time that the results are going to be

1    any different than what you've got now and so, waiting

2    for that would simply put us three months behind.  You

3    know, we -- we simply have another set down hearing.

4    Set another public hearing for the results that we

5    think you already have in front of you.

6              COMMISSIONER PARSONS:  I see.

7              MS. MCCARTHY:    Basically, we weren't

8    interested in wasting the Commission's time or anybody

9    else's if the university was out of compliance.  We

10   reviewed with the university very carefully their

11   numbers.  The only discrepancy that we would expect to

12   see is if the independent auditor finds that the

13   university has not reported its numbers accurately and

14   so, given that, it appears from all of the numbers

15   that we've seen from the university that they're in

16   compliance given that part of the reason why the count

17   has been delayed was not GW's fault, but sort of

18   getting Zoning Administrator and the community and the

19   Office of Planning together and talking about what

20   ought to be counted and not counted and the rest of

21   it.

22              It didn't -- it didn't seem reasonable to

23   impose a further delay as long as we all had

24   acknowledged that if they're not in compliance nothing

25   should go forward.

1          MR. PARKER:  Moreover, the -- the audit

2     process is not a requirement of the existing plan.

3     The -- the compliance with the existing plan is

4     determined by the Zoning Administrator or the Zoning

5     Commission and there's no requirement for the GW to go

6     through this process.   So, they're doing this

7     voluntarily.   So, we didn't -- another reason we

8     didn't delaying the set down when this is not a

9     requirement for them to go through.

10          COMMISSIONER PARSONS:  Now, is the auditor

11     using the same figures that you -- you -- you've

12     already been presented with or are they gaining

13     additional information going into the files of the

14     university and --

15          MR. PARKER:   Ideally, they'll be going

16     into the files of the university and confirming the

17     figures.

18          COMMISSIONER PARSONS:  Okay.

19          MR. PARKER:  Correct.

20          COMMISSIONER PARSONS:  Okay.  Thank you.

21          CHAIRPERSON MITTEN:  Anyone else comments

22     or questions?

23          COMMISSIONER PARSONS:  Well, I -- I did

24     have a -- a comment about how we -- how would we

25     conduct this -- this three-part hearing and I -- I

32

1    have no thoughts on that, but it seems very

2    complicated. It seems like a number of evenings.

3                CHAIRPERSON MITTEN: At least.

4                COMMISSIONER PARSONS: And we ought to

5    anticipate that and not frustrate everybody by

6    scheduling it for two days in July and having this

7    moved to September and so forth and -- and really just

8    saying we'll -- we'll devote two weeks to this.

9    Whatever it takes.

10               CHAIRPERSON MITTEN: I think that has

11   merit.

12               COMMISSIONER PARSONS: But, I don't know

13   quite in what sequence we would deal with it. I -- I

14   -- I guess an overall campus plan and a PUD and -- and

15   then the text amendment. It's almost three separate

16   processes or -- or --

17               CHAIRPERSON MITTEN:    It's definitely

18   three.

19               COMMISSIONER PARSONS: -- is it not?

20               CHAIRPERSON MITTEN: Well, it's definitely

21   three separate actions with rules regarding each, but

22   I don't -- I -- I don't know how to talk about them

23   separately.

24               COMMISSIONER PARSONS: Neither do I.

25               CHAIRPERSON MITTEN: Without -- you know,

1    without really being laborious and, you know, saying,

2    okay, tonight we're just going to talk about this and

3    then you'd have redundancy the -- you know.

4              COMMISSIONER PARSONS:  Oh, yeah.  Yes.

5              CHAIRPERSON MITTEN:  So, I don't know if

6    the Office of Planning has any thoughts on that.  I

7    just --

8              MR. PARKER:  Our thoughts that it would

9    have to be one continuous hearing with three separate

10   actions.  Then whether that goes into multiple

11   evenings and multiple weeks is --

12             COMMISSIONER PARSONS:  But -- but, you

13   mean -- as the Chairman just said, three -- three

14   separate decisions at the end of a process rather than

15   three different processes.

16             MR. PARKER:  Right.

17             COMMISSIONER PARSONS:  Okay.  Well,

18   somehow we'll get through it.

19             CHAIRPERSON MITTEN:  Well, and I -- and I

20   think just based on past experience we should -- we

21   should -- I think there -- it -- there -- it's a good

22   idea to anticipate that it will be multiple hearings.

23   I think there's -- we should try an schedule several

24   nights as you say, you know, in consecutive weeks so

25   that we don't have -- so, that we can get -- get

1    through it and then if there's additional information

2    that is going to take some time to come in, we'll get

3    that, but we will have gotten through the case.

4              So, just based on my past experience, I'm

5    going to suggest that we at least reserve four nights,

6    a Monday, a Thursday, a Monday, a Thursday.

7              MS. SCHELLIN:  Do you want those to follow

8    each other?  That -- that's probably going to put them

9    into September then for a hearing because we're booked

10   into July.  We have right now if we have to --

11             CHAIRPERSON MITTEN:  Well --

12             MS. SCHELLIN:  -- have it all.

13             CHAIRPERSON MITTEN:   -- I don't know if

14   it's possible to -- to -- you know, if you did a

15   Monday, a Thursday, a Thursday, the following Monday.

16    I mean we want it in a relatively -- we don't have to

17   do that now.

18             MS. SCHELLIN:  Yes.

19             CHAIRPERSON MITTEN:  I'm just saying if we

20   can schedule it tightly, I think that's what we'd like

21   to do.

22             MS. SCHELLIN:  Okay.

23             CHAIRPERSON MITTEN:  Okay.  Then I would

24   move that we set down Case Number 06-12 and Case

25   Number 06-19 for public hearing.

35

1      COMMISSIONER TURNBULL:  Second.

2      CHAIRPERSON MITTEN:  Is there any further

3  discussion?  All those in favor please say aye.

4      (Ayes.)

5      CHAIRPERSON MITTEN:  Mrs. Schellin, we

6  have none opposed.

7      MS. SCHELLIN:  I'm -- I'm getting

8  information from OAG that we actually have to vote on

9  these separately because one's a contested case and

10 one is rule making.  We have to set them down -- take

11 two votes.

12     CHAIRPERSON MITTEN:  Fine.  Okay.  Well,

13 then I'll withdraw that motion and I'll move that we

14 set down Case Number 06-12 for public hearing.  Can I

15 get a second from you?

16     COMMISSIONER PARSONS:  Yes.

17     CHAIRPERSON MITTEN:  Okay.  All those in

18 favor, please say aye.

19     (Ayes.)

20     CHAIRPERSON MITTEN:  None opposed, Mrs.

21 Schellin.

22     MS. SCHELLIN:  Staff will record the vote

23 5-0-0 to set down Zoning Commission Case Number 06-12.

24  Commissioner Mitten moving.  Commissioner Parsons

25 seconding.  Commissioners Hood and Turnbull in favor.

1    Commissioners Jeffries in favor by absentee ballot.

2              CHAIRPERSON MITTEN:  Thank you and then I

3    would move that we set down Case Number 06-19 for

4    public hearing.

5              VICE CHAIRMAN HOOD:  Second.

6              CHAIRPERSON MITTEN:  Thank you.  All those

7    in favor please say aye.

8              (Ayes.)

9              CHAIRPERSON MITTEN:  Mrs. Schellin.

10             MS. SCHELLIN:  Staff will record the vote

11   5-0-0 to set down Zoning Commission Case Number 06-19.

12    Commissioner  Mitten  moving.    Commissioner  Hood

13   seconding.  Commissioners Turnbull and Parsons in

14   favor.  Commissioner Jeffries in favor by absentee

15   ballot and just to add that 06-19 is a rule making

16   case and 06-12 is contested.

17             CHAIRPERSON MITTEN:  And for ease of this

18   whole mishmash that we're going to take -- take on,

19   the whole thing is going to be run as a contested

20   case.  So, we're not going to have separate testimony

21   that, you know, just swear in for one and you don't

22   swear in for another.  We're just going to run it all

23   as a contested case.

24             (Whereupon, the meeting was concluded at

25   7:48 p.m.)