## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FOGGY BOTTOM ASSOCIATION,    ) | |
|                           ) | |
|       Plaintiff,          ) | |
|                           ) | |
|       vs.            ) | |
|                           ) | Court No. 06 Civ. 0746 (RJL) |
| DISTRICT OF COLUMBIA OFFICE OF   ) | |
| PLANNING, *ET AL.*,       ) | |
|                           ) | |
|       Defendants.        ) | |
|                           ) | |

## DECLARATION OF GEORGE H.F. OBERLANDER, AICP

I, George H.F. Oberlander, AICP, declare as follows:

1.     I have been asked by the law firm of Bode & Grenier, LLP to render my opinion whether the George Washington University ("GWU") is in compliance with Conditions 8 and 9(a)-(b) of the District of Columbia Board of Zoning Adjustment's ("BZA") January 23, 2002 Corrected Final Order On Remand ("Final Order") governing GWU's existing campus plan.  I understand that this declaration will be filed to assist the Court in resolving plaintiff's motion for a preliminary injunction.

2.     My expert qualifications are as follows.  I have more than forty-five years of professional urban planning and zoning experience.  I served, from 1979 to 1990, as the Associate Executive Director, D.C. Affairs of the National Capital Planning Commission, Washington D.C.  In that capacity, I supervised the review of the several GWU Campus Plans submitted to the BZA and the Zoning Commission for the District of Columbia.  In addition, I prepared Commission reports on those Campus Plans to the District of Columbia zoning authorities.  I am familiar with the current GWU 2000-2010 Campus Plan and the proposed new GWU Campus Plan.  My complete résumé is attached to this declaration as Exhibit K.

3.     In preparing this declaration, I have reviewed the following data and information: the

BZA's March 29, 2001 Order pertaining to Application No. 16553 of GWU; the BZA's

December 21, 2001 Final Order On Remand; the BZA's January 23, 2002 Corrected Final Order

On Remand (referred to here as the "Final Order"); the BZA's February 6, 2002 Order Certifying

Campus Plan; the BZA's February 24, 2004 Order On Second Remand; the George Washington

University's February 16, 2006 Application to the District of Columbia Zoning Commission for

first stage review and approval of a planned unit development and zoning map amendment for

the Foggy Bottom Campus; the George Washington University's Foggy Bottom Campus Plan:

2006-2025; the District of Columbia Office of Planning's April 10, 2006 "Setdown Report for

George Washington University Campus Plan 2006-2025"; the George Washington University's

February 28, 2006 "Biannual Report Required for GWU Foggy Bottom Campus Plan"; the

George Washington University's 2003 Internal Revenue Service Form 990 ("Return of

Organization Exempt From Income Tax"); the "Enrollment and Persistence" statistics issued by

the George Washington University's Office of Institutional Research; the "Unduplicated

Enrollment (All Campuses)" statistics issued by the George Washington University's Office of

Institutional Research; the "On-Campus Enrollment Fall 2005" statistics issued by the George

Washington University's Office of Institutional Research; the "Full and Part-time Faculty

Appointments by School and Department Fall 2005" statistics issued by the George Washington

University's Office of Institutional Research; the "Paid Personnel Fall 2005" statistics issued by

the George Washington University's Office of Institutional Research; the "On-Campus

Enrollment Fall 2002" statistics issued by the George Washington University's Office of

Institutional Research; the "Virginia Campus Enrollment Fall 2005" statistics issued by the

George Washington University's Office of Institutional Research; and other statistic information

prepared by the George Washington University's Office of Institutional Research and posted on GWU's website.

4.     My opinion follows:

## SUMMARY OF OPINION

Based on the information I have reviewed, analyzed, and discussed below, it is my opinion that the George Washington University is not in compliance with the existing Campus Plan. Specifically, GWU is out of compliance with conditions 8 and 9(a)-(b) of the Campus plan. Condition 9 of the Campus Plan requires that university-supplied beds be provided for 70% of the first 8,000 undergraduates, and one bed for every undergraduate student in excess of 8,000. The housing GWU provides its undergraduates is currently 1,754 beds short of this requirement. Condition 8 of the Campus Plan limits the enrollment "headcount" of GWU to 20,000 students, but the University has a current enrollment (Fall 2005) in excess of 24,000 students. Condition 8 further limits the "full-time faculty" to 1,552; the current faculty (2005) is 2,992. The Condition 8 limitation on faculty is thus exceeded by 1,440.

## DISCUSSION

**I.     Conditions 8 and 9(a)-(b) of the Campus Plan**

The Final Order comprising the Campus Plan provides certain Conditions to ensure that the proposed university use is "not likely to become objectionable to neighboring property because of noise, traffic, number of students or other objectionable conditions." 11 DMCR § 210.2. Pursuant to Condition 8, "Student enrollment (headcount) over the life of the plan shall not exceed 20,000 students and the student full-time equivalent shall not exceed 16,553. The number of full-time equivalent faculty and staff shall not exceed 1,550 and 9,000 respectively,

while the headcount for faculty and staff shall not exceed 2,236 and 10,293 respectively." (BZA Order, March 29, 2001) (attached hereto as Exhibit A).

The Final Order also conditioned approval of GWU's 2000-2010 Campus Plan on the "University's promptly taking decisive steps to provide housing for the bulk of the undergraduate students on campus." Final Order, January 23, 2002, at 5 (attached hereto as Exhibit B). This limitation was based on the BZA's findings that the informal off-campus housing of undergraduate students in Foggy Bottom threatened the "livability and residential character" of Foggy Bottom. Thus, Condition 9 requires that GWU provide housing on-campus or outside Foggy Bottom for 70% (5,600 of the first 8,000 undergraduate students), plus one on-campus or non-Foggy Bottom bed for every full-time undergraduate student over 8,000. After August 31, 2006, the 5,600 beds are to be located entirely on campus. Final Order, Conditions 9(a)-(c).

## II.    Data and Analysis Relevant to Condition 8

### A.   Department of Education

The Department of Education ("DOE") conducts an annual survey of enrollment information for every college and university. In the survey, GWU is identified as "Institution 131469" and the enrollment information it provides the DOE is set forth and retrievable at the website of the IES National Center for Education Statistics. For the year 2004, the online IES Report lists GWU's student enrollment at 24,092 students. *See* IES Report (attached hereto as Exhibit C).

### B.   Internal Revenue Service Filings

As a non-profit Institution, GWU is required to file IRS Form 990. Educational institutions are required to disclose their student enrollment in this form. GWU's IRS Form 990

filed in 2004 lists GWU's student enrollment in FY04 at 23,417 students for the Fall semester

and 23,034 students for the Spring semester.  (attached hereto as Exhibit G).

    C.  GWU's Office of Institutional Research

GWU's Office of Institutional Research reports on-line a "University Factbook" listing

detailed enrollment data.  Included in the Factbook is a page entitled "Unduplicated Enrollment

(All Campuses)" (attached hereto as Exhibit H).  The "Total Headcount" set forth for the Fall

2005 Semester is 24,099 students.  There is separately listed in the Factbook the "Virginia

Campus Enrollment" (attached hereto as Exhibit I).  For the Fall 2005 Semester, the "Total

Headcount" for the Virginia campus is 530 students.  The total enrolled headcount for the GWU

Foggy Bottom Campus is thus 23,569 students for the Fall 2005 Semester.  [24,099 (student

enrollment/all campuses) – 530 (student enrollment/Virginia campus) = 23,569 total student

enrollment (headcount) for Foggy Bottom Campus].  This assumes that none of the Virginia

students take courses on GWU's D.C. campus.  GWU's Office of Institutional Research

explicitly states that GWU's Mt. Vernon campus is considered part of the Foggy Bottom

campus, and there are no other GWU campus locations.

I believe the student "Enrollment" (headcount) reported by GWU's Office of Institutional

Research has a high degree of reliability in that the almost identical student headcount figure was

reported to the Department of Education and the Internal Revenue Service.  I therefore conclude

that GWU's "student enrollment (headcount)" in the language of Condition 8 has been exceeded

by 3,569 students.  [23,569 (headcount) – 20,000 (Campus Plan Limit) = 3,569].

The Factbook also reports the number of Faculty at GWU.  (attached hereto as Exhibit J).

Specifically, the Office of Institutional Research reports that for the Fall 2005 Semester there

were 4,478 faculty appointments (1,549 full time; 2,929 part time).  Thus, it is clear that GWU

has violated Condition 8 by exceeding the faculty cap by 2,242. [4,478 (faculty) – 2,236 (faculty cap) = 2,242].

**III.     Data and Analysis Relevant to Condition 9**

Pursuant to the Campus Plan (Condition 17 of BZA Remand Order), GWU is required to submit semi-annually an audited Report concerning its compliance with Condition 9. (See Condition 17, attached as Exhibit B). Attached hereto as Exhibit D is the "Biannual Reports Required for GW Foggy Bottom Campus Plan; BZA Application No. 16553F" dated February 28, 2006 ("Biannual Report").

Preliminarily, the number of beds that GWU must provide undergraduate students may be computed by adding to the 5,600 beds required under Condition 9(a), the additional beds required under Condition 9(b). Pursuant to Condition 9(b), "whenever the headcount of full-time undergraduates exceeds 8000 (the "base number"), the University shall provide one bed on campus … for each full-time undergraduate in excess of the base number." GWU's Office of Institutional Research lists the total number of undergraduates for the Fall 2005 semester (Unduplicated Enrollment) as 9,660. Thus, GWU must provide 7260 beds for its undergraduate population. [5,600 (beds) + (9660 (undergraduate headcount) – 8000(base)) = 7260 beds].

The Biannual Report lists "University supplied beds" as totaling 5512. It further notes that 605 beds are under development, and should be available for the Fall 2006 semester. Thus, based on the Biannual Report, GWU has violated Conditions 9(a) & (b) by providing 1754 fewer beds than that required. [7260 (beds required by Condition 9) – 5512 (current University supplied beds = 1748 bed deficiency]. Assuming 605 beds are constructed in time for the Fall 2006 semester, and the number of undergraduates does not increase in 2006 compared to 2005, GWU will have violated Conditions 9(a) & (b) by 1,143 beds.

**IV.     GWU's Redefinition Of Student Headcount**

At Tab Q of the proposed new Campus Plan (2006-2025) Application, GWU proposes a new "Enrollment Methodology." I am advised that GWU is using "retroactively" this new method of counting student enrollment (headcount) with the effect of arriving at a Fall 2005 "Foggy Bottom Student Body Headcount" of 18,802. I state these opinions about the validity of the "new methodology" for determining student enrollment headcount, as used in Condition 8 of the existing Campus Plan.

First, GWU maintains it is entitled to subtract from the 24,099 Fall Enrollment figure 3,781 students that include the Virginia campus and "Off Campus" enrollment. In my opinion, as a matter of zoning regulation enforcement, these students should not be excluded. First, the federal government's definition of enrollment should control, unless a different definition is set forth in the BZA's Final Order – and it is not. The DOE's Integrated Postsecondary Education Data System ("IPEDS"), the "standard reporting mechanism for student enrollment for United States institutions of higher Education" (quote from GWU's auditors in Semi-Annual Report), explicitly provides a definition that contradicts GWU's enrollment subtraction. In its "Instructions for Enrollment" in the IPEDS's Enrollment Survey Form (attached hereto as Exhibit E), enrolled students are defined as:

> **Students included in report** - Report all students enrolled in courses creditable toward a diploma, certificate, degree, or other formal award. Include students that are enrolled in courses that are part of a vocational or occupational program, **including** those enrolled in off-campus centers. Include high school students taking regular college courses for credit.... Be sure to include full-time students taking remedial courses if the student is considered degree-seeking for the purpose of student financial aid determination. (emphasis in original)

Thus, based on the IPEDS enrollment definition there is no basis for subtracting 3,560 as GWU apparently wants the Zoning Commission to do.

In its proposed new "enrollment methodology," GWU further proposes subtracting from the 20,318 student figure an additional 1,516 students to come into compliance with the 20,000 cap imposed by Condition 8.  GWU cites three categories of students in the 1,516 subtraction exercise:  (a) students who study abroad for a semester; (b) Continuous Enrollment students; and (c) Mount Vernon Students.  In my opinion, the IPEDS specifically rejects subtraction from student enrollment the aforementioned categories of students.

The first category, "Study Abroad" students are treated in the IPEDS:

Students excluded from this report:

Students studying abroad (e.g. at a foreign university) if their enrollment at this institution is only an administrative record and the fee is only nominal.

In contrast to the IPEDS criteria, the students that GWU seeks to exclude are full tuition-paying students.  Moreover, the students reside at the GWU campus for the second semester, and their place is usually filled with an (uncounted) foreign exchange student.  In my opinion, there are no bases for subtracting from the student headcount those enrolled students who study abroad for a semester.

The second category of excluded students, "Continuous Enrollment" students is likewise contradicted by the definition of students by the IPEDS.  The DOE explicitly requires universities to report all enrolled students and to include them in the "headcount."

The third category of excluded students, "Mount Vernon Students," is likewise not defensible under the IPEDS reporting system.  The instructions provided by the IPEDS for "Students Included in this Report" explicitly provide that all students enrolled in courses creditable toward a diploma, certificate, or degree, "**including** those enrolled in off-campus centers" should be counted toward the number of enrolled students (emphasis in original).  Thus,

8

any attempt to subtract the 925 enrolled students at the Mount Vernon campus would directly contradict IPEDS requirements.

In my opinion, the subtractions from enrollment proposed by GWU violate the purpose and spirit of the D.C. Zoning Regulations and the existing Campus Plan. A college or university is permitted to exist in a residential area like Foggy Bottom, and to expand its presence, so long as the university use is not likely to be objectionable to the residential community. 11 DCMR § 210.2. But the students GWU seeks to exclude from the enrollment headcount – such as the Mount Vernon students – are either bussed into the Foggy Bottom campus, or routinely visit the campus by automobile or other means of transportation. Thus, they contribute to the noise, pollution, congestion, and student body population – the objectionable factors – that supported the BZA's decision to limit student encroachment in Foggy Bottom.

With regard to GWU's violation of Condition 9, a few points are pertinent. In Attachment A of GWU's semi-annual report is set forth an undergraduate student headcount based on the "Average for Fall 2005 and Spring 2006." In my opinion, the use of an "average" for purpose of determining compliance with Condition 9 is inadequate. When the undergraduate body arrives for the Fall Semester, the beds that are to be provided by GWU under Condition 9 must be available – they cannot wait until the Spring Semester. Next, GWU subtracts from the headcount of full-time undergraduates these categories of students: (a) undergraduates at the Mount Vernon campus; (b) students studying abroad for the semester; and (c) students who are enrolled for administrative purposes. In my opinion, the undergraduate students in these categories should not be excluded for purposes of determining compliance with Condition 9 of the Campus Plan.

Condition 9 does not permit this exclusion; rather, it states the University must provide beds for "full-time undergraduate students." Second, the students at the Mount Vernon campus are contemplated in the provisions of the Condition treating students "outside Foggy Bottom/West End." Third, foreign exchange students (non-resident aliens) use the beds that would otherwise be occupied by the students that are studying abroad for the semester. And, when these students return to campus, they require a bed.

With regard to the faculty cap, it is my understanding that GWU maintains that it is entitled to obtain compliance by adding the faculty and staff caps (2,236 and 10,293 respectively) together. GWU thus contends because the reported faculty and staff employees for the Fall 2005 Semester, added together, is less than the sum set forth in Condition 8 for faculty and staff combined, then it is in compliance. In my opinion, this is incorrect. Condition 8 places an explicit cap on both faculty appointments and staff hires. Condition 8 nowhere permits the University to add these two separate categories – professional and non-professional – to win compliance. Cogent reasons support the separate caps on each. For example, the limitation on faculty also serves as a "soft cap" on student enrollment. The University must be sensitive to faculty/student ratios to be competitive. Moreover, the faculty is much more likely than lower level staff employees to use automobiles to commute to and from the University. Considering the University is at the "tipping point" for air quality, this is an important reason for independently limiting faculty headcount.

10

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated:  July 18, 2006

George H.F. Oberlander, AICP
5403 Huntington Parkway
Bethesda, Maryland 20814

11