80000 SERIES

## GOVERNMENT OF THE DISTRICT OF COLUMBIA
### BOARD OF ZONING ADJUSTMENT



**Application No. 16553 of the George Washington University**, pursuant to 11 DCMR § 3104.2, for a special exception for the review and approval of the University Foggy Bottom Campus Plan – Years 2000-2010 under Sections 210 and 507. The boundaries are as follows: Pennsylvania Avenue on the north; 19th, H, 20th, and G Streets on the east; F Street on the south; and 23rd, G and 24th Streets on the west, and also includes a portion of Square 122 extending south of F Street along 19th Street, N.W.  Within the campus plan boundaries, the property owned by the University is devoted to a variety of University uses, including but not limited to classroom, dormitory, library, research, office, support, assembly, athletic, and hospital purposes. These uses would be continued under the Campus Plan in a variety of existing and new buildings in the R-5-D, R-5-E, C-3-C, and SP-2 Districts: Square 39, Lot 803, Square 40, Lot 36, Square 41, Lot 40, Square 42, Lots 54 and 55, Square 54, Lot 30, Square 55, Lots 28, 854, and 855, Square 56, Lots 30 and 31, Square 57, Lots 55 and 56, Square 75, Lots 23, 33, 34, 41, 42, 46, 47, 858, 961, 863, and 864, Square 77, Lots 5, 59, 60, 845, 846, and 864, Square 79, Lots 63, 64, 65, 808, 853, 854, 861, and 862, Square 80, Lots 2, 26, 27, 28, 29, 42, 45, 46, 47, 50, 51, 52, 54, 55, 800, 811, 820, 821, 823, 824, 825, and 828, Square 101, Lots 58, 60, 62, and 879, Square 102, Lot 46, Square 103, Lots 1, 13, 27, 28, 33, 35, 40, 812, 813, 814, 816, 817, 818, 819, and 820, Square 119, Lot 26, Square 121, Lot 819, Square 122, Lots 824 and 825; these Squares are within the campus plan boundaries; Square 39, Lot 77, Square 40, Lot 79, Square 41, Lot 80, Square 42, Lot 101, Square 54, Lot 102, Square 55, Lot 103, Square 56, Lot 119, Square 57, Lot 121 (part only), Square 75, Lot 122 (part only).

**HEARING DATES:** April 26, 2000, September 13, and September 26, 2000

**DECISION DATES:** December 12, 2000 and February 13, 2001

**PRELIMINARY MATTERS:**

Advisory Neighborhood Commission (ANC) 2A was a party in this proceeding.  The Board received requests for party status from the Foggy Bottom Association, the Monroe House Condominium Association, Stephen Mandelbaum, James McLeod, Dorothy Miller, Barbara Spillinger, and Maria Tyler.  These requests were all granted.

**FINDINGS OF FACT:**

1. The George Washington University (hereinafter "University" or "Applicant") originally filed an application December 28, 1999 for review and approval of the George Washington University Foggy Bottom Campus Plan for Years 2000-2010.  A revised proposal was filed April 12, 2000.

**EXHIBIT A**

BZA Application No. 16553
Page 2

2.  The boundaries of the George Washington University Foggy Bottom Campus encompass approximately 43 acres, generally extending from Pennsylvania Avenue on the north to F Street on the south and from 19th Street on the east to 24th Street on the west. Property within the campus boundaries is zoned R-5-D, R-5-E, SP-2, and C-3-C.

3.  The campus is surrounded by high-density zoning, including C-3-C to the north, C-4 to the east, R-5-E and SP-2 to the south, and R-5-E to the west. The campus is also adjacent to the Foggy Bottom Historic District, located west of New Hampshire Avenue and zoned FB/R-3.

4.  The University, which has been located at the Foggy Bottom campus for almost 90 years, currently owns approximately 85 percent of the area and has a stated goal to acquire all of the property within the campus boundary. The University also anticipates using property outside the campus plan boundaries for uses permitted as a matter of right under applicable zoning regulations. No changes to the existing campus plan boundaries are proposed in the 2000 campus plan.

5.  The Applicant submitted a plan for developing the campus as a whole, showing the location, height, and bulk of all present and proposed improvements, as required by 11 DCMR § 210.4.

6.  The proposed campus plan anticipates:

    (a) adding approximately 950,000 square feet of gross floor area, including 874,000 square feet within the residentially zoned area of the campus, to meet the need for new facilities;

    (b) a floor area ratio (FAR) of 3.47, within the allowed maximum of 3.5 FAR;

    (c) student headcount of 20,000 and corresponding full-time equivalent (FTE) count of 16,553;

    (d) faculty headcount of 2,236 and corresponding FTE count of 1,550;

    (e) staff headcount of 10,293 and corresponding FTE count of 9,000;

    (f) maintenance and further development of the open space system and pedestrian network;

    (g) mid-block crossings to reinforce the pedestrian network and provide a safer pedestrian environment;

    (h) urban design enhancements to identify the campus perimeter;

    (i) 2,700 to 3,240 off-street parking spaces; and

BZA Application No. 16553
Page 3

     (j)     encouragement of alternative modes of transportation by students, faculty, staff, and visitors to minimize campus traffic and the impact on neighborhood streets.

7.    The Applicant met repeatedly with community representatives in 1999 to discuss campus plan issues, and also participated in discussions facilitated by the Office of Planning in March and April 2000. The University subsequently filed a new proposed campus plan in April 12, 2000 that amended the original filing by:

     (a)     identifying two sites on campus for the construction of new residence halls;

     (b)     stating a long-term goal of housing 80 percent of full-time undergraduate students in University-owned or –controlled housing;

     (c)     stating a commitment to a new communication process with the community, including regular quarterly meetings;

     (d)     proposing enhanced policies regarding the conduct of University students both on campus and within the larger community; and

     (e)     proposing an enhanced Transportation Management Plan to maximize the use of public transportation.

Exhibit No. 95 at 9.

8.    The proposed 2000 campus plan anticipates the addition of less gross floor area than was approved in the 1985 campus plan (*see* BZA Order No. 14455) and does not propose any change in student, faculty, or staff headcounts or the FTE equivalents for students and faculty, while the proposed staff FTE represents a reduction from the 1985 plan.

9.    The University estimates that 2,775 undergraduates are not housed in University housing. Of those, approximately 1,103, or 40 percent, live in Foggy Bottom (zip codes 20006 and 20037), 543 live elsewhere in the District of Columbia, 718 live in Virginia, and 411 live in Maryland. Exhibit No. 230 at 2.

BZA Application No. 16553
Page 4

10. The Applicant testified that the University will require all freshmen and sophomore students to live in on-campus housing by 2002, except for those who are commuters, are married, have children, or have disabilities or religious beliefs inconsistent with residence hall life.

11. The University proposed to provide housing by the end of 2005 for at least 70 percent of its full-time undergraduates in University-owned or -controlled housing, toward a long-term goal of housing 80 percent of full-time undergraduate students in University-owned or -controlled housing. The Applicant stated that the percentage requirement would act as a "soft cap" on undergraduate students, since the "rough parity" between the number of beds and full-time undergraduates would limit increases in the number of undergraduates.

12. The Applicant's revised campus plan proposal provides for a total of 1,350 new beds on campus, subject in some cases to contingencies. The total stock of on-campus University beds would potentially increase by approximately 40 percent, from 3,519 to 4,869. The University proposed to provide additional on-campus housing on three sites:

    (a)     200 beds on Square 103;

    (b)     650 beds on Square 80, provided that the District of Columbia transfers property it owns on that site to the University for redevelopment including new space for the School Without Walls, or alternatively, approximately 288 beds if the property is not transferred; and

    (c)     500 beds on Square 54, provided that the University is able to secure approval of a planned unit development (PUD) and rezoning of the site to C-3-C, and provided that the University is able to secure the necessary permits.

    Transcript (Tr.), September 13, 2000 at 144.

13. The Applicant proposed to provide an additional 550 beds immediately off-campus within a designated Housing Opportunity Area; that is, approximately 200 beds on Square 122 and at least 350 beds on Square 43. The Applicant defined the proposed Housing Opportunity Area as: (a) all areas on campus, (b) existing off-campus residential facilities owned or controlled by the University as of November 8, 2000, (c) properties located in Squares 43, 58, 81, and 122, and (d) property located outside the "Foggy Bottom Area," that is, the area bounded by 19th Street, E Street, Rock Creek Park, and Pennsylvania Avenue, N.W., not including the Housing Opportunity Area.   Tr., September 13, 2000 at 146-147.

14. The University suggested that, as an incentive, any additional housing constructed on campus after approval of the campus plan should not count toward the maximum FAR limiting the bulk of all buildings on campus.

BZA Application No. 16553
·Page 5

15.     The University also pledged not to purchase residential facilities in Foggy Bottom (excluding certain areas) for dormitory use for a period of five years or until the 70 percent housing goal was reached. Exhibit No. 196

16.     The Foggy Bottom campus is served by two Metrorail stations – the Foggy Bottom/GWU station on-campus at 23rd and I Streets, and the Farragut West station located near the campus at 18th and I Streets, N.W. – as well as three Metrobus routes. The University provides a shuttle service connecting the Foggy Bottom and Mount Vernon campuses and the satellite parking at the Kennedy Center.

17.     The Applicant's proposed Transportation Management Plan is intended to further encourage the use of public transportation by students, faculty, staff, and visitors to the Foggy Bottom campus. The University established a target of 60 percent transit use by faculty and staff and a five percent target for carpooling and vanpooling.

18.     The Zoning Administrator, by memorandum dated March 23, 2000, submitted the results of a count of parking spaces on the campus, reporting that the current parking inventory on campus is 2,632 spaces. (*See* Exhibit No. 45.) The University proposed to increase the minimum parking inventory to 2,800 spaces. Exhibit No. 196.

19.     The Board finds that parking spaces located outside that campus plan boundary should not be counted toward the campus parking inventory because the record reflects that the 150 spaces leased by the University at the Kennedy Center have not been well-utilized and thus do not satisfy the demand for parking on-campus. The Board also finds that 2,800 parking spaces on-campus will be sufficient to mitigate potential adverse impacts on neighboring property.

20.     The Office of Planning (OP) submitted several reports on the Applicant's campus plan. OP opposed approval of the proposed campus plan as filed, but ultimately supported approval subject to conditions necessary to protect the neighborhoods surrounding the University. According to OP, the conditions of approval should be designed to (a) protect adjacent communities that absorb a disproportionate share of students, university facilities and related uses and activities, (b) ensure that the West End is included as an adjacent·community in need of protection from future University expansion and student growth, (c) provide the University with the flexibility to determine sound strategies for encouraging students to look at housing options in other areas of the city or region, (d) allow the University to further its academic mission, and (e) incorporate an enforcement mechanism that would give the University adequate incentive to follow through on its commitments. Exhibit No. 239 at 5, 6.

21.     For purposes of its reports, OP defined the Foggy Bottom Area – that is, the area where OP believed that the University should not acquire off-campus housing – as the area bounded by 19th Street, E Street, Rock Creek Park, and N Street, N.W., except for property zoned C3 or C4, the campus plan area, and the Housing Opportunity Area. OP defined the Housing Opportunity Area as (a) existing University residential facilities, (b)

BZA Application No. 16553
.Page 6

properties currently owned by the University on Squares 43 and 122, and (c) any property located within the campus plan boundary. Exhibit No. 239 at 8.

22.   In its April 21, 2000 report, OP indicated that the proposed campus plan had "many positive points" but two related issues concerning neighborhood impacts remained unresolved: (1) the physical expansion of the University beyond the campus plan boundary to meet student housing needs, and (2) the impact on nearby communities of students not in University-owned housing who put added pressure on the local housing market.   Seeking to ensure that a policy of no or very limited impacts on the fragile Foggy Bottom and West End neighborhoods was reflected in the approved campus plan, OP identified five issues of concern:

(a)   Projected enrollment increases will inevitably put pressure on the neighborhoods surrounding the University, and the Applicant's guarantee to provide housing for 60 percent of undergraduates would not adequately mitigate the full impact of the pressure.

(b)   There is presently insufficient housing located inside the boundaries of the campus plan, new housing will be needed, and if the University continues to purchase land outside the campus plan boundaries and the number of students living in the small, constrained Foggy Bottom community continues to increase, the residential community will reach a "tipping point" where the Foggy Bottom community simply transforms into a "University area."

(c)   Information about the undergraduate population is critical to determining present and future impacts on the surrounding residential community.

(d)   While the University provides significant economic benefits, there is concern about the trend of removing land from the tax rolls for university purposes.

(e)   No agreement currently exists or is included in the proposed campus plan that would provide binding, verifiable assurances that expansion into the Foggy Bottom/West End community would not occur in the future.

Exhibit No. 138 at 2-3.

23.   In its supplemental report submitted September 8, 2000, OP recommended denial of the proposed campus plan due to its nonconformity with the requirements of Section 210 of the Zoning Regulations.   However, OP also proposed two sets of recommendations that, in its view, would bring the campus plan into conformity with Section 210.   One approach, which OP initially designated its preferred recommendation, included (a) establishment of a baseline number of students in the Foggy Bottom Area, (b) requiring the University to establish a program that would maintain or lower that baseline number, (c) implementation of strict enforcement mechanisms to provide certainty for the community and motivation for the University in complying with its baseline obligations, and (d) requirements for construction of additional housing on Squares 54 and 80.   OP

testified that the preferred set of recommendations would solve cumulative student impacts in Foggy Bottom while also discouraging the University from acquiring residential property for dormitory use. However, OP also noted that its preferred approach might require legislative action to avoid any possible violation of the District of Columbia Human Rights Act, D.C. Code § 1-2501, *et seq*. OP subsequently decided that the baseline approach would "introduce too much complexity" in the proceeding. Exhibit No. 90 at 2, 8-9; Exhibit No. 239 at 5-6.

24.    OP's second set of recommendations was based on specific elements of the Applicant's proposal with modifications including (a) a requirement to provide one additional unit of housing for each additional full-time undergraduate student above the University's 1999-2000 enrollment figures, (b) building in an enforcement mechanism if the University fails to meet its commitments, and (c) restricting the University's request to develop off-campus housing on property in which the University owns an interest. Exhibit No. 90 at 2.

25.    OP testified that the University's expansive definition of a "Housing Opportunity Area" rendered the campus plan boundaries "virtually meaningless" from the perspective of neighborhood preservation and enhancement. OP also objected to the Applicant's proposal to exclude the campus plan area from the definition of the Housing Opportunity Area, stating that the University must bear the burden of further expansion. *Id*. at 20.

26.    According to OP, the Applicant's commitment to house 70 percent of its undergraduate students on campus by 2005 was "no real solution to the dangers posed to the further viability of the Foggy Bottom and West End neighborhoods." OP testified instead that any means used to protect the surrounding neighborhoods "must be based on the actual source of threat to those neighborhoods: continuing University expansion without any concomitant increase in on-campus student housing." *Id*.

27.    The Department of Public Works (DPW), in its report to the Board, concluded that one of the best and most effective ways to minimize traffic to and from the campus is to provide on-campus housing for students presently living off-campus. According to DPW, the second most effective way to decrease traffic volume to and from the campus is to encourage the use of the existing public transportation conveniently located throughout the campus. Exhibit No. 138, DPW Report, April 21, 2000 at 3.

28.    DPW supported much of the Applicant's proposed Transportation Management Plan, including the expansion of the shuttle bus service between the Mount Vernon and Foggy Bottom campuses. However, DPW also recommended that the University should seek to increase the use of transit and bicycle by students, staff, and faculty commuting to and from the campus. *Id*.

29.    The Board concurs with the findings and recommendations of DPW, and finds that the Applicant's proposed Transportation Management Program is adequate to address any potential adverse impacts associated with traffic.

BZA Application No. 16553
Page 8

30.    ANC 2A recommended denial of the campus plan application. In its report, dated April 17, 2000, the ANC contends that the proposed campus plan "largely ignores the adverse impacts that the University has on surrounding neighborhoods. . . ." The ANC objects especially to the University's "failure to build sufficient dormitories to house its students within the campus plan boundaries and [its] concomitant practice of acquiring properties outside the campus plan boundaries for student housing" as well as "the traffic and parking impacts that spill into the neighborhoods outside the campus plan boundaries." ANC Report at 2.

31.    ANC 2A argues that housing large numbers of students is an institutional university use that is not compatible with a viable, permanent residential neighborhood, because student residents displace permanent residents, deplete available housing stock, erode the fabric of the neighborhood, and contribute little to the local tax base since their incomes are usually minimal and their legal residence is usually elsewhere. Accordingly, ANC 2A reiterated its "long-standing policy and goal" that the University should provide housing for all undergraduate students within the boundaries of the current campus plan to alleviate the deleterious effects of housing large numbers of students in the residential areas outside the campus boundaries. *Id.* at 3-4.

32.    The ANC asserts that the University's designation of two small sites on campus for the construction of dormitories is not sufficient to alleviate the effects of housing large numbers of students outside the campus plan boundaries, particularly in light of the University's projected increase in student headcount by 3,000 over the current level. The ANC stated that additional sites within the campus plan boundaries should be designated for dormitories, naming Square 54, the north half of Square 103, the southwest quadrant of Square 79, and the southeast quadrant of Square 101. *Id.* at 8.

33.    By resolution passed unanimously at its April 12, 2000 public meeting, ANC 2A contended that the University has heavily increased enrollment of full-time students without commensurate available dormitory space, creating "an environment where students are forced to seek housing in the surrounding residential neighborhood, resulting in the displacement and flight of tax-paying residents." The ANC also objected to the University's purchase of properties outside the campus plan boundaries "without provision for review or regulation of its acquisitions." Finding the campus plan unacceptable as submitted, the ANC concluded that student enrollment should be curtailed "until adequate on-campus housing, parking and other facilities are made available and result in a quantifiable decrease in the number of students forced to live in the surrounding off campus residential neighborhood." Exhibit No. 113.

34.    The Foggy Bottom Association (FBA) also urged the Board to deny the application, stating that the institutional policies of the Applicant have been very damaging to the Foggy Bottom/West End area over the term of the 1985 plan, and that the area would not survive as a residential community if the same policies are permitted in the future. According to the FBA, the core problem has two main causes: (1) the University has had no meaningful constraint on enrollment and (2) there has been no requirement to house added students on campus, and the University has largely not done so. The FBA testified

that, as a result, student renters have "flooded the private market, turning apartment houses into *de facto* dorms and row houses into informal frat houses," and the University has bought about three dozen properties outside the campus plan boundaries but within Foggy Bottom/West End, mostly to house students.

35.  The FBA testified that the Applicant's housing proposals "are completely inadequate," particularly because an undifferentiated student cap of 20,000 does not guarantee against additional students living in Foggy Bottom/West End, and because the Applicant made no unconditional commitment to add any on-campus dormitory rooms. *Id.* at 5.

36.  The Board received numerous letters in support of the Application. The letters generally cited the important role of the University in the District's economy, its commitment to the Foggy Bottom neighborhood, and contributions made by the University and its students and faculty, for example, in serving as volunteers and providing assistance to local businesses, churches, and neighborhood groups. Other letters in support, written by residents of Foggy Bottom, described advantages of living near the University, including landscaping and other open space improvements, opportunities to audit classes and use the University library, and the proximity to students who enliven the neighborhood.

37.  The Board also received numerous letters in opposition to the proposed campus plan. Many residents of Foggy Bottom expressed concern about the University's continued expansion into the residential neighborhood. Other letters cited concerns relating to traffic and insufficient parking in the surrounding neighborhood associated with the University. Opponents of the proposed campus plan generally stated that the Applicant should not be permitted to increase its undergraduate enrollment, because the University's expansion off-campus has displaced taxpaying residents, jeopardized the residential character of the Foggy Bottom and West End neighborhoods, and harmed the District of Columbia by removing properties from the tax rolls.

38.  The Board gives great weight to the testimony of the Office of Planning and the affected ANC and finds that the number of students at the Foggy Bottom campus is having an adverse impact on the surrounding neighborhoods because of the displacement of permanent, non-student housing as a result of the lack of sufficient on-campus housing and the University's acquisition of property off-campus to increase the supply of dormitory beds.

## CONCLUSIONS OF LAW AND OPINION:

The Applicant is seeking a special exception, pursuant to Sections 210 and 3104 of the Zoning Regulations, for approval of an updated campus plan for a period of 10 years. The Board is authorized to grant a special exception where, in the judgment of the Board based on a showing through substantial evidence, the special exception will be in harmony with the general purpose and intent of the Zoning Regulations and Maps and will not tend to affect adversely the use of neighboring property in accordance with the Zoning Regulations and Zoning Maps. D.C. Code § 6-641.07(g)(2), 11 DCMR § 3104.1.

BZA Application No. 16553
Page 10

The Zoning Regulations specify that use as a university in a residential zone shall be located so that it is not likely to become objectionable to neighboring property because of noise, traffic, number of students, or other objectionable conditions. 11 DCMR § 210.2. In reviewing and deciding a campus plan application, the Board must consider relevant policies of the District Elements of the Comprehensive Plan. 11 DCMR § 210.7. The Ward 2 element of the Comprehensive Plan provides that:

> George Washington University continues to expand its operations in the Foggy Bottom area. Therefore, the University must work closely with the Foggy Bottom community on developing a campus plan. The campus plan should include sufficient dormitory space for the student body on campus to alleviate some of the pressure on housing by students.

10 DCMR § 1327.1(b). The Comprehensive Plan also provides that:

> . . . The expansion of the University has resulted in the diminishment of housing and the construction of buildings for the University purposes. This and other commercial usage is of grave concern to the Foggy Bottom residential community. Intense student pressure on Foggy Bottom's housing stock outside the campus, combined with the impact of university generated traffic has had a negative effect on residential Foggy Bottom. The University must continue to construct student dormitories to alleviate the pressure on the housing stock outside the boundaries of the campus plan. The University must be sensitive to the surrounding residential neighborhood.

10 DCMR § 1358.1.

The Board concludes that the Applicant has met its burden of showing that the university use will not be objectionable to neighboring property. However, the Board concludes that it is necessary to condition its order to minimize any impacts from existing conditions and any potential impacts from planned future development.

The Zoning Regulations specify that the number of students is one factor that the Board must take into account when assessing whether a university use in a residential zone is likely to become objectionable to neighboring property. See 11 DCMR § 210.2. In this case, the Office of Planning, the affected ANC, and parties in opposition have asserted that the number of students using the Foggy Bottom campus has become objectionable to the surrounding neighborhoods because of the lack of sufficient on-campus housing and because of the University's acquisition of property off-campus to increase the supply of dormitory beds. The Board concludes that both factors – the insufficient supply of on-campus housing and expansion of university use through off-campus acquisition – are likely to exacerbate objectionable impacts on neighboring property unless steps are taken to prevent that outcome. The Board notes especially the concerns of the Office of Planning about the continued viability of the Foggy Bottom and West End neighborhoods, as pressures associated with University expansion threaten their livability and residential character.

Therefore, the Board concludes that approval of the 2001 campus plan must be conditioned on measures that will allow the University to operate and improve its facilities without creating adverse impacts on neighboring property. For purposes of these conditions, the Board adopts the following definition of the Foggy Bottom/West End Area: the area bounded by E Street on the south, Rock Creek Park on the west, N Street on the north, and 19th Street on the east, excluding the campus plan area. The Foggy Bottom and West End neighborhoods are the communities immediately affected by the presence and impacts of the University.

As a condition of approval of the 2001 campus plan, the University must limit enrollment of full-time undergraduate students to that number enrolled as of February 13, 2001[1] ("benchmark enrollment") until the University has available on-campus student housing in an amount that will house 70 percent of its undergraduate population. Until the 70-percent target is reached, the University will not be granted a special exception for any non-residential use on campus. Once the University is able to offer on-campus housing to at least 70 percent of full-time undergraduates, enrollment may be increased only if additional on-campus student housing is available for each additional undergraduate student to be enrolled.

The 70-percent on-campus housing condition is intended to provide the impetus for the Applicant to encourage more undergraduates to live within the boundaries of the campus plan and to discourage the University from seeking to acquire additional property outside the campus plan boundaries in the surrounding neighborhoods for undergraduate student housing. This condition is a performance standard that gives the University significant flexibility in deciding how to use its property within the campus plan boundaries, rather than mandating the development of dormitories in certain locations on campus.

The performance standard approach is somewhat similar to the "preferred recommendation" that OP originally proposed but later withdrew in light of its complexity. Both measures are intended to increase the undergraduate population living within the area defined by the campus plan boundaries, and thereby minimize the adverse impacts on surrounding neighborhoods associated with numbers of students living there and the potential for University expansion by acquiring property outside the campus plan boundaries. The 70-percent on-campus condition eliminates much of the complexity inherent in OP's recommendation, which would have required a determination of the number of students living off-campus in Foggy Bottom. Instead, any future increases in enrollment will be tied to the on-campus undergraduate population as a percentage of total full-time undergraduate enrollment, which should not be unduly difficult for the University to calculate.

The Board concludes that the issues and concerns of OP and ANC 2A are adequately addressed by the 70-percent undergraduate on-campus housing condition, which requires future University growth to occur in conjunction with future increases in on-campus housing, thereby minimizing the incentive to acquire additional properties outside the campus plan boundary and decreasing the threat of creating additional pressures on the permanent housing stock in the Foggy Bottom/West End Area. The University's implementation of a new housing program to

---

[1] February 13, 2001 was the date on which the Board voted to approve this application at a public meeting. This condition and all other set forth in this Order were specifically approved.

encourage those students not living on campus to find housing outside the Foggy Bottom/West End Area will also reduce the impact of students there, as will the condition proposed by the Applicant that all freshmen and sophomores be required to reside on campus.

The Board concludes that the boundaries of the campus plan area should be revised to reflect more accurately those areas where the University already owns and plans to develop University residential facilities. Accordingly, the southern portion of the campus plan boundary should be redrawn to encompass certain University-owned properties located outside of and adjacent to the southern boundary as previously drawn. The campus plan boundary shall be redrawn to include within it the Dakota at 2100 F Street in Square 81; 2201 Virginia Avenue (Riverside Towers), addresses 518 through 526 22nd Street, in Square 58; addresses 2006 and 2008 F Street in Square 58; and the University-owned property in Square 43. Especially in light of the University's plans to develop housing on property it owns in its proposed Housing Opportunity Area, the Board notes that inclusion of portions of certain squares immediately adjacent to the southern edge of the previous campus plan boundary will assist the University in meeting the 70 percent on-campus housing requirement. The previous campus plan boundary is otherwise unchanged.

The campus plan boundaries were redrawn in 1988 to exclude Square 43 on the basis of the Board's belief that "the removal of Square 43 [is] essential to the preservation and enhancement of residential uses in the Foggy Bottom neighborhood." BZA Order No. 14455 at 34. In that case, the Office of Planning testified in favor of excluding Square 43 from the campus plan area because implementation of the University's policy to acquire all property within its boundaries created a need to protect residential uses within the boundary from elimination. *Id.* at 16. In light of the University's plans to develop additional housing on the property it owns there, the Board now concludes that the Applicant's use of Square 43 is essentially a university use and that the square should be included within the boundaries of the campus plan.

The Applicant proposed, and OP concurred, that to encourage construction of on-campus dormitories, any additional housing constructed on-campus after approval of the campus plan should not count toward the maximum FAR limiting the bulk of all buildings on campus. The Board cannot approve this recommendation because it would have the effect of increasing the FAR cap for the campus – something only the Zoning Commission can do by means of an amendment to the Zoning Regulations or through the PUD process. *See* 11 DCMR § 402.4.

The Board accorded the issues and concerns of ANC 2A the great weight to which they are entitled. In doing so, the Board fully credited the unique vantage point that the ANC holds with respect to the impact of the University and its proposed campus plan on their constituents. The ANC adopted a resolution stating that the proposed campus plan should not be approved and describing adverse impacts the ANC believes the University has on the Foggy Bottom/West End neighborhoods. The Board concludes that conditional approval of the campus plan adequately addresses the issues and concerns of the ANC and will minimize the potential adverse impact of the University on surrounding residential neighborhoods.

The Board notes that the ANC and other community representatives testified that the University's acquisition of properties outside the approved campus plan boundary should be restricted. However, as the Board has previously concluded, "the reach of § 210 does not extend

beyond a campus to a use otherwise permitted." BZA Order No. 16507 at 7. That is, the Zoning Regulations do not prevent the University from acquiring and using property anywhere outside the campus plan boundaries so long as that use is consistent with all applicable zoning restrictions, including matter-of-right uses. *See also Spring Valley Wesley Heights Citizens Ass'n v. District of Columbia Board of Zoning Adjustment*, 644 A.2d 434 (1994).

Accordingly, it is **ORDERED** that the application is **GRANTED SUBJECT** to the following **CONDITIONS**. For the purpose of these conditions, the term "campus plan boundary" means the campus plan boundary established by the Board in Condition No. 2. The term "Foggy Bottom/West End Area" means that area bounded by 19th Street, E Street, Rock Creek Park, and N Street, N.W., excluding the campus plan area.

1.  The Applicant's proposed campus plan is approved until June 30, 2009, subject to the following conditions intended to mitigate those adverse impacts identified in this Order and any adverse impacts potentially arising from the location of a university use in a residentially zoned district, or until such time prior to June 30, 2009 as the Zoning Commission determines that conditions warrant submission of an updated campus plan.

2.  The campus boundary as depicted in the plan offered by the Applicant is modified and expanded to encompass certain University-owned properties located outside of and adjacent to the southern boundary as previously drawn. The campus plan boundary shall be redrawn to include within it the Dakota at 2100 F Street in Square 81; 2201 Virginia Avenue (Riverside Towers), addresses 518 through 526 22nd Street, in Square 58; addresses 2006 and 2008 F Street in Square 58; and the University-owned property in Square 43.

3.  The University shall work with community representatives to form an Advisory Committee for the purpose of fostering consistent communication between the University and the Foggy Bottom/West End community, discussing issues of mutual interest and proposing solutions to problems that exist or arise in implementing the approved campus plan. It is recommended that the Advisory Committee consist of 10 members: five members to be selected by the University and five members chosen by ANC 2A, the Foggy Bottom Association, and the West End Citizens Association. The Advisory Committee should schedule quarterly meetings open to the public, and should keep minutes of each meeting. Upon request, the University will provide timely data relevant to campus plan issues to the Advisory Committee, provided that the data is not confidential or overly burdensome to produce. Decisions regarding the operation of the Committee should be made jointly by the University and the community.

4.  The University shall notify the Office of Planning, ANC 2A, and the Advisory Committee of its development plans for a specific site on campus following approval of the proposal by appropriate University committees and the University's Board of Trustees and prior to preparation of final, detailed plans and specifications.

5.  The University shall incorporate the following land-use policy into the 2001 Campus

Plan: University uses and structures (including the location of any means of approach to and egress from the structure) will be located to avoid adverse impacts on non-University properties, especially those residential properties on the periphery of the campus.

6.      The University shall incorporate the following design policy into the 2001 Campus Plan: The height, bulk, and design (including the location of any means of approach and egress) of future University structures will be compatible with and sensitive to the height, bulk, and design of adjacent non-University-owned structures.

7.      The University shall prepare a detailed streetscape plan applicable to the entire campus. The plan shall include, among other elements, a discussion of the installation of sign pylons, and it shall be developed in conjunction with the Office of Planning, the Department of Public Works, and the Advisory Committee. Upon completion, the plan shall be submitted to the Board for review.

8.      Student enrollment (headcount) over the life of the plan shall not exceed 20,000 students and the student full-time equivalent shall not exceed 16,553. The number of full-time equivalent faculty and staff shall not exceed 1,550 and 9,000 respectively, while the headcounts for faculty and staff shall not exceed 2,236 and 10,293 respectively.

9.      The University's undergraduate population shall be capped at the number of full-time students enrolled as of February 13, 2001 ("benchmark enrollment").[2] The cap will remain in place, and only applications for residential special exceptions may be processed, until the University has available on-campus student housing in an amount that will house 70 percent of its undergraduate population. For purposes of this condition, a special exception requested for an on-campus mixed-use project that includes residential use will be considered residential if the residential use occupies at least 50 percent of the FAR of the proposed project (exclusive of unoccupied roof structures). Once the Zoning Administrator certifies to the Office of Zoning that this level of on-campus housing has been achieved, (1) the University may increase enrollment only if additional on-campus student housing is available for each additional undergraduate student to be enrolled, and (2) applications for special exceptions for both residential and non-residential projects may be processed. For purposes of this condition, the term "full-time undergraduate student" does not include part-time or evening students, students who are married or have children, students with disabilities or religious beliefs inconsistent with residence hall life, or students who commute from outside the District of Columbia.

10.     Commencing in the Fall 2001 semester, the University shall require all full-time freshmen and sophomore students to reside in University housing located within the campus boundary established by the Board, to the extent that such housing is available. The University may exempt students who commute, are married or have children, or have disabilities or religious beliefs inconsistent with residence hall life. Prior to the Fall 2003

---

[2] February 13, 2001 was the date on which the Board voted to approve this application at a public meeting. This condition and all other set forth in this Order were specifically approved.

semester, housing commitments made to current University students may be taken into account when determining the amount of housing available.

11. The University shall institute a program to provide its students who are eligible to live off-campus with information about housing opportunities outside the Foggy Bottom/West End Area. The University shall provide this information using local licensed brokers or apartment locators as appropriate, and shall also provide information on the availability, reliability, and accessibility of public transportation between the campus and the housing opportunities. For those locations that are not Metro accessible, the University shall explore the use of a shuttle bus service to its campus for areas that the University determines contain a critical mass of University students, and shall report its criteria and findings to the Advisory Committee annually, at the beginning of each Fall semester.

12. The University shall expand the use of disciplinary interventions to acts of misconduct by students living off-campus in the Foggy Bottom/West End Area, even if the students are not in properties owned or controlled by the University. The University shall act on incident reports by residents, the ANC, community associations, building management, building association boards, University security officers, and police. The University shall develop an outreach program with neighboring apartment buildings to educate management companies and tenant associations on the University's disciplinary program and its reporting requirements to facilitate effective use of its program. Additionally, subject to applicable law, the University shall permit management companies to obtain University clearances for student applicants for apartments to prevent students who are not eligible for the University's on-campus housing due to conduct violations from obtaining units in neighboring apartments.

13. The University shall maintain and publicize a hotline line available 24 hours per day, seven days per week to receive calls about student conduct issues and safety and security concerns. The University shall maintain a log of all calls received and all actions taken, including all referrals made. The University shall maintain its Crimes Tips Hotline (presently 994-TIPS), where calls can be made anonymously to a recorded "tip" line. Calls needing a more immediate response shall be directed to the University police (presently 994-6110) 24 hours per day, seven days per week. The University police will aid off-campus complainants in obtaining assistance from the Metropolitan Police Department. Reports of improper off-campus student conduct will also be referred to the appropriate University departments for their attention.

14. The University shall promptly establish a mandatory program for its students that will address "good neighbor" issues, educating students about appropriate conduct in the off-campus community.

15. The University shall implement measures to minimize adverse impacts associated with parking and traffic.

    a.     <u>Support of Mass Transit</u>: The University shall institute the Metrochek program offered by the Washington Metropolitan Area Transit Authority (WMATA) to

allow employees to pay for public transportation costs on a pre-tax basis, with a target date for implementation of Spring 2001. In an effort to increase Metro ridership among the student population, the University shall implement an introduction to public transportation program for incoming students that includes provision of WMATA's "SmarTrip" cards to incoming students as of the Fall 2001 new student orientation. The University will work with Metro to schedule a future SmarTrip "carding event" starting in Fall 2001 at various locations around campus to provide additional information about public transportation to the University community.

b.    Parking: The University shall provide at least 2,800 off-street parking spaces within the campus boundary. Any off-street parking obtained by the University at a location outside the campus plan boundaries, including the University's off-campus spaces located at the Kennedy Center, shall not be counted toward the 2,800 minimum for purposes of satisfying this condition. The number of off-street parking spaces required to be provided within the campus boundary may be increased in any subsequent special exception order issued pursuant to this plan if necessary to mitigate the adverse impact of the approved uses on parking. The University shall monitor its utilization of University parking lots to determine usage patterns and to conduct an ongoing assessment of parking needs.

c.    Community Parking Program: In addition to its on-campus parking inventory, the University maintains parking facilities in certain off-campus properties. Members of the Foggy Bottom community have expressed an interest in exploring the creation of a parking program pursuant to which non-student residents of the Foggy Bottom community would be permitted to park in University properties. The University shall provide contracts for parking to residents of the Foggy Bottom/West End Area on a space-available basis. The location of such spaces will be determined by the University. Levels of and changes in availability will be reported to the Advisory Committee on request.

d.    Notice: The University shall notify all affected property owners or occupants in a timely manner of the occurrence of any temporary street closing necessary to accommodate University-related functions.

e.    Student vehicles: The Applicant, through its Office of the Registrar, shall maintain an accurate record of the license plate numbers of motor vehicles kept by students, updated annually at the beginning of the Fall semester. The Applicant shall direct the students to register their vehicles in the District of Columbia, or obtain a reciprocity sticker, and shall consult with the D.C. Department of Motor Vehicles to determine whether such registration is completed or such stickers are obtained. The Applicant shall withhold parking privileges to students who do not comply with D.C. registration or reciprocity requirements. Failure to register student vehicles in the District or to obtain reciprocity stickers shall constitute a violation of the Code of Student Conduct.

BZA Application No. 16553
Page 17

16.     Within six months of the effective date of this Order, the University shall prepare an updated comprehensive management plan to address traffic and parking associated with attendance at events on campus that are attended by a significant number of persons not normally associated with the University and the campus, who come to the campus for the specific purpose of attending the event. The management plan shall be maintained by the University, made available to the public, and submitted to the Advisory Committee, and shall include the following:

    a.      Measures to schedule events at times that reduce conflicts with other traffic and other demands for parking.

    b.      Measures to discourage travel by private automobile and encourage travel by public transportation.

    c.      Measures to encourage persons who drive to park in commercial or University parking garages.

    d.      Any other specific measures to address parking demand and decrease vehicular traffic in the surrounding Foggy Bottom/West End Area.

17.     Starting in the Fall 2001 registration process, the University shall gather information about the local addresses of the full-time undergraduate population. The University shall update the information annually. The University shall annually provide the Advisory Committee with an audited count of the number of full-time undergraduate students residing in the Foggy Bottom/West End Area outside the campus plan boundaries, and shall include the information in each application for a special exception pursuant to the approved 2001 Campus Plan.

18.     Within 90 days of the effective date of this Order, the University shall revise the Campus Plan to reflect changes mandated by the above-stated conditions. The revision shall include a revised map of the campus, with the following specifications: The map shall show the campus boundaries and the number of each square within the boundary, and shall identify the approved uses for each square; the map shall be legible and not require color for graphic clarity. Upon completion, the revised copy shall be submitted to the Board. The Board shall certify the revised copy as the approved campus plan. Copies of the approved plan shall be maintained in the Office of Zoning and the Office of the Zoning Administrator.

19.     The University shall submit a special exception application to the Board for each structure or addition to an existing structure that the University proposes to construct over the life of the Plan. In addition to a demonstration of compliance with applicable provisions of the zoning regulations and the contents of the approved 2001 Campus Plan, each application shall include the following:

a.  A showing that the use, height, bulk, and design (including the location of any means of approach and egress) of the proposed structure is sensitive to and compatible with adjacent and nearby non-University-owned structures and uses;

b.  An indication of any need for, amount of, and proposed locations of interim leased space necessary to accommodate housing and/or activities displaced by construction, and/or activities intended to be located permanently in the completed structure;

c.  Recomputation of the University's total FAR, copies of which shall be submitted to the Office of Zoning and the Zoning Administrator. Such information shall be broken down by zone district and include the following: existing and occupied FAR; FAR under construction pursuant to Board approval; and FAR upon completion of the proposed structure;

d.  An updated student enrollment headcount indicating actual enrollment of full-time undergraduate students, as of 30 days prior to the application date, and the number and percentage of full-time undergraduate students housed on campus, including documentation and an explanation of the methods and assumptions used in the calculation;

e.  The most recent audited count of full-time undergraduate students residing in the Foggy Bottom/West End Area outside of the campus plan boundaries;

f.  A progress report on the implementation of the streetscape plan required by Condition No. 7;

g.  The number of off-street parking spaces within campus boundaries, as of 30 days prior to the application date, including documentation and an explanation of the methods and assumptions used in the calculation; and

h.  A status report on the Transportation Management Program.

20.  No special exception application filed by the University for further processing under this plan may be granted unless the University proves that it has consistently remained in substantial compliance with Conditions 1 through 19 set forth in this Order. Further, any violation of a condition of this Order shall be grounds for the denial or revocation of any building permit or certificate of occupancy applied for by, or issued to, the University for any University building or use approved under this plan, and may result in the imposition of fines and penalties pursuant to the Civil Enforcement Act, D.C. Code §§ 6-2701 to 6-2723.

**VOTE:**   **4-0-1**   (Robert N. Sockwell, Anne M. Renshaw, and Carol J. Mitten to grant; Sheila Cross Reid to grant and concurring in all conditions except Conditions No. 9; Rodney Moulden not present, not voting.)

BZA Application No. 16553
Page 19

**BY ORDER OF THE D.C. BOARD OF ZONING ADJUSTMENT**

Each concurring member has approved the issuance of this Order.

ATTESTED BY: _____
JERRILY R. KRESS, FAIA
Director

Final Date of Order: **MAR 2 9 2001**

PURSUANT TO 11 DCMR §3125.6, THIS ORDER WILL BECOME FINAL UPON ITS FILING IN THE RECORD AND SERVICE UPON THE PARTIES. UNDER 11 DCMR §3125.9, THIS ORDER WILL BECOME EFFECTIVE 10 DAYS AFTER IT BECOMES FINAL.

PURSUANT TO 11 DCMR § 3205, FAILURE TO ABIDE BY THE CONDITIONS IN THIS ORDER, IN WHOLE OR IN PART, SHALL BE GROUNDS FOR THE REVOCATION OF ANY BUILDING PERMIT OR CERTIFICATE OF OCCUPANCY ISSUED PURSUANT TO THIS ORDER.

THE APPLICANT SHALL COMPLY FULLY WITH THE PROVISIONS OF THE HUMAN RIGHTS ACT OF 1977, D.C. LAW 2-38, AS AMENDED, CODIFIED AS CHAPTER 25 IN TITLE 1 OF THE D.C. CODE. *SEE* D.C. CODE § 1-2531 (1999). THIS ORDER IS CONDITIONED UPON FULL COMPLIANCE WITH THE HUMAN RIGHTS ACT. THE FAILURE OR REFUSAL OF THE APPLICANT TO COMPLY SHALL BE A PROPER BASIS FOR THE REVOCATION OF THIS ORDER.

GOVERNMENT OF THE DISTRICT OF COLUMBIA
BOARD OF ZONING ADJUSTMENT

★ ★ ★



**BZA APPLICATION NO. 16553**

As Director of the Office of Zoning, I hereby certify and attest that on _____**MAR 2 9 2001**_____, a copy of the foregoing Decision and Order in BZA Application 16553 was mailed first class, postage prepaid, to each party and public agency who appeared and participated in the public hearing concerning this matter, and who is listed below:

Maureen Dwyer, Esquire
ShawPittman
2300 N Street, NW
Washington, D.C. 20037-1128

Jack Evans, Councilmember
Ward Two
441 4th Street, NW, 7th Floor
Washington, D.D. 20001

Maria Tyler, Commissioner
Single Member District 2A03
949 25th Street, NW
Washington, D.C. 20037

Barbara Spillinger
2500 Virginia Avenue, NW
Washington, D.C. 20037

James McLeod
2424 Pennsylvania Avenue, Suite 407
Washington, D.C. 20037

Chairperson
Advisory Neighborhood Commission 2A
c/o St. Mary's Court
724 24th Street, NW
Washington, D.C. 20037

Richard Sheehey, Commissioner
Single Member District 2A01
2000 F Street, NW, Suite 207
Washington, D.C. 20006

---

BZA APPLICATION NO. 16553
PAGE NO. 2

Dorothy Miller, Commissioner
Single Member District 2A05
2440 Virginia Avenue, NW
Washington, D.C. 20037

Sara Maddux, Representative
Monroe House Condominium Association
522 21st Street, NW
Washington, D.C. 20006

Michael Thomas
Foggy Bottom Association
c/o West End Library
24th and L Streets, N.W.
Washington, D.C. 20037

Steven J. Mandelbaum, Commissioner
Single Member District 2A06
2222 I Street, NW, Suite 513
Washington, D.C. 20037

Andrew Altman, Director
D.C. Office of Planning
801 North Capitol Street, N.E., Suite 4000
Washington, D.C. 20002

Kenneth G. Laden
Administrator
District Division of Transportation
Department of Public Works
2000 – 14th Street, NW
Washington, D.C. 20009

Michael D. Johnson, Zoning Administrator
Building and Land Regulation Administration
Department of Consumer and Regulatory Affairs
941 North Capitol Street, NE, Suite 2000
Washington, D.C. 20002

James T. Draude, Esquire
Driscoll & Draude
1230 31st Street, NW, Second Floor
Washington, D.C. 20007

Ellie Becker, Vice-President
Foggy Bottom Association
2528 I Street, NW
Washington, D.C. 20037

Attested by: _Jerrily Kress_
JERRILY R. KRESS, FAIA
Director