GOVERNMENT OF THE DISTRICT OF COLUMBIA
BOARD OF ZONING ADJUSTMENT



F

**Application No. 16553F of the George Washington University**, pursuant to 11 D.C.M.R. § 3104.1, for a special exception for the review and approval of the University Foggy Bottom Campus Plan – Years 2000-2010 under Sections 210 and 507.

**HEARING DATES:** April 26, 2000; September 13, 2000; September 26, 2000; September 17, 2001; and September 21, 2001

**DECISION DATES:** December 12, 2000; February 13, 2001; October 9, 2001; October 30, 2001; and December 11, 2001

## CORRECTED FINAL ORDER ON REMAND*

Following the Board's March 29, 2001, final Order in this proceeding, the University filed a petition for review with the District of Columbia Court of Appeals. It also filed a civil action in the federal district court against the Board, its members, the District of Columbia, and Mayor Anthony Williams. On June 15, 2000, the district court issued a preliminary injunction preventing enforcement of Condition 9 of the March 29, 2001, Board Order during academic year 2001-2002, or until further order of the court. The Corporation Counsel then filed a motion in the District of Columbia Court of Appeals to remand the case to the Board for further consideration of the Board decision in light of the preliminary injunction. On July 31, 2001, the Court of Appeals remanded the case without limitation as to the scope of the remand proceedings.

On remand, the Board ordered the University to respond to a number of questions. It also urged the parties to attempt to settle their differences, failing which the Board would hold additional evidentiary hearings. When the parties reported that their negotiations were fruitless, the Board held evidentiary hearings on September 17 and 21, 2001. In addition to eliciting further evidence, the Board directed the parties to suggest their alternatives to Condition 9, if any.

Following the Board's approval of a proposed Order, the parties were given an opportunity to file exceptions. The Applicant, ANC 2A, Foggy Bottom Association, Sol Shalit, and ANC Commissioner Maria Tyler filed exceptions. The Board modified this Order in light of these exceptions. Its explanation for approving some exceptions and for rejecting others appear in part III of this Order. The Board has also made a few formal changes on its own motion.

---

*This Order is being issued to conform the language of the conditions on pages 21 and 22 to the precise language adopted by the Board on December 11. In condition 9.c, the word "purely" is omitted. In condition 17, the word "ascertain" is replaced by "gather information about" and the phrase "organized by postal zip codes" is moved to category (2). *See* December 11, 2001.

441 4th Street, N.W., Suite 210-S, Washington, DC 20001  (202) 727-6311

**Exhibit B-Part 1**

Page 2
BZA Application No. 16553F

This Order on Remand is based on the entire record of this proceeding, both before and after remand. It incorporates and adopts the Board's March 29, 2001, Order. To the extent of any inconsistency between the findings, conclusions, and conditions contained in the two Orders, this Order supersedes the earlier Order.

## I. Supplemental Findings of Fact.

1. On August 24, 2001, the University's full-time undergraduate enrollment was 7881. Tr. September 17, 2001, at 29; Exhibit 297, attachment 5-6.

2. As of September 21, 2001, the University's full-time undergraduate enrollment was 8044. Exhibit No. 320, att. 3. Of those students, the University estimated that 1239 were students who commuted from outside the District of Columbia, held religious beliefs or had disabilities inconsistent with dormitory life, were married, or had children. *Id.* The University testified that the number of commuters (829) was a verifiable number and the rest were reasonable estimates. Tr. September 21, 2001, at 21-23; Tr. September 17, 2001, at 80.

3. In addition to the 8044 full-time undergraduate students, the University had between 6000 and 7000 full-time graduate students enrolled for academic year 2000-2001. *Id.* at 170. The total student body for academic year 2001-2002 is approximately the same size as in 1985, between 17,000 and 18,000. Tr. September 17, 2001, at 17. During the period, the number of undergraduates has increased and the number of graduate students has decreased. Tr. September 17, 2001, at 16-17.

4. The full-time undergraduate enrollment as of September 2001 is substantially larger than in previous years (Exhibit 297, attachments 5 & 6):

    | Year | Enrollment |
    |---|---|
    | 1998 (Fall) | 6339 |
    | 1999 (Fall) | 6857 |
    | 2000 (Fall) | 7410 |
    | 2001 (Fall) | 8044 |

    The increase in student enrollment resulted in part from a substantial increase in the size of the freshman class for academic year 2001-2002. The University attributed this increase to an unusually high registration rate by applicants who had been offered admission. Tr. September 17, 2001, at 19. At the same time, however, the University offered more admissions for the 2001-2002 academic year than for previous years. The rates of acceptance from 1998 to 2001

Page 3
BZA Application No. 16553F

consistently were between 48% and 49%. As a result, as the number of applicants increased, the number offered admission increased almost proportionately (exhibit 297, attachment 1):

| Year | Applications | Acceptances | Percentage |
|------|--------------|-------------|------------|
| 1998 | 12,754 | 6227 | 48.2% |
| 1999 | 13,584 | 6633 | 48.8% |
| 2000 | 14,105 | 6882 | 48.7% |
| 2001 | 14,591 | 7072 | 48.4% |

6. Only 9.1% of the freshmen admissions (646 of 7072) for academic year 2001-2002 resulted from early admissions. Exhibit 297, attachment 3. The University freshmen admissions process varies only within a narrow range each year. "Early Decision I" offers are normally issued by December 15 with registration deposits due on January 15. *Id.* The timing of "Early Decision II" notifications varies. In 2000, those offers were issued on February 3 with registration deposits due March 3. *Id.* Regular admissions offers are generally mailed in the latter part of March, and deposits must be post-marked by May 1. That procedure was followed in 2001. Nevertheless, 54 freshmen were permitted to enroll after May 4. *Id.*

7. The admission of transfer students normally continues after the size of the freshman class is known. The University described the admission of transfer students as a "rolling process." Tr. September 21, 2001, at 168. In 2000, the University admitted 94.6% of its transfer students (579 out of 612) between May 7 and August 13. Exhibit 297, attachment 2.

8. Increases in enrollment have not been accompanied by commensurate increases in on-campus housing. As of September 2001, the University had 4108 beds on campus for its 8044 full-time undergraduate students (51.1%). Exhibit 307. Of the 4108 beds, 190 were added after the Board's initial Order on this application, partly as a result of converting lounges and reconfiguring rooms in existing dormitories and partly through the Board's expansion of the campus boundaries to encompass additional University-owned property. Exhibit 296, attachments A-C.

9. Following the Board's March 29, 2001, Order, the University accelerated plans for providing more on-campus housing. In August 2001, the University applied for special exceptions to build a 700-bed dormitory on Square 43 and a 200-bed dormitory on Square 57. Tr. September 21, 2001, at 25. The University expects both to be completed in time for the 2004-2005 academic year. *Id.* at 102; Exhibit 296, attachment F. Once completed, they will increase on-campus beds to 5008.

The University explained that its acceleration of the Squares 43 and 57 projects is to provide "housing that we can control that's close to where our students go to school." Tr. September 21, 2001, at 53.

The University has applied to the Zoning Commission for modification of a previously approved planned unit development (PUD) on University-owned property in Square 122. The

Page 4
BZA Application No. 16553F

    University application included plans for a 200-bed dormitory. Tr. September 17, 2001, at 25. If the PUD modification is approved and the project constructed accordingly, and if Square 122 were to be included within the campus, the number of beds on campus available by the fall of 2004 would increase by 1100 to 5208.

12.    The University testified that it is ready to commit funds to build additional dormitories on campus. Lack of money is not an issue. Tr. September 21, 2001, at 54-55.

13.    Besides on-campus dormitories, the University owns or leases off-campus buildings that it uses as dormitories containing 1380 beds in 2001. All are located in Foggy Bottom/West End. Exhibit 296, attachments B-C.

14.    The University leased two off-campus properties that it converted into dormitories during the summer of 2001 in response to the increased enrollment for academic year 2001-2002. The University leased the former St. James Hotel (24th St. and Pennsylvania Avenue, N.W.) for 15 years, renamed it City Hall, and provided accommodations for 543 undergraduates. Exhibit 296, attachment C. It leased 78 apartment units in 2424 Pennsylvania Avenue, N.W. (Pennsylvania House) for three years. That building had previously been used partly for long-term renters and partly for transients. The University is providing 166 beds in the 78 leased units. *Id.* The Board credits the testimony of James McLeod, a resident of 2424 Pennsylvania Avenue and a party to this proceeding, that the influx of students has made the building much noisier, seriously disturbing long-term residents, many of whom are elderly. Tr. September 17, 2001, at 107-108; Exhibit 306 at 4.

15.    The University explained it had not leased property outside Foggy Bottom once it became aware that the 2001-2002 class would be unusually large because the University administration believes that students want to live close to their school. Tr. September 21, 2001, at 197.

16.    The University has a 28.55% limited partnership interest in Columbia Plaza, a multi-building 800-unit complex at 23rd Street and Virginia Avenue, N.W. Under the partnership agreement, the University is entitled to recommend University students for vacancies at Columbia Plaza. Tr. September 17, 2001, at 72. There was a dispute among the parties as to the number of students who now live there. The Board credits the University's statement that 240 students have been placed in the complex through the University's housing lottery system. *Id.* at 77. In addition, an undetermined number of other University students are Columbia Plaza residents. The Board credits the testimony of Dorothy Miller, a resident and a party to this proceeding, that the quality of life in the complex has diminished as the student population has grown. Exhibit 319 at 3.

## II. Conclusions of Law and Opinion

The hearings on remand provided the Board with additional information about current student housing, University plans for future on-campus housing, admission practices, and other developments since the Board's previous consideration of this application. That information, together with the parties'

Page 5
BZA Application No. 16553F

recommendations, has permitted the Board to revise its Order to ensure that the campus plan fully complies with the language and intent of the Zoning Regulations and is not inconsistent with the Comprehensive Plan.

The Board's initial decision in this case expressed concern that, unless conditions were imposed, the University's use of residentially-zoned property within the campus for non-residential uses, and its resulting failure to provide sufficient on-campus housing for undergraduate students, would cause the University's use of its property to become objectionable to neighboring property. The Board shared the concerns expressed by the Office of Planning ("OP") and ANC 2A about the continued vitality of the Foggy Bottom and West End neighborhoods, as pressures associated with University expansion threaten their livability and stable residential character.

The Board's fears have proved to be justified. The recent explosive increase in student enrollment has placed additional pressures on Foggy Bottom/West End. At the beginning of the 2001-2002 academic year, almost half of the 8044 undergraduates were forced to find housing outside the campus. Stated another way, at the start of the current academic year, the University was able to provide housing for a bare majority (4108 or 51.1%) of its undergraduate students on campus.

The University has traditionally chosen to export its student overflow to Foggy Bottom/West End. It did so again for the 2001-2002 academic year. It leased two buildings in Foggy Bottom/West End, one of which housed elderly long-term residents, and created dormitories for 709 additional undergraduates. In addition, it used its status as a limited partner in the Columbia Plaza complex to obtain housing for 240 of its students. These concentrations of students have vexed elderly long-term residents in those buildings. More important, the Board agrees with OP that the University's aggressive expansion into Foggy Bottom and the West End area has brought those neighborhoods to the "tipping point," if not beyond. Large swathes of Foggy Bottom/West End have effectively been transformed into an expanded campus at the expense of the prior variety of uses. The Board therefore concludes that the University's use of its residentially-zoned property within the campus boundaries for non-residential uses has become objectionable to the surrounding neighborhoods.

For these reasons (and for the reasons given in the Board's March 29, 2001, Order), the Board is willing to approve the proposed campus plan only if the University promptly takes decisive steps to provide housing for the bulk of its undergraduate students on campus. The Board agrees with ANC 2A that until there is a significant decrease in the number of students forced to live in the surrounding off-campus neighborhoods by virtue of insufficient on-campus housing, the campus plan is unacceptable. See Tr. September 13, 2000 at 315. The Board recognizes that the University needs time to construct dormitories on campus. This Order therefore provides the University considerable flexibility for the first five years of the plan. The Board encourages the University to take immediate steps to meet the conditions set by this Order.

The University will be required to make more intensive residential use of its campus property in two phases. In the first phase, starting in August 2002, the next academic year, the University will be required to make housing available for at least 5600 full-time undergraduate students on campus or in areas outside Foggy Bottom/West End. (That "base number" represents 70% of the undergraduate

enrollment of approximately 8000 in the fall of 2001. *See* above, findings 1-2). This is not an onerous requirement. The University's experience in the current academic year, when it was able to acquire 709 beds in a matter of a few months when faced with an uncharacteristically large freshman class—using short- and long-term leases—establishes that there should be no major impediment to the University's acquisition of housing accommodations in the universe outside Foggy Bottom/West End by next fall. For purposes of this Order, the Board adopts the following definition of the Foggy Bottom/West End Area: the area bounded by E Street on the south, Rock Creek Park on the west, N Street on the north, and 19th Street on the east, excluding the campus area as defined below.

A straight percentage requirement would not prevent further inundation of the Foggy Bottom/West End neighborhood by University dormitories and by students compelled to find housing outside the campus. As enrollment increases—the University has estimated that it may grow by at least another 500 students by 2005—the neighborhoods would likely be saturated by yet more student housing under a pure percentage goal. For that reason, the University will be required to provide one additional on-campus bed for each additional student whenever the University's full-time undergraduate enrollment exceeds 8000. The University will be free to increase its enrollment but, by providing one bed for each additional student, the total number of undergraduate students accommodated in Foggy Bottom/West End should not grow. This is in keeping with the "soft cap" originally proposed by the University. *See e.g.*, Tr. September 13, 2000, at 256.

Beginning in the fall of 2006, five years from now, approval of the campus plan is conditioned on the University providing housing for the bulk of its students on campus. The University must provide accommodations in on-campus dormitories for 70% of the first 8000 undergraduates (5600 beds) and an additional bed for each full-time undergraduate over 8000. As a result of this campus plan proceeding, the University has accelerated its campus housing program. It has applied for special exceptions to construct buildings on Squares 43 and 57 to add 900 new beds. The University expects to complete both buildings in time for academic year 2004-2005. In addition, the University has applied to the Zoning Commission to modify a PUD for University-owned property on Square 122 with a capacity of 200 more beds. If the Commission approves the PUD modification, the University may count those beds toward satisfying the housing requirements of this Order.

Even these 1100 new beds will be insufficient to satisfy the need. When completed, the University will be providing no more than 5208 on-campus beds for its current enrollment of 8044 undergraduate students (64.7%). Considering that the University projects its enrollment to increase over the life of the campus plan, an increase of 1100 beds becomes even more inadequate.

The University has identified at least three residentially-zoned squares on its campus suitable for additional dormitories. The University owns all of Square 54, the site of the current hospital. That large square will no longer be used as a hospital and will essentially be vacant in 2002. By itself, it is large enough to satisfy all of the University's housing requirements for the foreseeable future. The University also owns property in Square 103, where it estimated that housing for at least 200 students could currently be built. That square could be used more intensively for residential development if the University acquires the remaining lots, as it intends to do. Finally, the University owns a portion of Square 80, where it acknowledged that housing for 288 students could currently be built; if the District

Page 7
BZA Application No. 16553F

of Columbia transfers public property in the square, it could accommodate at least 650 beds. Order, March 29, 2001, at 4. Finally, the ANC identified portions of Squares 56, 79, 101, and 103 as suitable for dormitories. Tr. September 29, 2001, at 80. This recitation of campus sites that are available to the University demonstrates that it enjoys considerable latitude in deciding how to satisfy the on-campus housing requirement.

The University has acknowledged that financing new dormitories should not pose a problem and that five years would be sufficient time to construct new dormitories. Tr. September 17, 2001, at 21-22.

The housing requirements imposed as a condition for approval of the campus plan application are neither too severe nor too lax. The Order permits the University to avoid providing housing for up to 2400 undergraduates (30% of 8000). These may be housed in University dormitories or in private properties off campus, including in Foggy Bottom/West End. The University estimated that 15% of its student body normally would consist of students for whom dormitory life is unnecessary or unsuitable: commuters; married students; students with children; religious objectors; and students with disabilities. The University estimated that only 1239 of the 8044 undergraduates then registered in September 2001 (15.4%) fell into those categories. The Board Order therefore does not prevent the slightly more than 1100 other students to continue to be housed in University or private housing within the Foggy Bottom/West End neighborhoods. While that is significantly more than the parties in opposition want, the Board believes that a student population of that size—but no greater—is not incompatible with the Zoning Regulations or the Comprehensive Plan.

Because the housing condition is the essential element of the Board's approval of the application, the Order provides that if a court enjoins any aspect of the condition containing the housing requirement, or if the University fails to comply with the condition, no special exceptions or permits for non-residential uses will be granted; those already granted pursuant to the campus plan approved by this Order will be subject to suspension. The Order also requires the University to file and serve semiannual reports to facilitate the monitoring of compliance.

The University proposed a complex housing commitment. Essentially, the University proposed that it be allowed to count its off-campus housing (other than Pennsylvania House) toward meeting a goal of housing 70% (and effective 2004, 75%) of full-time undergraduates in University-controlled dormitories. The proposal was hedged with a number of restrictions. It excluded 15% of the student body, thereby lowering the base used for calculating the number of beds needed. It introduced a number of contingencies, such as voiding the housing requirement if graduate school enrollment falls. It also proposed to count beds in buildings that the University might construct outside the campus on Squares 58 and 81.

Aside from adding needless complexity, the proposal is inadequate because it essentially permits the University to continue to house an unacceptably large number of students in Foggy Bottom/West End. As the OP correctly noted, the University simply redefines terms to permit it to claim that it is housing a high percentage of its students while "actually not changing the situation on the ground, the protection of the Foggy Bottom neighborhood. . . ." Tr. September 21, 2001, at 21. The University conceded that its students want to live nearest the school. Yet, perversely, the University's proposal maintains the

Page 8
BZA Application No. 16553F

present status under which the campus is the one nearby place where a large portion of undergraduates cannot live.

The Board finds no justification for expanding the campus to include Squares 58 and 81. As noted, the University already has ample property within the campus plan boundaries specified by this Order to meet the Board's housing requirement condition. The University also recommended that the penalty for noncompliance with the housing requirement be a $100,000 "fine" payable to a public benefit program; the fine would be payable only if the University failed to cure the violation within one year. The Board believes that a fine of that magnitude (if within the Board's powers to impose at all) would constitute a nominal cost of doing business for an institution that at the end of fiscal year 2000 had total financial resources in excess of $781 million and has recently raised $394 million during a capital campaign. Exhibit 296, attachment D at 2. A year's delay in complying with the housing condition is unnecessary. The Board has phased in the requirement to accommodate students, and the record demonstrates that the University has sufficient control over its admissions process and size to match enrollment to housing availability.

ANC 2A offered two recommendations. One would force the University permanently to reduce its enrollment to 7380 students within two years and to accommodate all students on the campus immediately (except for waivers when specifically requested by individual students in certain categories). The Board concludes that a substantially reduced cap on enrollment is too onerous and inflexible and that the remainder of the proposal, for 100% on-campus housing, is probably infeasible during the life of the current plan. By contrast, the Board's solution, with its one- and five-year phases, is both feasible and reasonable. It freezes the number of students who need not be accommodated on campus to a reasonable number, including the estimated 15% for whom dormitory life would be inappropriate and unnecessary. It requires all the rest to be accommodated outside Foggy Bottom/West End beginning in August 2002 and on campus by August 2006. The second ANC proposal omits a cap on enrollment but would have the University prohibit any University undergraduate from living in Foggy Bottom. The proposal is misconceived. It places the ultimate burden on individual students, allowing the University to avoid using its campus to provide housing altogether. The focus of this campus plan proceeding, however, is on ensuring that the campus is used in a manner that does not adversely impact surrounding residential areas. It is the property owner's obligation to prevent such an impact, not that of innocent third parties. Moreover, requiring the Zoning Administrator to monitor and enforce a ban on where individuals reside would be extremely difficult at best, if not unlawful.

OP recommended that the University be required to accommodate 70% of its fall 2001 undergraduates on campus or in a "housing opportunity area." The housing opportunity area could include anywhere outside Foggy Bottom/West End, together with Square 122 and existing dormitories at the Aston apartment house and the "Hall on Virginia Avenue." Any enrollment increase beyond the fall 2001 base would also have to be accommodated on campus or in the housing opportunity area on a one-for-one basis. The Board has adopted these recommendations in part. The Board does not believe, however, that they go far enough to protect the surrounding communities. Indeed, OP candidly acknowledged that its proposal could theoretically permit the University to "have zero percent of their students on campus and still be in compliance." Tr. September 21, 2001, at 218. The Board therefore prefers that the University make more intensive use of its residentially-zoned campus. The Board is

Page 9
BZA Application No. 16553F

also conscious that its Orders should not be instruments for exporting University housing into other neighborhoods in order to protect Foggy Bottom/West End. The Board realizes, of course, that a reasonable interim period of five years is necessary to permit the University to construct more dormitories on campus. Nevertheless, there is no justification for not having sufficient on-campus housing at the end of that time to satisfy OP's numerical goals. As for existing off-campus dormitories, the University will be able to use them for student housing or for any other use permitted by the Zoning Regulations. After August 2002, however, beds in those facilities will no longer count toward the housing requirements in this Order.

Finally, the Foggy Bottom Association ("FBA") proposed that undergraduate enrollment be capped at 7881 until 75% of undergraduate students are housed on campus or in any property the University might acquire outside the ANC-2A area. The University would have until 2004 to achieve the 75% goal. Thereafter, the University would be permitted to increase enrollment so long as it had an on-campus bed for each additional student above 7881. The University would also be required to remove its students from 2424 Pennsylvania Avenue and Columbia Plaza by 2004. The Board has concluded that a "hard" cap on the number of students is unnecessary, given the other steps the Board is mandating, even though the March 29th Order contained such a cap. It is unnecessary because the goal of preventing further adverse impact on neighboring property can be achieved by simply requiring the University to provide sufficient on-campus housing for its students. As the University grows, so do the number of accommodations that need to be constructed. Because the link between enrollment size and the adverse impact that the University's use of its campus property has on neighboring property is severed by the reasonable provisions of this Order, a hard cap on university growth is no longer essential. Its elimination is responsive to the University's plea that it be allowed to maintain flexibility in its enrollment in response to market conditions. The FBA proposal is also inadequate to bring sufficient student housing to the campus. With respect to 2424 Pennsylvania Avenue and Columbia Plaza, the Board prefers to give the University limited flexibility in meeting the housing requirement. As part of the University's proposal, it offered to remove its students from both properties. The Board believes, however, that its revised Order should serve as a strong incentive to do so.

The Board concludes that the issues and concerns of OP and ANC 2A are adequately addressed by this Order on Remand which requires future University growth to occur in conjunction with future increases in on-campus housing, thereby minimizing the University's incentive to acquire property outside the campus boundary to house its undergraduate students and decreasing the threat to permanent housing stock and other property uses in the Foggy Bottom/West End area.

### III. Board Response to the Parties' Exceptions.

After reviewing exceptions filed by the parties, the Board made adjustments to its findings and conditions of approval of the campus plan and rejected other changes for the reasons that follow.[1]

---

1. Parties other than those specifically identified in the text also submitted exceptions to the proposed order. Their exceptions are addressed in the following discussion.

A. ANC 2A (exhibit 333).

1. The ANC objected to the Board's conditional inclusion of part of Square 122 in the campus, subject to the Zoning Commission's approval of a PUD modification. The modification would permit University use of the property, including use as a dormitory. The ANC is a party to the Commission's proceedings. Here, the ANC complains that it received no prior notice that the PUD property might be included in the campus; the University had not applied for its inclusion; the Board did not hear evidence concerning the probable traffic consequences of the PUD modification; and the modification is inconsistent with the Comprehensive Plan.

The Board's contingent inclusion of the PUD property cannot legitimately be construed as endorsing approval or disapproval of the pending PUD modification. Rather, it is simply a necessary acceptance of a *fait accompli* if the Zoning Commission gives *its* approval. The Zoning Commission has sole say over the PUD process. The Board has no control over the use of the property, traffic generation, or other consequences of Commission action. In that sense, the ANC's protests are misdirected. Traffic, consistency with the Comprehensive Plan, and the like are matters that the ANC must direct to the Commission. If the Commission approves the University's proposed modification, however, thereby expanding the University beyond its current campus, no purpose would be served in the Board's refusal to recognize that expansion. If anything, inclusion of a modified PUD would help ensure that the property will be used to provide housing for a specified minimum number of undergraduate students over the life of the campus plan. Since the boundary change is essentially technical should the PUD modification be approved, the Board believes no prior notice to the ANC was necessary.

2. The ANC also objected to the Board's selection of 8000 as the base number for calculating the housing requirement in Condition 9. The ANC points out that the undergraduate population was only 6857 at the time the University filed its application in 1999 and 7380 when the Board voted to approve the campus plan (with conditions) on February 13, 2001. According to the ANC, use of current enrollment as the base number "rewards" the University's "uncontrolled growth."

Although the ANC's criticism has some merit, the Board concludes that its selection of 8000 is justified. In the March 29, 2000, Order formally adopting the February 13 vote, the Board concluded that University use of its residentially-zoned campus for nonresidential purposes would imminently become objectionable. At the time, undergraduate enrollment stood at 7380, well above 1999's enrollment of 6857. The University's growth since February 13, forcing even more undergraduate students into Foggy Bottom/West End, has convinced the Board that the University's use of its campus has now become objectionable. It follows that some number greater than 7380 yields the "tipping point," the point at which the survival of the surrounding neighborhoods has become seriously threatened. That point cannot be determined with great precision. Using 8000 as the base number means that the University need not provide housing for 2400 undergraduates (30% of 8000); using 7380 translates into 2214 undergraduates without university housing (30% of 7380). Stated another way, using 8000 as the base number requires the University to supply 5600 on-campus accommodations; using 7380 would require 5786 beds ((7380 x 0.7 + (8000-7380)). Under either analysis, the difference is only 186, a relatively small number. While the Board might have chosen a different base

number, the number it chose was reasonable, especially if it makes satisfying Condition 9 during the life of this campus plan more feasible. The Board therefore declines to change the base number.

3. There is no need to reaffirm Condition 17, which requires the University to provide annual audited counts of the number of full-time undergraduates living in Foggy Bottom/West End to the Advisory Committee established in accordance with Condition 3. The March 29 Order remains in effect unless changed by this Order, expressly or by necessary implication.

Nevertheless, the ANC request, coupled with the Foggy Bottom Association's related request for additions to the reporting requirements in Condition 9, persuades the Board to modify its Order in two respects. First, the Board agrees that members of the Advisory Committee should be included among those to receive the semiannual reports required by Condition 9, just as they are included in Condition 17. Second, the Board agrees that the reports required by Condition 17 should be filed semiannually (rather than annually), contemporaneously with the related reports required by Condition 9; should be served on the ANC, Zoning Administrator, Zoning Commission, Office of Planning, and Advisory Committee; and should include more information than the Board initially requested.

## B. The University (exhibit 334).

1. The University challenged the Board's conclusion that use of its campus for nonresidential purposes adversely affects the neighboring area.

The University's assertion that its off-campus housing facilities had previously been used as hotels or other transient or commercial uses is exaggerated. The University bought the Dakota apartment house in the 2100 block of F Street. Even if the Dakota housed a number of students when the University acquired it, its acquisition for student housing permanently removed it from housing stock available to non-students. Similarly, the Aston was classified as an apartment house when the University acquired it. Exhibit 165 at 3 (R. 1523).[2] The University also bought an interest in Columbia Plaza, a complex that had previously been used primarily for permanent residents and has a right of first refusal to buy a larger share of the property. Exhibit 92 at 3 (R. 503). Columbia Plaza's general partner notifies the University of vacancies "up to our investment percentage" and the University "recommends" students for the vacancies. Tr. September 17, 2001, at 72-73, 77. It is likely that those "recommendations" translate into preferences for students. *Compare id.* at 77 (University does not know whether students are given preference) *with* tr. September 26, 2000, at 173 (R. 2610) (testimony by tenants' association that preference is given). The University leased Pennsylvania House twice. The Board received evidence, which it credits, that the University's initial lease caused a remodeling of apartments into furnished suites for students. The remodeled suites were not restored to long-term housing stock when the University's leases lapsed. Exhibit 185 at 3 (R. 1554). The most conspicuous example of the loss of permanent housing stock is Square 43, which the Board in 1988 explicitly refused to include within

---

2. References marked "R. __" refer to the pagination of the record on appeal to the District of Columbia Court of Appeals in *George Washington University v. Board of Zoning Adjustment*, No. 01-AA-571.

Page 12
BZA Application No. 16553F

the campus in order to preserve long-term residential housing. Application of George Washington University, No. 14455, Order, Feb. 25, 1988, at 34 ("The board believes the removal of Square 43 to be essential to the preservation and enhancement of residential uses in the Foggy Bottom neighborhood"); id. at 41. The University acquired over two-thirds of the square and leveled 33 townhouses. Exhibit 25 at 3-4 (R. 308-309). The new use for the property is solely student housing, excluding other potential residents.

These examples demonstrate the erosion of the long-term residential housing in Foggy Bottom/West End. As the Foggy Bottom Association correctly observed, "[o]nce properties are part of the university's inventory, they are irretrievably lost to the residential community." Exhibit 191 at 7; (R. 1684).

The University's assertion that it had not displaced longtime residents is also beside the point. The Comprehensive Plan calls for retaining existing businesses and employment opportunities. 10 D.C.M.R. § 1301.1. The Plan regards hotels as "key element[s] of ... economic development" and as "important activity generators," especially in Ward 2. 10 D.C.M.R. § 1331.1; see 10 D.C.M.R. § 1332.1 (creating an objective to increase hotel space in the ward). While increasing the concentration of transient facilities in Foggy Bottom/West End is undesirable, 10 D.C.M.R. § 1331.4, so is the loss of existing commercial activity, associated employment opportunities, and neighborhood amenities, such as hotel restaurants and public spaces. Even the loss of uses that are not purely residential, therefore, is a matter of proper concern. Moreover, as a witness cogently observed, a loss of short-term residential facilities exerts economic pressure to convert long-term residential properties to transient use. Tr. September 17, 2001, at 108-109.

Elimination of long-term residential housing and commercial properties through University off-campus acquisitions is not the only objectionable consequence of the University's failure to provide on-campus housing. It has forced large numbers of students to compete for housing in Foggy Bottom/West End. The Board received credible evidence that, in early 2000, students comprised more than 50% of the occupants of six large apartment houses and smaller but considerable percentages in several others. See, e.g., Exhibit 93 (R. 510-511); exhibit 272, attachment B (R. 3322); exhibit 200, attachment III (R. 2141). As OP noted, the University was unable to confirm or refute this testimony because it kept no statistics as to where students live. Exhibit 190 at 7 (R. 1643); Tr. September 26, 2000, at 217 (R. 2517).

The Board heard credible evidence that these concentrations of students had effectively turned apartment houses into dormitories and townhouses into fraternity houses. Tr. September 26, 2000, at 64 (R. 2436). Such large transient populations, in addition to those housed in the University's off-campus dormitories, undermine the residential stability of the already fragile Foggy Bottom/West End neighborhoods. The Board also received evidence of student misconduct in private housing. The supplemental findings cite two examples, in Columbia Plaza and Pennsylvania House. There are others. A letter from a resident complained that "[l]ast week there was beer can bowling in the hallway of my [Columbia Plaza] apartment building." Exhibit 179 at 1 (R. 1539). The Board heard testimony from a neighbor of undergraduates at another location: "They're wild. They drink. They make a mess, and we have to call the police. . . ." Tr. September 26, 2000, at 170 (R. 2607). Another

Page 13
BZA Application No. 16553F

witness spoke of having to summon the police on a weekly basis because of rowdy parties in a two-bedroom house occupied by six to ten students. Tr. September 26, 2000, at 186 (R. 2623); *see* Exhibit 236 & attachments (R. 2840, 2842-2844).

In short, there was substantial evidence before the Board to refute the University's contention that its failure to provide sufficient on-campus housing has not had objectionable consequences for the surrounding areas. As OP observed, the core issue is the "cumulative impact" of the University's actions. Tr. September 26, 2000 at 393-394 (R. 2765-2766). The communities' diversity has been so severely compromised that, at this point, the cumulative impact of increasing concentrations of students has become objectionable.

The University's protest, that the greatest damage to Foggy Bottom/West End was caused by freeway construction and other activities, is irrelevant to this campus plan proceeding even if true. Here, the only relevant issues are whether the plan should be approved and, if so, with what restrictions, if any. The evidence before the Board established that the University's failure to use its residential property for residential purposes was aggravating conditions in an already fragile neighborhood, whatever the initial cause for the area's decline. The Board heard credible testimony that university expansion is *now* the "driving force" in the neighborhoods' decline. Tr. September 26, 2000, at 323 (R. 2695). Conditions may only become worse without the Board's intervention. University expansion, without a corresponding provision of student housing, OP informed the Board, "will lead to the inevitable elimination of the Foggy Bottom Area as a recognizable residential neighborhood." Exhibit 190 at 19 (R. 1655); *see* Tr. September 26, 2001, at 218 (Tr. 2518) (expansion is objectionable because "there is so little left of the neighborhood housing stock and the neighborhood fabric"); *id.* at 232 (R. 2532) (Foggy Bottom/West End's problems are already "too acute"). There is therefore no need for the Board to explore the reasons for the onset of the neighborhoods' deterioration.

Finally, the Board rejects the University's argument that its burgeoning undergraduate population is irrelevant because the University's total student population has allegedly not increased, a proposition disputed by other parties. *See* Exhibit 191 attachment at 5 (R. 1682); *see also id.* attachment A (R. 1696) (showing growth of full-time undergraduate *and* undergraduate enrollment between 1985 and 1999). Even if the University's overall population has not varied, the growth in undergraduate enrollment is alone ample foundation for Condition 9. The University's own actions demonstrate why. With the surge of undergraduates over the past several years, the University acquired more dormitories in Foggy Bottom/West End. During the past academic year alone, it added more than 700 beds to its off-campus inventory to keep pace. Absent a showing by the University that the student population of Foggy Bottom/West End remained static, the Board must infer that the additional dormitories represent a net increase in the total Foggy Bottom/West End student population. The University told the Board that approximately 70% of its graduate students live outside the District of Columbia and that relatively few of the rest live in Foggy Bottom/West End. Exhibit 165 at 2 (R. 1522). That strongly implies that, as graduate enrollment falls and undergraduate enrollment rises, the number of students searching for housing in the two neighborhoods increases even without an overall increase in enrollment. The University previously acknowledged, however, that its student population will *not* remain static over the life of the campus plan. It expects a 20% increase in full-time equivalent student enrollment. Exhibit 21, appendix C (R. 124). Since undergraduate students have recently formed the larger share