Page 14
BZA Application No. 16553F

of that increase (Tr. September 13, 2000, at 168; R. 1934), ever larger masses would be forced to hunt for nearby housing.

2. The University's exceptions attempt to introduce new evidence well after the record closed, alleging that information it had previously provided to the Board in these lengthy hearings about the number of undergraduate students who commute understated the actual number by 50% to 100% or more.

The Board cannot accept the University's new evidence. It is inexcusably late. While the University contended that the information was never sought during the hearings, it bore the burden of proof on all matters in this proceeding under the District of Columbia Administrative Procedure Act: "In contested cases, except as may be otherwise provided by law, . . . the proponent of a rule or order shall have the burden of proof." D. C. Code § 2-509(b) (2001 ed.) The Board's Order on Fact Finding (September 13, 2001, at 2), offered the University "an opportunity to elaborate on or supplement the information provided in its responses to the Board's inquiries. . . ." The University declined the invitation by failing to "elaborate on or supplement" during the remand hearings. Even now, the University has not presented the Board with a proper motion to reopen the record to provide additional information.

The University cannot reasonably claim to have been unaware that a central element in the Board's inquiry in this campus plan proceeding was the number of students living in Foggy Bottom/West End. *See* 11 D.C.M.R. § 210.2. In fact, other parties explicitly complained repeatedly about the University's failure to provide data about its students' whereabouts. *See, e.g.*, Tr. September 26, 2000, at 223, 280-281 (R. 2523, 2652-2653).

To consider the University's new numbers at this late date would be unfairly prejudicial. Other parties have not had the opportunity to cross-examine or to submit rebuttal evidence. The figures may be based on double counting commuters who are also married, or have children, religious views, or disabilities. They may be aberrational. They may or may not be the direct consequence of the failure of the University to supply sufficient housing on campus for undergraduate students. No underlying data are before the Board to allow the new numbers' reliability to be evaluated. The University's previous submissions displayed substantial variability. During the hearings, for example, the University informed the Board that 1672 undergraduates lived in Foggy Bottom, 543 elsewhere in the District, and 1261 in Virginia and Maryland. Exhibit 230 at 2 (R. 2830). During the remand proceedings, the University informed the Board (as well as a United States district court) that only 829 students lived in Maryland and Virginia—a 50% discrepancy. Finding 2, above at 2. As Finding 2 reflects, the University assured the Board the latter number was reliable and verifiable. The problem is that these are all questions about which the Board would be forced to speculate. The current record provides the Board no basis to resolve them. The Board therefore rejects all exceptions based on information that was never introduced in the record.

Even if, however, the number of commuters is greater than the record evidence shows, the Board has noted that its conditional approval of the campus plan allows the University to avoid providing housing for 30% of its undergraduate students—the equivalent of, say, more than the entire senior class—and all of its graduate students. The Board's initial intention was to require the University to provide sufficient housing to accommodate the equivalent of all of its undergraduate students but to allow for

Page 15
BZA Application No. 16553F

a "carve-out" for students for whom dormitory living was inappropriate or unnecessary. During the many hearings on the campus plan, the University estimated that 15% of undergraduate students fit that description. This Order allows the University to decline to provide housing for *twice* that number. Thus, the Board's 30% allowance provides a reasonable cushion even if the information the University provided to the Board during the course of these proceedings was incomplete or inaccurate.

The Board's references to undergraduate students should not be misinterpreted. The Order does not dictate which students are to occupy University housing; it is designed only to relieve pressure on the surrounding communities created by the University's failure to provide sufficient on-campus housing. The number of undergraduate students was chosen as a benchmark for several reasons. Undergraduates are the fastest growing segment of the University's population. They constitute the only category of students for whom the University has acquired housing outside the campus and for whom it has traditionally provided housing. They are also the group that the University characterizes as having more "behavioral problems" and of being less mature. Exhibit 165 at 2 (R. 1522) (graduate students "are generally older and more mature" and "present fewer behavioral problems compared to undergraduates"). By obliging the University to provide 5600 beds on campus, and an additional bed whenever undergraduate enrollment exceeds 8000, the Board expects the number of students forced to find housing off-campus to decline and pressure on Foggy Bottom/West End to ease significantly, even absent restrictions on which students can occupy the on-campus beds. Nothing in the Board's Order, it bears repeating, can legitimately be construed to tell students where they can or must live. Rather, the Order simply requires the University to add residential space on its residentially-zoned campus so that undergraduates are not forced into the surrounding communities.

3. The University repeatedly notes that the Zoning Regulations permit universities to establish dormitories in certain residential districts as a matter of right. The Board agrees with that proposition and so held in *Appeal of Sheridan*, No. 16507, Feb. 11, 2000. But that is not the end of the analysis. The Zoning Regulations also provide that University property must be used so as not to become objectionable to neighboring property and must be used consistently with the Comprehensive Plan. While the Board cannot prohibit the University's creation of off-campus dormitories, it must assess the impact of a university's decision to use residentially-zoned campus property for nonresidential purposes. The record in these proceedings reveals that this University's failure to provide on-campus housing has directly harmed the surrounding communities and that the University's own off-campus expansion is a symptom of that harm. Under those circumstances, it is plainly within the Board's power to regulate the use of *campus* property, irrespective of off-campus rights conferred by the Zoning Regulations, whenever *campus* uses have adverse external effects and are inconsistent with the Comprehensive Plan.

4. Contrary to the University's objections, the Board's refusal to expand the campus border to squares 58 and 81 is essential to protect the southern border of the campus against further encroachment. OP testified that the southern flank is at great risk. Tr. September 26, 2000, at 216 (R. 2516). The two squares contain a variety of current uses that the Comprehensive Plan suggests are worthwhile preserving, including a hotel, drug store, rooming house, offices, and residences, among others. To designate the squares as parts of the campus is to create hydraulic pressure on existing uses, as the University's previous on-campus expansion has demonstrated through the years. Considering the

Page 16
BZA Application No. 16553F

availability of ample space for the construction of dormitories on the campus as currently designated, the Board sees no justification for further enlargement.

5. The University objected that compelling it to use residentially-zoned property for student housing gives an unwarranted preference to housing over other academic needs. Although the Board is sympathetic to the University's other needs, the Board's obligation is to ensure compliance with the Zoning Regulations and the Comprehensive Plan. Without Board intervention, there may be no remaining space on campus for student housing. The University took inconsistent positions on that likelihood. On the one hand, it told the Board that "we have a mature, older campus and it's getting to be a zero sum [game], that if you do academic, you can't do housing." Tr. September 13, 2000, at 176 (R. 1942). On the other hand, it told the Board that its "campus is not densely developed when compared to the surrounding commercial area." Exhibit 22 at 27 (R. 105); *id.* at 23 (R. 100) (even with planned growth, gross floor area will be "well below" the regulatory limit). In any event, the Order places no limit as to where the University can locate its academic buildings. OP and other witnesses cited Georgetown University's decision to move its law school outside its campus as an example of an option for George Washington University to consider. Tr. September 26, 2000, at 44, 259 (R. 2416, 2559). The University may also consider converting some commercially-zoned properties into classrooms or administrative offices.

6. The Board imposed the requirement that the University accommodate a minimum number of students on campus by late 2006 for three reasons: first, to absorb most of the excessive number of University students who live in Foggy Bottom/West End because of the absence of on-campus housing; second, to prevent the Board Order from being the unintentional instrument for placing strains on other neighborhoods; third, to ensure that the residentially-zoned campus is put to more intensive residential use. The first two reasons have been adequately addressed. The third deserves elaboration.

One of the Council's concerns in the Comprehensive Plan is to foster greater residential use downtown and in the ring of neighborhoods surrounding downtown. 10 D.C.M.R. § 1325.1. The Council expressed concern about the loss of housing stock in Foggy Bottom/West End, "aggravated by the lack of dormitory construction on the George Washington University (GWU) campus." 10 D.C.M.R. § 1325.3. Among the Plan's prime objectives are the conservation and enhancement of existing residential neighborhoods and the creation of new ones. 10 D.C.M.R. § 1326. If the campus is entirely devoted to nonresidential uses, it will be irrevocably lost to residential use despite its residential zoning. Institutional nonresidential space creates dead zones, robbing the area of vitality and diversity, especially after classes end in the evenings and during weekends, holidays, and school vacations. More intensive residential use should add "street vitality and safety." Tr. September 26, 2000, at 323 (R. 2695). It is therefore consistent with the Comprehensive Plan to direct the University not only to alleviate the pressures on Foggy Bottom/West End (10 D.C.M.R. § 1327.1(b)), but also to insist on a residential core on campus. See 10 D.C.M.R. § 1342.1 (University campus plans are to "take account of the residential . . . status of Foggy Bottom in any future development"). This is not a new concern. In the 1985 campus plan, the Board directed the University to retain on-campus apartment houses that it was in the process of acquiring for housing and to build at least one new on-campus dormitory. *Application of George Washington University*, No. 14455, February 25, 1988, at 37-38.

Page 17
BZA Application No. 16553F

7. Although the University charged that the "record establishes that there is no way the University can meet this [on-campus] housing in the fall of 2006," it failed to cite any part of the record for support. If anything, the record contains testimony that can reasonably be interpreted to the contrary. The Board was informed that the University needed five years, measured from September 13, 2000, the date of the testimony, to construct dormitories satisfying its promise to add more beds: "We're going to add more beds than students in five years. But we need the five years. It takes time to build beds. . . ." Tr. September 13, 2000, at 153 (R. 1919); see, similarly, tr. September 17, 2001 at 21-22 ("We thought the five-year time frame made sense because we need time to build new residential facilities"). The Board has given the University an additional year, until August 2006, to supply more on-campus housing. In September 2000, the University also testified that it would shortly begin the process to allow construction of a 500-bed dormitory on campus, on Square 54 or elsewhere. It told the Board that it was so committed to moving "aggressively" to obtain approval for development of Square 54 that it "pledge[d]" to file at least a first-stage PUD application with the Zoning Commission "within 15 months." Tr. September 26, 2000, at 355 (R. 2727). That fifteen-month period ended December 13, 2001. The University also told the Board that it would be possible within five years to build a 500-bed dormitory on Square 54 or elsewhere on campus prior to commercial development of Square 54. Exhibit 196 at 3 (R. 1865); Tr. September 13, 2000, at 213 (R. 1979).

Based on the University's own testimony and other evidence in the record, the Board reasonably concluded that the University would be able to satisfy the Condition 9 requirements by August 2006. The University had 4108 on-campus beds as of September 2001. Finding 8, above at 3. Another 1093 will be built by fall 2004 (if Square 122 is included), raising the total of 5201. See above at 6. The University also has the ability to provide another 988 beds on campus: 500 on Square 54 or an alternate site; 200 on Square 103; and 288 on Square 80. See above at 6; exhibit 196 at 3 (R. 1865). That adds up to 6189 beds together, more than enough to satisfy Condition 9 absent large increases in enrollment.

There is, however, merit to the University's objection that Condition 9 does not provide relief if construction of on-campus dormitories is delayed for reasons outside the University's control. The Board understands that unusual circumstances may force construction delays despite the University's prompt, expeditious, and good-faith efforts.

The Board has therefore amended Condition 9 to allow for application to the Zoning Commission for additional time to meet on-campus housing goals under limited circumstances, after notice and hearing. The additional time is to be equivalent to time lost as a result of unusual delays by government agencies in processing applications for special exceptions or other construction permits; the resolution of third-party appeals to the District of Columbia Court of Appeals or to another judicial forum; or construction delay resulting from acts of God, contractor delays, or acts of third parties. Additional time is not authorized if the delay is fairly attributable to the University. In particular, the amendment does not authorize extensions of the Condition 9 deadlines for time lost as a result of delays in the processing of PUD applications. The University can build housing on campus through special exceptions, and the Board is unwilling to allow controversial nonresidential projects to hold campus housing hostage. The University remains free, of course, to apply for mixed-use PUDs but the University's choice to do so cannot serve to extend the time for providing urgently needed housing beyond the 2006 deadline.

Page 18
BZA Application No. 16553F

It is worth noting that the principal sanction for failure to build sufficient housing by 2006 is the denial of permission to construct and occupy new nonresidential buildings. That penalty bites only when the University has given nonresidential projects priority over residential ones. In other circumstances, factors preventing the University from completing housing on time should normally delay other projects equally.

8. The Board declines the University's invitation to alter the requirement in Condition 9.a to provide more housing on campus or outside Foggy Bottom/West End between August 2002 and August 2006. The University asserted that it spent "millions of dollars" to acquire and convert its present inventory of off-campus housing. It also claimed that there is no record evidence that it will be able to acquire housing outside Foggy Bottom/West End for four years.

As the Board previously noted, above at 9, the Board Order does not prevent the University from continuing to use the Foggy Bottom acquisitions for dormitories. It only prevents such acquisitions from counting toward the undergraduate housing goal. If the University finds it infeasible to continue their current use, nothing in the record suggests an impediment to their return to pre-existing uses or to long-term residential use. On the contrary, the University already owns a number of structures that it uses for investment income. For example, the University owns One Washington Circle but continues to operate it as a hotel. Tr. September 17, 2001, at 103. The Board heard testimony (never rebutted) that at least one of the off-campus dormitories was acquired as investment property and was converted only to accommodate an unexpected spurt in enrollment. Tr. September 26, 2000, at 72 (R. 2444). More than 700 of the off-campus accommodations, moreover, were acquired after the Board clearly put the University on notice, in its March 29, 2000, Order (at 10-11), that the Board intended to prevent Foggy Bottom/West End from being forced to absorb additional dormitories.

Although it is true that the record does not specifically establish that the University can acquire four-year leases for off-campus housing, it does establish that the University has acquired property in a shorter time in a much smaller geographic area. Finding 14, above at 4. That evidence, combined with the University's ample financial resources, is sufficient for the Board to conclude that the University should be readily able to find the off-campus space necessary to comply with Condition 9 in the District or elsewhere in the metropolitan area. OP testified that it would be "more than happy" to assist in locating interim space. Tr. September 20, 2000, at 231 (R. 2531).

9. The University informed the Board that its application to the Zoning Commission for a PUD modification for Square 122 has been amended to reduce the number of projected student accommodations to 193 from 200. The University's explanation is that the reduction stems from agreement with the West End Citizens Association to provide neighborhood amenities such as retail space. Because the reduction is minor and the University remains subject to the housing requirements of Condition 9, the Board has modified Condition 2 to the extent of redrawing the campus boundary to include the Square 122 PUD once beds for at least 193 undergraduates are made available there.

10. In passing, the University asserted that the Board failed to consider the University's proposal to modify Condition 15(e) relating to student automobile registrations. The University made that proposal on remand (without objection) but presented no new evidence. Tr. September 21, 2001, at 194.

Page 19
BZA Application No. 16553F

Absent a compelling reason to change, the Board retained Condition 15(e) and found no need to make additional findings on remand. The Board has placed a more stringent automobile registration condition in an Order approving another campus plan (*Application of Georgetown University*, No. 16566, Mar. 29, 2001), and the Zoning Commission has voted to include similar language in yet another campus plan order currently under consideration. *Application of American University*, Z.C. 00-36CP/16638.

### C. The Foggy Bottom Association (exhibit 330).

1. The Foggy Bottom Association criticized the Board's use of 8000 as the base number in Condition 9, echoing the ANC. It regarded the growth of undergraduate enrollment to result from the "University's blatant disregard of the expressed intent" of the Board's February 13 oral decision and March 29 Order. The Association recommended that undergraduate enrollment be permanently capped at 7881 and the University be required to provide housing for 5911 of those students (75% of 7881).

The Board declines to revisit the formula contained in Condition 9 largely for the same reasons that the Board rejected the ANC's proposed change. The fact that two community organizations could plausibly come up with different formulations illustrates how people can reasonably disagree about precisely where the line should be drawn. In addition, however, the recommendation for a permanent cap on undergraduate enrollment remains unnecessary and undesirable. *See* above at 8, 9. The campus plan that the Board is approving achieves consistency with the Zoning Regulations and Comprehensive Plan through reasonable restrictions on land use. Within five years, the University must supply sufficient on-campus housing for at least 70% of its undergraduate students. Condition 9 will act as a "soft cap" on enrollment by requiring the University to have an additional on-campus bed available for each student it admits over the 8000 base number. Condition 9 is therefore a land-use tool that satisfies the Zoning Regulations and the Comprehensive Plan without intruding in the University's academic decisions.

2. The Association protests that the Order does not address the growth of graduate enrollment and the possibility that graduate students will fill accommodations in Foggy Bottom/West End vacated by undergraduates. However, there is little evidence in the record on which the Board could reasonably rely to evaluate the need for on-campus housing for graduate students. What evidence there is suggests that most graduate students (whose numbers appear to have been declining in recent years) do not live in Foggy Bottom/West End. *See* above at 13.

3. As noted above (at 11), the Board agrees with the need for modifications in the reporting requirements and has revised Conditions 9 and 17 accordingly.

4. The Association's apprehensions about enforcement of the Board Order appear baseless. The Board anticipates that the University will comply with this Order in good faith. If not, the remedies provided by this Order and by law should be sufficient to call the University to account. In particular, the Order's requirement that no nonresidential construction may take place when the University is out of compliance is a serious sanction. Tr. September 20, 2000, at 153 (R. 1919); Tr. September 26, 2000, at 366 (R. 2738). The Order provides the community, the Zoning Commission, which henceforth

Page 20
BZA Application No. 16553F

reviews special exception applications for the campus (Z.C. Order No. 932, 47 D.C.R. 9725 (2000)), and the Department of Consumer and Regulatory Affairs with the information needed to monitor compliance closely. Aside from these provisions, violations of the campus plan can also be prosecuted under the Civil Infractions Act, D.C. Code § 2-1801.01 *et seq.* (2001 ed.), and the Zoning Act of 1938, D.C. Code § 6-641.09 (2001 ed.); *see* 11 D.C.M.R. §§ 3204.1-3204.5 (1995), 16 D.C.M.R. § 3229.1(c) (1993).

## IV. Conditions.

Accordingly, it is **ORDERED** that the application is **GRANTED** subject to the following **CONDITIONS** contained in the Order of March 29, 2001, as amended in the following paragraphs:

Condition 2 is amended to read:

> 2. The campus boundary as depicted in the plan offered by the Applicant is modified and expanded to encompass certain University-owned properties located outside of and adjacent to the southern boundary as previously drawn. The campus plan boundary shall be redrawn to include within it the Dakota at 2100 F Street in Square 81; 2201 Virginia Avenue (Riverside Towers), addresses 518 through 526 22nd Street in Square 58; addresses 2206 and 2208 F Street in Square 58; and the University-owned property in Square 43. In addition, in the event that the Zoning Commission approves the University's application for modification of the approved PUD for Square 122, the campus boundary shall be redrawn to include the PUD property in Square 122 once at least 193 beds for undergraduates are made available there.

Condition 9 is amended to read:

> 9. The University must ameliorate the adverse consequences of its failure to supply sufficient housing for its full-time undergraduate students on campus by taking the following steps:
>
> a.  Beginning no later than August 31, 2002, the University shall provide beds for at least 5600 full-time undergraduate students on campus or outside Foggy Bottom/West End (as the terms "campus" and "Foggy Bottom/West End" are defined in this Order).
>
> b.  Beginning in August 2002, whenever the head count of full-time undergraduate enrollment exceeds 8000 (the "base number"), the University shall provide one bed on campus or outside the Foggy Bottom/West End area for each full-time undergraduate in excess of the base number.
>
> c.  No later than August 31, 2006, the housing requirements in subparagraphs a. and b. of this condition shall be met exclusively by on-campus housing. The

Page 21
BZA Application No. 16553F

> Zoning Commission may extend this deadline after notice and public hearing but only (1) to the extent of time lost as a result of unusual delays by government agencies in processing applications for special exceptions for residential projects; (2) for the duration of third-party appeals to the District of Columbia Court of Appeals or to another judicial forum from the grant of a special exception for a residential project; (3) to the extent of time lost as a consequence of construction delay resulting from acts of God, contractor delays, or acts of third parties. No extension may be granted for delays fairly attributable to University actions or for delays resulting from the processing of Planned Unit Development (PUD) applications before the Zoning Commission or from judicial challenges to PUD approvals.

d. Beginning February 28, 2002, and semiannually thereafter in August and February, the University shall file with the Zoning Commission, Zoning Administrator, the Office of Planning, ANC 2A, and members of the Advisory Committee established in accordance with Condition 3 reports under oath giving (1) the number of full-time undergraduate students then enrolled; (2) the number of University-supplied beds (a) occupied by and (b) made available to full-time undergraduate students on campus; (3) the number and location of University-supplied beds (a) occupied by and (b) made available to its full-time undergraduate students outside the Foggy Bottom/West End area; (4) the number and location of University-supplied beds (a) occupied by and (b) made available to its full-time undergraduate students within Foggy Bottom/West End. For purposes of these reports, the term "University supplied beds" shall include beds in any property in which the University has an ownership, leasehold, or contractual interest. Each report shall be accompanied by supporting documentation and full explanations of methods, assumptions, and sources used to compile information in the report.

e. No special exception shall be granted and no permit to construct or occupy buildings for nonresidential use on campus may be issued, and existing special exceptions and permits issued pursuant to the campus plan approved by this Order shall be subject to suspension and revocation, whenever a semiannual report reveals that the University is not in compliance with the provisions of this condition except special exceptions and permits for projects in which a student housing component would occupy at least 50% of the FAR. In addition, Condition 20 of the March 29, 2001, Order, shall apply to violations of this condition.

f. The foregoing condition is an integral, non-severable aspect of the Board's approval of this application. If any portion of this condition is declared void for any reason by any court in any proceeding, no application for a special exception will be processed and no permit to construct or occupy buildings for

Page 22
BZA Application No. 16553F

    non-residential use on campus may be issued until and unless the Board thereafter orders otherwise.

Condition 17 is amended to read:

    17. Starting in the Fall 2001 registration process, the University shall gather information about the local addresses of the full-time undergraduate population. The University shall update the information semiannually. Beginning February 28, 2002, and semiannually thereafter in August and February, the University shall provide the Zoning Commission, Zoning Administrator, ANC 2A, Office of Planning, and Advisory Committee with an audited census of the number of full-time undergraduate students residing in (1) Foggy Bottom/West End outside the campus plan boundaries; (2) the District of Columbia outside the campus plan boundaries and Foggy Bottom/West End, organized by postal zip codes; (3) Maryland; and (4) Virginia. Each semiannual report shall also include a good faith estimate of the number of married students and students with children encompassed in each category, (1)-(4). The latest semiannual report shall be included with each application for a special exception filed pursuant to the approved 2001 Campus Plan.

**Vote on Remand to Alter Conditions 2 and 9:**

    5-0    (Sheila Cross Reid, Anne M. Renshaw, Carol J. Mitten, Geoffrey H. Griffis, David W. Levy, to grant subject to stated conditions).

**Vote to Issue Proposed Remand Order for Exceptions:**

    4-0    (Geoffrey H. Griffis, Anne M. Renshaw, Carol J. Mitten, and David W. Levy, to issue the proposed order)

**Vote to Issue Final Order:**

    4-0    (Geoffrey H. Griffis, Anne M. Renshaw, David W. Levy, and Carol J. Mitten (by absentee vote), to issue the final order as amended at the public meeting on December 11, 2001)

**BY ORDER OF THE D.C. BOARD OF ZONING ADJUSTMENT**

Each concurring member has approved issuance of this Order.

    ATTESTED BY: _____
                        JERRILY R. KRESS, FAIA
                        Director

Page 23
BZA Application No. 16553F

Final Date of Order: **JAN 2 3 2002**

PURSUANT TO 11 D.C.M.R. §3125.6, THIS ORDER WILL BECOME FINAL UPON ITS FILING IN THE RECORD AND SERVICE UPON THE PARTIES. UNDER 11 D.C.M.R. §3125.9, THIS ORDER WILL BECOME EFFECTIVE 10 DAYS AFTER IT BECOMES FINAL.

PURSUANT TO 11 D.C.M.R. § 3205, FAILURE TO ABIDE BY THE CONDITIONS IN THIS ORDER, IN WHOLE OR IN PART, SHALL BE GROUNDS FOR THE REVOCATION OF ANY BUILDING PERMIT OR CERTIFICATE OF OCCUPANCY ISSUED PURSUANT TO THIS ORDER, AND MAY RESULT IN THE IMPOSITION OF FINES AND PENALTIES PURSUANT TO THE CIVIL INFRACTIONS ACT, D.C. CODE §§ 2-1801.01 TO 2-1803.03 (2001 ED.)

THE APPLICANT SHALL COMPLY FULLY WITH THE PROVISIONS OF THE HUMAN RIGHTS ACT OF 1977, D.C. LAW 2-38, AS AMENDED, CODIFIED AS CHAPTER 14 IN TITLE 2 OF THE D.C. CODE. *SEE* D.C. CODE § 2-1402.67 (2001). THIS ORDER IS CONDITIONED UPON FULL COMPLIANCE WITH THE HUMAN RIGHTS ACT. THE FAILURE OR REFUSAL OF THE APPLICANT TO COMPLY SHALL BE A PROPER BASIS FOR THE REVOCATION OF THIS ORDER.

## GOVERNMENT OF THE DISTRICT OF COLUMBIA
### BOARD OF ZONING ADJUSTMENT



**BZA APPLICATION NO. 16553-F**

As Director of the Office of Zoning, I hereby certify and attest that on **JAN 2 3 2002**, a copy of the foregoing Order was mailed first class, postage prepaid, to each party and public agency who appeared and participated in the public hearing concerning this matter, and who is listed below:

Maureen Dwyer, Esquire
ShawPittman
2300 N Street, NW
Washington, D.C. 20037-1128

Jack Evans, Councilmember
Ward Two
The John Wilson Building
1300 Pennsylvania Avenue, NW, Suite 106
Washington, D.C. 20004

Maria Tyler, Commissioner
Single Member District 2A03
949 25th Street, NW
Washington, D.C. 20037

Elizabeth B. Elliott, Chairperson
Advisory Neighborhood Commission 2A
C/O St. Mary's Court
725 24th Street, NW
Washington, D.C. 20037

Jeff Marootian, Commissioner
Single Member District 2A06
2212 I Street, NW, Suite #D206
Washington, D.C. 20037

Richard Sheehey
Advisory Neighborhood Commission 2A
C/O St. Mary's Court
725 24th Street, NW
Washington, D.C. 20037

BZA ORDER 16553F – Attestation Sheet
PAGE NO. 2

Dorothy Miller, Commissioner
Single Member District 2A05
2440 Virginia Avenue, NW, #D206
Washington, D.C. 20037

James McLeod
2424 Pennsylvania Avenue, Suite 407
Washington, D.C. 20037

Sara Maddux, Representative
Monroe House Condominium Association
522 21st Street, NW
Washington, D.C. 20006

Barbara Spillinger
2500 Virginia Avenue, NW
Washington, DC 20037

Andrew Altman, Director
D.C. Office of Planning
801 North Capitol Street, N.E., Suite 400
Washington, D.C. 20002

Kenneth G. Laden
Administrator
District Division of Transportation
Department of Public Works
2000 – 14th Street, NW
Washington, D.C. 20009

Toye Bello, Acting Zoning Administrator
Building and Land Regulation Administration
Department of Consumer and Regulatory Affairs
941 North Capitol Street, NE, Suite 2000
Washington, D.C. 20002

James T. Draude, Esquire
Driscoll & Draude
1230 31st Street, NW, Second Floor
Washington, D.C. 20007

Jacqueline Lemire, President
Foggy Bottom Association
2555 Pennsylvania Avenue, NW
Apt. 509
Washington, D.C. 20037

BZA ORDER 16553F – Attestation Sheet
PAGE NO. 3

Ellie Becker, Vice-President
Foggy Bottom Association
2528 I Street, NW
Washington, D.C. 20037

Alan Bergstein
Office of the Corporation Counsel
441 4th Street, N.W., 7th Floor
Washington, DC 20001

Attested By: _____
JERRILY R. KRESS, FAIA
Director